**FILED**

NOV 18 2014



CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

FLANDREAU SANTEE SIOUX TRIBE,
a Federally-recognized Indian tribe,

            Plaintiff,

              v.

ANDY GERLACH, Secretary of Revenue
of the State of South Dakota; and DENNIS
DAUGAARD, Governor of the State of
South Dakota,

            Defendants.

CIVIL NO. 14- 4171

**VERIFIED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

## INTRODUCTION

Comes now the Flandreau Santee Sioux Tribe, a federally-recognized Indian tribe, (hereinafter the "Tribe" or the "Flandreau Tribe") and alleges as follows:

1.    This action seeks a judgment declaring that, under federal law, the State of South Dakota does not have authority to impose its use tax on the use, storage or consumption, by nonmembers of the Tribe, on the Tribe's reservation, of goods and services purchased by nonmembers from the Tribe at the Tribe's gaming facility, which is operated pursuant to and in accordance with the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721, (the "Tribe's gaming facility" or the "Tribe's Casino Complex") and that the State lacks authority to require the Tribe to collect such use taxes from such non-member patrons and remit such taxes to the State.

2.    This action also seeks a declaratory judgment that federal law prohibits the State of South Dakota from refusing to reissue alcoholic beverage licenses to the Tribe for the Tribe's

gaming facility on the basis that the Tribe has failed to remit to the Department of Revenue "all use tax incurred by nonmembers as a result of the operation of the licensed premises, and any other state tax." SDCL § 35-2-24.

3.      This action also seeks a declaratory judgment that pursuant to IGRA , the State of South Dakota does not have authority to regulate the Tribe's sale of alcoholic beverages at the Tribe's gaming facility.

4.      This action also seeks preliminary and permanent injunctions enjoining the Defendants from imposing or seeking to impose on the Tribe an obligation to collect and remit these taxes, from refusing to reissue alcoholic beverage licenses to the Tribe based on alleged delinquencies in remitting these taxes, and from taking any action that would deny to the Tribe any of the rights and privileges of a holder of a State alcoholic beverage license on the grounds that the Tribe does not hold such a license for the Tribe's gaming facility.

5.      The Tribe also seeks a declaratory judgment that "the State does not have jurisdiction to assess sales and use tax on transactions between the Tribe and non-members taking place in a Tribally owned gambling casino" (operated by the Tribe pursuant to and in accordance with IGRA), in order that the Tribe may recover funds it deposited pursuant to a Deposit Agreement (a true and complete copy of which is attached hereto as **Exhibit A**) entered into between the Tribe and the State of South Dakota in connection with the consolidated litigation concerning State taxation jurisdiction, captioned *Sisseton-Wahpeton Dakota Nation, et al. v. South Dakota, et al.*, Case No. 93-1033 (D.S.D.) and *Flandreau Santee Sioux Tribe v. State of South Dakota, et al.*, Civil No. 94-4086 (D.S.D.).

2

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1362, in that this is a civil action arising under the Constitution, laws, or treaties of the United States, this is a civil action arising under one or more Acts of Congress regulating commerce, and this is a civil action brought by an Indian tribe with a governing body duly recognized by the Secretary of the Interior wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

7.      This action arises under the Constitution, laws, or treaties of the United States, including but not necessarily limited to the following: the Interstate and Indian Commerce Clauses, U.S. Const. art. I, § 8, cl. 2 & 3; the Supremacy Clause, U.S. Const. art. VI, cl. 2; the Due Process and Equal Protection Clauses of the Fourteenth Amendment, U.S. Const. amend XIV, § 1; the Indian Trader Statutes, 25 U.S.C. §§ 261-264, and the accompanying regulations, 25 C.F.R. Part 140; the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, and the accompanying regulations, 25 C.F.R. Parts 501-599; the Declaratory Judgments Act, 28 U.S.C. §§ 2201-2202; the Statehood Enabling Act of February 22, 1889, c. 180, § 4, 25 Stat. 676; and the federal common law.

8.      The Tax Injunction Act, 28 U.S.C. § 1341, does not bar this action because it does not apply to civil actions brought by Indian tribes under 28 U.S.C. § 1362. *See, e.g., Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 470-74 (1976); *U.S. on Behalf of Cheyenne River Sioux Tribe v. State of South Dakota*, 105 F.3d 1552, 1560 n.15 (8th Cir. 1997).

3

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2), in that each of the defendants herein reside in this judicial District, and a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial District.

## PARTIES

10.     The Flandreau Santee Sioux Tribe is a federally-recognized Indian tribe with offices located on the Flandreau Indian Reservation, 603 W. Broad Ave., PO Box 283, Flandreau, SD 57028.

11.     Dennis Daugaard is the Governor of the State of South Dakota, with offices located at Office of the Governor, 500 E Capitol Ave., Pierre, SD 57501. The Governor is the principal agent of the State of South Dakota in administering and carrying out the laws and policies of the State. *See* SDCL § 1-7-1. Governor Daugaard is sued in his official capacity.

12.     Andy Gerlach is the Secretary of Revenue of the State of South Dakota, with offices located at 445 East Capitol Avenue, Pierre, SD 57501. In this capacity he has the responsibility to administer the Department of Revenue and carry out and enforce the tax laws of the state, including the sales and use taxes, and the laws of the state pertaining to the issuance and reissuance of alcoholic beverage licenses. *See* SDCL §§ 1-47-3, 10-1-13, 10-1-14, 35-1-2. Secretary Gerlach is sued in his official capacity.

## GENERAL ALLEGATIONS

### *The Tribe*

13.     The Flandreau Santee Sioux Tribe is comprised primarily of descendants of the Mdewakanton, Wahpekute and other bands of the Santee, or Dakota, division of the Great Sioux Nation. In 1869, pursuant to and in accordance with the provisions of the Fort Laramie Treaty of

1868, art. VI, 15 Stat. 635, twenty-five Santee Sioux families established a colony of homesteads along the Big Sioux River in the area that would become Flandreau, South Dakota.

14.    The colony of Santee Sioux at Flandreau formed a Tribal Council in 1929. After Congress enacted the Indian Reorganization Act of June 18, 1934 (the "IRA" or the "Act") c. 576, 48 Stat. 984, codified as amended at 25 U.S.C. § 461 *et seq.*, the Indians of the colony voted in 1935 to accept the Act pursuant to section 18 of the Act, 25 U.S.C. § 478, and the Flandreau Santee Sioux Tribe organized under a Constitution and Bylaws, ratified by the Tribe and approved by the Secretary of the Interior in 1936 pursuant to section 16 of the Act, 25 U.S.C. § 476. Later that year, the Secretary of the Interior issued the Tribe a Corporate Charter pursuant to section 17 of the Act, 25 U.S.C. § 477.

15.    The Tribe is included on the list of recognized Indian tribes published by the Secretary of the Interior pursuant to 25 U.S.C. § 479a-1. *See* Indian Entities Recognized and Eligible to Receive Services From the Bureau of Indian Affairs, 79 Fed. Reg. 4748, 4750 (Jan. 29, 2014).

16.    The Tribe's territory is generally known as the Flandreau Indian Reservation, and is comprised of lands held in trust by the United States government on behalf of the Tribe in accordance with the IRA and other applicable federal laws.

17.    The Tribe has a comprehensive body of civil and criminal laws applicable to activities and transactions on the Flandreau Indian Reservation.

18.    Depending on the type of goods or services involved, the laws governing activities and transactions at the Tribe's Casino Complex include the Tribe's Liquor Control Ordinance, certified and published by the Secretary of the Interior, 58 Fed. Reg. 16330 (Mar. 25, 1993); the Tribe's Class III Gaming Ordinance, approved by the Chairman of the National Indian Gaming

Commission (the "NIGC") pursuant to IGRA on August 19, 1999; the Tribal Tax Act, Title 23 of the Flandreau Santee Sioux Law and Order Code; and the Tribal-State Gaming Compact, approved by the U.S. Department of the Interior's Assistant Secretary – Indian Affairs pursuant to IGRA on August 31, 2011.

19.     The Tribe imposes sales and use taxes of 6% on tangible personal property and services sold and/or used within its jurisdiction, pursuant to its Tribal Tax Act. The Tribe uses the revenues it collects from these taxes to support essential governmental programs for Indians and non-Indians alike. The Tribe also imposes other special taxes pursuant to the Tribal Tax Act, including a tax on cigarettes and other tobacco products, a tax on motor vehicle fuel, and a tax on the rental of a room at a lodging establishment.

20.     The Tribe provides a forum for resolution of civil and criminal litigation for matters arising on the reservation and involving members or non-members, including customers of the Tribe's Casino Complex.

21.     Pursuant to contractual agreements with local government, the Tribe contributes 30% of the City of Flandreau Police Department's operating costs, and contributes significant funds to the city's volunteer fire department, to provide police and fire protection on the Tribe's reservation, including at the Casino Complex.

22.     The roads on the reservation, including those providing access to the Casino Complex, are built and maintained by the Bureau of Indian Affairs with funds provided by the federal government through a contract between the Tribe and the Bureau of Indian Affairs pursuant to the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450, et seq.

### *The Tribe's Casino Complex*

23.    The Tribe owns and operates the Royal River Casino (the "Tribe's gaming facility" or the "Tribe's Casino Complex").

24.    The Tribe's gaming facility is an enterprise comprised of several departments operating within three separate but adjacent premises, which the Tribe operates d/b/a the "Royal River Casino," the "Royal River Bowling Center" (also known as the "Royal River Family Entertainment Center"), and the "First American Mart."

25.    The Tribe holds alcoholic beverage licenses issued by the State of South Dakota for each of the three premises:  the main building of the Royal River Casino (the "Main Casino"), the Royal River Bowling Center (the "Bowling Center") and the First American Mart (the "Mart").

26.    The Tribe's Casino Complex is located on the Flandreau Indian Reservation, on land held by the United States in trust for the Tribe, all of which is "Indian country" as defined by 18 U.S.C. § 1151.

27.    The Tribe operates the Casino Complex pursuant to and in conformance with the federal Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721; the Tribe's Gaming Ordinance adopted and approved in accordance with IGRA, 25 U.S.C. § 2710(d)(2); and the Tribal-State Gaming Compact entered into between the Tribe and the State and approved in accordance with IGRA, 25 U.S.C. § 2710(d)(3) and (8).

28.    The Casino Complex's gaming departments, and its hotel, gift shop, restaurants and entertainment venues (not including the Bowling Center) are located at the Main Casino.  The Tribe began construction of the Main Casino building in 1997, and opened the Main Casino in July 1997.  The Tribe developed and opened a new hotel wing of the Main Casino in about 2001. The Tribe acquired financing of approximately $21 million to develop and construct the Main

7

Casino building, including the addition of the hotel wing. The Tribe has fully repaid these loans with Tribal funds.

29.     The Tribe operates approximately 407 class III gaming machines, eight blackjack tables and two poker tables at the Main Casino. The Main Casino also includes a 120-unit hotel, and 136-seat restaurant, a 56-seat bar, a 60-seat snack bar, a multi-purpose room with 700-guest capacity, and space formerly used as a bingo hall with an 800-guest capacity.

30.     At the Main Casino, the Tribe offers live entertainment services to the public, selecting and booking acts to perform free, cover-charge, or ticketed shows, and also sells food, beverages, tobacco products, gift shop items, casino-related memorabilia, and Native-made items, as well as gambling, lodging, and related services.

31.     The Casino Complex's bowling alley department is located at the Bowling Center. The Bowling Center is located at a separate building adjacent to the Main Casino. The Bowling Center includes ten bowling lanes, twenty-five arcade games, five dartboards, three pool tables, two jukeboxes and one air hockey table. The bowling area has sixty seats and the lounge area has seventy seats.

32.     The Bowling Center formerly housed the all of the Tribe's gaming operations, which opened in October 1990. The Bowling Center's current operations began in the fall of 1998. To develop the Bowling Center facility, the Tribe first renovated an existing building shell, and later converted the building to its present use, at total cost to the Tribe of approximately $1 million.

33.     At the Bowling Center, the Tribe sells bowling, arcade games, food and beverages.

34.     The Tribe transferred the Bowling Center's assets to the Casino Complex in January 2011.

35.     The Mart is the Casino Complex's convenience store department. It is located at a separate building adjacent to the Main Casino building. The Tribe developed and opened the Mart in about 1994. The Tribe contributed the full costs to develop and construct the Mart, in the amount of approximately $850,000.

36.     At the Mart, the Tribe sells convenience store items, food and beverages, tobacco products, and motor vehicle fuel.

37.     The Tribe transferred the Mart's assets to the Casino Complex in 2005.

38.     The Tribe operates the entire Casino Complex, including all of its departments, as a single gaming enterprise, with management overseen by the Tribe's elected governing body, the Flandreau Santee Sioux Executive Committee.

39.     By operating the Casino Complex's departments as a single gaming enterprise, the Tribe intends to provide an attractive overall entertainment experience to patrons, in which every aspect of the business exists to support and enhance the gambling that takes place in the Main Casino. The Tribe's Executive Committee selects and hires Casino Complex management personnel. Casino management exercises managerial control over the entire Casino Complex's operations, including that of each of its departments. Its functions include the hiring of employees and the selection of the products and services offered for sale.

40.     The Mart and Bowling Center are situated adjacent to the Main Casino premises. Without the ancillary services provided by the adjacent Casino departments, the Main Casino operations would be less successful in attracting gamblers and in extending their patronage over time.

41.     The Mart and Bowling Center are both located within the parcel identified for gaming in the Tribal-State Gaming Compact.

42.     Though they do not currently offer gaming, the Bowling Center was the initial site of the Tribe's casino operation, and until recently the Mart offered Class III video lottery type games, for which it held a Tribal gaming license and approval of the National Indian Gaming Commission ("NIGC").

43.     The total revenues from each of the Tribe's Casino Complex departments is included in the measure of total "net revenues" of the gaming activities conducted by the Tribe that are distributed to Tribal members in accordance with the Tribe's Revenue Allocation Plan adopted and approved pursuant to and in accordance with IGRA, 25 U.S.C. § 2710(b)(3) and (d)(1)(A)(ii) & (B). The Tribe's current Revenue Allocation Plan was approved by the Department of the Interior's Assistant Secretary—Indian Affairs in accordance with IGRA on October 26, 2012. The approved Plan provides that 40% of net revenues from the entire Casino Complex, including each of the Tribe's gaming facility departments operated at the Main Casino, the Mart and the Bowling Center premises, is distributed to individual qualified Tribal members, and another 5% is deposited into a trust fund for enrolled Tribal members under 18 years old.

44.     The Tribe annually provides the NIGC the reports of its annual independent financial audit as required by IGRA, 25 U.S.C. § 2710(b)(2)(c) and (d)(A)(ii). Among other things, the annual audit reports accurately report that the net revenues from the Tribe's gaming activities distributed to Tribal members are determined from the total gross revenues from all of the Casino Complex's departments.

45.     In accordance with IGRA, 25 U.S.C. §2713(a) and (b), the NIGC and the Chairman of the NIGC are authorized and directed to take enforcement action "against the tribal operator of an Indian game" whenever they have "reason to believe that the tribal operator" is engaged in activities that may be in violation of "[IGRA], any regulation prescribed by the [NIGC], or tribal

regulations, ordinances, or resolutions approved under" IGRA. Such enforcement action may include a "written complaint stating the acts or omissions" and the "action or choice of action being considered by the" NIGC, civil fines, and temporary and permanent closure orders.

46.     In accordance with IGRA, 25 U.S.C. § 2716(b) and (c), when information received by it pursuant to IGRA "indicates a violation of Federal, State, or tribal statutes, ordinances or resolutions," the NIGC is authorized and required to "provide such information to the appropriate law enforcement officials[,]" and the Attorney General "shall investigate activities associated with gaming authorized by [IGRA] which may be a violation of Federal law."

47.     To the Tribe's knowledge, neither the NIGC nor the Chairman of the NIGC has ever taken any enforcement action in accordance with the requirements of IGRA, 25 U.S.C. § 2713(a) and (b), based on; nor has the NIGC or the Chairman of the NIGC ever notified the Tribe, or expressed to the Tribe any concern or other indication that; nor has the NIGC provided information to law enforcement officials, nor has the Attorney General investigated, in accordance with the requirements of IGRA, 25 U.S.C. § 2716(b) and (c), that; the Tribe's calculation of or distribution, as indicted above, of the net revenues of the Tribe's gaming activities is or might be a violation of, or inconsistent with, any provision of IGRA or any other Federal, State, or tribal statutes, ordinances or resolutions, or other Federal law, including the Tribe's approved Revenue Allocation Plan.

48.     All the services and all, or nearly all, the goods purchased from the Tribe by patrons at the Casino Complex are used and consumed entirely on the Casino Complex premises or elsewhere within the Tribe's reservation. Goods and services used and consumed on the Casino Complex premises include gambling, bowling, shows and other live entertainment, lodging, food, beverages, package cigarettes and other sundry items.

49.    Approximately 40% of the patrons at the Casino Complex are not residents of the State. To the extent that the use and consumption of goods purchased from the Tribe at the Casino Complex may not have been purchased for use within, or may not be used and consumed within, the Tribe's reservation, if any, such goods purchased by out-of-state residents are either brought into the State from the reservation for the nonresident's personal use or enjoyment while within the state, or purchased for the nonresident's use and consumption inside the state of such patrons' residence, outside the exterior borders of the State of South Dakota, and such use and consumption occurs outside the State. The State's use tax is inapplicable to "use in this state of all articles of tangible personal property ... brought into the State of South Dakota by a nonresident individual thereof for his or her personal use or enjoyment while within the state." SDCL § 10-46-8. The State's use tax is also inapplicable to the use or consumption of goods and services outside the State or purchased for use outside the State. *See, e.g.*, SDCL §§ 10-46-2 (tax is "imposed on the privilege of the use, storage, and consumption in this state of tangible personal property purchased for use in this state"), 10-46-2.1 (tax is imposed "for the privilege of using services in South Dakota").

50.    As of November 10, 2014, the Casino Complex employed a total of 302 people. Of these, 64 were Tribal members. Eighty-two identified themselves as Native American and not a member of the Tribe. The remaining 156 employees identified themselves as non-Indians.

51.    The Tribal government receives over half of its funding from Casino Complex revenues.

### *State Taxation of Tribal Commerce*

52.    Pursuant to Chapter 10-46 of the South Dakota Codified Laws, the State imposes a use tax on, among other things, "the use, storage, and consumption in this state of tangible personal

property purchased for use in this state" and the use of non-exempt services in the state, to the extent such property and services are not subject to the State's sales tax. SDCL §§ 10-46-2, 10-46-2.1, 10-46-6. Generally, the use tax is to be collected by the retailer from the consumer and remitted to the Department of Revenue. SDCL § 10-46-23.

53.     The State is not attempting to impose the sales tax on the Tribe's sales of goods or services at the Tribe's Casino Complex.

54.     The State is not attempting to impose the use tax on the use or consumption of goods or services sold by the Tribe to Tribal members at the Tribe's Casino Complex.

55.     The State is attempting to impose the use tax, and to compel the Tribe to collect and remit the State's use tax to the State, on all use, storage and consumption by nonmembers of all goods and services sold by the Tribe at the Casino Complex. The State does not differentiate between goods and services, nor between use and consumption of goods and services that may have been purchased for use and consumption, and that in fact are used and consumed, either on-Reservation or outside the State of South Dakota. The Department of Revenue has notified the Tribe that pursuant to State law, the Tribe must collect and remit to the Department of Revenue all State use taxes the State alleges are incurred by nonmembers of the Tribe as a result of the Tribe's operation of the three licensed premises at the Casino Complex. As explained below, the State has taken and continues to take action against the Tribe seeking to enforce this alleged obligation.

### *Alcoholic Beverage Licenses*

56.     The Tribe holds and for many years has held three alcoholic beverage licenses issued by the State. The Tribe holds license number RL-5579 (for the Main Casino), number RL-6191 (for the Bowling Center), and number PB-1462 (for the Mart).

13

57.     The Tribe denies and has denied for many years that the Tribe is legally required to obtain and hold such State licenses, but nevertheless has obtained and held such licenses in the interest of administrative convenience to the Tribe as well as comity with the State. Because the State's liquor laws fail to make provision for the sale by State-licensed liquor wholesalers to Tribal purchasers not legally required to hold a State license, and because the Tribe for its convenience has historically purchased liquor supplies from State-licensed liquor wholesalers, the Tribe has found it more convenient in the past to obtain and hold licenses rather than engage in a legal dispute with the State and potentially put its wholesalers in jeopardy of unlawful enforcement action by the State.

58.     On March 6, 2006, effective January 7, 2007, the State legislature amended its liquor laws to prohibit the reissuance to an Indian tribe of a State liquor license "until the Indian tribe . . . remits to the Department of Revenue . . . all use tax incurred by nonmembers as a result of the operation of the licensed premises, and any other state tax has been remitted or is not delinquent." SDCL § 35-2-24, as amended by 2006 South Dakota Laws Ch. 191 (SB 98), eff. Jan. 7, 2007. The provision remains in effect, with minor changes not relevant to this action, and currently provides in relevant part:

> No license granted under this title may be reissued to an Indian tribe operating in Indian country controlled by the Indian tribe or to an enrolled tribal member operating in Indian country controlled by the enrolled tribal member's tribe until the Indian tribe or enrolled tribal member remits to the Department of Revenue all use tax incurred by nonmembers as a result of the operation of the licensed premises, and any other state tax has been remitted or is not delinquent.

59.     Based upon SDCL § 35-2-24, since December 2009 and continuously since, the State has denied each of the Tribe's applications for reissuance of each of the Tribe's liquor licenses.

14

60.     The Tribe applied for reissuance of the alcoholic beverage licenses for the Main Casino and Bowling Center in or about December 2009, and has re-applied again each year thereafter.  The Tribe applied for reissuance of its license for Mart in or about June 2010, and has re-applied each year thereafter. The Department of Revenue has refused to reissue the Tribe's three alcoholic beverage licenses because the Tribe has not remitted to the Department of Revenue the State use tax the State asserts has been incurred by nonmembers as a result of the Tribe's operation of the licensed premises.

61.     For each of the Department of Revenue's decisions refusing to reissue the Tribe's licenses, the Tribe requested an administrative hearing in accordance with SDCL Chapter 1-26.

62.     The State's Office of Hearing Examiners heard cross motions for summary judgment by the Department of Revenue and the Tribe on September 3, 2014.

63.     The Office of Hearing Examiners issued its Findings of Fact, Conclusions of Law & Final Order on October 29, 2014, a copy of which is attached hereto as **Exhibit B**.  The Office of Hearing Examiners found in favor of the Department of Revenue, concluding that all nonmember purchases at the Casino Complex "were subject to state use tax," and that in light of the Tribe's "fail[ure] to remit any use taxes in each calendar year since 2009 on non-member customer purchases" at the Casino Complex, "the Tribe is not entitled to the reissuance" of its alcohol beverage licenses.  Final Order, pp. [12] & [13] (pages unnumbered).

64.     Under State law, the Tribe may continue the activities authorized by its alcoholic beverage licenses until approximately ten days after the date the Department's license decision is "finally determined," including any State judicial review thereof.  In the absence of State judicial review, the Tribe's right to continue activities under the alcoholic beverage licenses will expire on or about December 13, 2014.  SDCL §§ 1-26-28, 1-26-31; *Matter of Exploration Permit Renewal*

*of Silver King Mines*, 323 N.W.2d 858, 860-61 (S.D. 1982). The Tribe continues to sell alcoholic beverages at each of the licensed premises at the Tribe's Casino Complex.

### *Federal Limits on State Regulation of the Tribe's Gaming Activities*

65.     Gaming activities in Indian country are governed by the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721. IGRA allows Indian tribes to engage in "class III" gaming activities (which primarily includes slot machines and certain card games) if such activities are authorized by a federally-approved Tribal gaming ordinance and conducted in conformance with a federally-approved Tribal-State compact entered into by the Indian tribe and the state in which the activities take place. 25 U.S.C. § 2710(d)(1).

66.     "Congress, by enacting IGRA, has established the preemptive balance between tribal, federal, and state interests in the governance of gaming operations on Indian lands." *Casino Resource Corp. v. Harrah's Entertainment, Inc.*, 243 F.3d 435, 437 (8th Cir. 2001). Congress "left states with no regulatory role over gaming except as expressly authorized by IGRA, and under it, the only method by which a state can apply its general civil laws to gaming is through a tribal-state compact." *Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 546 (8th Cir. 1996).

67.     IGRA places limits on a state's authority to regulate and tax Tribal gaming activities through a Tribal-State gaming compact. Relevant to this action, IGRA provides, at 25 U.S.C. § 2710(d)(3)(C):

Any Tribal-State compact … may include provisions relating to –

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

16

...

(vi)  standards for the operation of such activity and maintenance of the gaming facility, including licensing;

(vii)  any other subjects that are directly related to the operation of gaming activities.

68.      IGRA has "extraordinary pre-emptive power" of State authority with respect to all matters to which IGRA applies. *Gaming Corp. of America*, 88 F.3d at 543 (quoting *Metropolitan Life Insurance Co. v. Taylor,* 481 U.S. 58, 65 (1987). "Congress intended [IGRA] to completely preempt state law." *Gaming Corp. of America*, 88 F.3d at 544. In particular, State authority is completely pre-empted with respect to all matters that IGRA authorizes to be the subject of negotiations between an Indian tribe and a state for a Tribal-State gaming compact. *See*, *e.g.*, *Rincon Band of Luiseno Mission Indians v. Schwarzenegger*, 602 F.3d 1019 (9th Cir. 2010).

69.      The U.S. Department of the Interior, the federal agency charged with the responsibility and authority to approve or disapprove Tribal-State gaming compacts, has consistently determined that alcoholic beverage sales at a Tribal gaming facility "implicate the integrity of the conduct of class III gaming activities itself" and that regulation of alcoholic beverage sales are a "permissible subject of compact negotiations under IGRA." Letter from Acting Assistant Secretary-Indian Affairs to Governor of California at 11 n. 13 (July 13, 2012) (approving Tribal-State Gaming Compact) ("Graton Rancheria Approval Letter"); *see also*, *e.g.*, *In re Gaming Related Cases*, 331 F.3d 1094, 1116 (9th Cir. 2003).

70.      Alcoholic beverage sales at the Tribe's gaming facility, the Casino Complex, constitute a "subject[] that [is] directly related to the operation of gaming activities" within the meaning of IGRA, 25 U.S.C. § 2710(d)(3)(C). The purpose of the Tribe's offering alcoholic beverages for sale at the Casino Complex is to facilitate patronage at the Tribe's gaming facility.

71.    IGRA completely preempts any State authority to regulate alcoholic beverage sales at the Tribe's gaming facility, and only permits the State to exercise such authority through a Tribal-State gaming compact.

72.    The Tribe and the State of South Dakota entered into a Gaming Compact pursuant to IGRA on June 29, 1990. The Tribe and the State amended the Gaming Compact in July, 2011. The amended Compact took effect when the Secretary of the Interior's approval of the Compact was published in the Federal Register on September 13, 2011, 76 Fed. Reg. 56,466, and it remains in effect. A true and complete copy of the Compact is attached hereto as **Exhibit C**.

73.    The Tribal-State Gaming Compact contains no provision authorizing the State to apply its alcoholic beverage laws to the Tribe's gaming facility.

74.    Because the Tribe and State did not agree in the Tribal-State Gaming Compact that the State would have authority to regulate the Tribe's sales of alcoholic beverages at its gaming facility, the State lacks the authority to impose such regulation. Specifically, the State lacks the authority to require the Tribe to hold a State alcoholic beverage license in order to purchase and sell alcoholic beverages at any premises that is part of the Tribe's Casino Complex.

### *Federal Limits on State Taxation of Gaming-Related Activities*

75.    Concerning States' authority to tax Tribal gaming activities, IGRA provides, at 25 U.S.C. § 2710(d)(4):

> Except for any assessments that may be agreed to under paragraph (3)(C)(iii) of this subsection, nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity.

76.    Customers' use and consumption at the Tribe's Casino Complex of goods and services purchased from the Tribe at the Casino Complex constitutes a gaming activity subject to IGRA's constraints on the State's taxing authority.

77.     Casino Complex patrons who purchase food, beverages, gift shop items, and other goods and services at the Casino Complex come to the Casino Complex primarily to gamble, not to make these other purchases.   The Tribal-State Gaming Compact contains no provision authorizing the State to impose the State use tax on the use and consumption of goods and services purchased from the Tribe at the Casino Complex and used or consumed at the Casino Complex.

78.     IGRA prohibits the State from taxing the use or consumption of goods and services purchased from the Tribe at the Casino Complex and used or consumed at the Casino Complex.

79.     The Tribal-State Gaming Compact contains no provision authorizing the State to impose on the Tribe the obligation to collect from customers and remit to the State any State use tax for the use and consumption of goods and services purchased from the Tribe at the Casino Complex, whether used and consumed at the Casino Complex or elsewhere.

80.     IGRA prohibits the State from imposing on the Tribe an obligation to collect State use taxes from Casino Complex customers and to remit the taxes to the State.

### *Balance of Interests for the State's Taxation of Non-Indians' On-Reservation Activity*

81.     Where the legal incidence of a state tax falls on a non-Indian engaging in commercial activity on an Indian reservation, and Congress has not specifically preempted the tax, federal courts determine whether the state may impose the tax by employing a balancing test, weighing Federal and Tribal interests such as Tribal autonomy, self-governance and economic development against the State interest in collecting revenue from the particular activity. *See, e.g.*, *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 110 (2005); *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216-19 (1987); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144-45 (1980).

82.     The Federal and Tribal interests are strongest, and the State's interest weakest, when the revenues from the activity are derived from value generated on the reservation by activities involving the Indian tribe, and when the taxpayer is the recipient of tribal services. *See, e.g., Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 156-57 (1980). Transactions at the Casino Complex involve significant value added by the Tribe on its reservation. The value of the personal property and services purchased from the Tribe at the Casino Complex is generated by the Tribe on Tribal land. Customers are drawn to the Casino Complex, and purchase and use goods and services there, because of the Tribe's substantial investment in the gaming and entertainment industry and related infrastructure on the reservation, and in the goods and services themselves. The Tribe has built modern facilities which provide recreational activities and ancillary services to patrons, who do not simply drive onto the reservation, make purchases and depart, but spend extended periods of time there enjoying the services the Tribe provides.

83.     The Tribe provides substantial governmental services on the reservation, including to the nonmember patrons of the Casino Complex. For example, the Tribe's courts are available to resolve disputes arising from patronage of the Casino. The Tribal government directly regulates gaming and enforces applicable Tribal standards such as building and event capacity. The Tribal government directly provides roadway maintenance with funding from Federal contracts and grants.

84.     The Tribe funds law enforcement on the reservation through a joint agreement with the Flandreau city police force, and funds fire protection through an agreement with the city's volunteer fire department.

85.     The State lacks any interests sufficient to justify the imposition of its use tax on non-Indians' use and consumption of goods and services on the Tribe's reservation, or the imposition of an obligation on the Tribe to collect such use tax and remit it to the State.

86.     The State's sole interest in connection with the imposition of its use tax on the use and consumption on the Tribe's reservation of goods and services purchased from the Tribe at the Casino Complex is in collecting revenue through taxation of Tribal commerce to provide general governmental services off-reservation.

87.     The State does not provide police or fire protection to the Tribe or the Tribe's businesses for which the Tribe is not separately required to provide compensation.

88.     The State does not provide construction or maintenance of the roads on the Tribe's reservation used by customers of the Casino Complex.

89.     There are no state courts, state schools, or local subsidiaries of the state government on the reservation.

90.     The State does not provide governmental services to the Tribe or its customers in connection with their transactions with the Tribe or their use or consumption of goods or services purchased from the Tribe at the Casino Complex.

### *Deposit Agreement*

91.     On April 14, 1994, the Tribe filed a Complaint for Declaratory and Injunctive Relief against the State of South Dakota, Walter D. Miller, Governor of South Dakota, and Ronald J. Schreiner, Secretary of Revenue of the State of South Dakota (collectively the "State"), in the United States District Court for the District of South Dakota, *Flandreau Santee Sioux Tribe v. State of South Dakota, et al.*, Civil No. 94-4086 (D.S.D.).  In that action, the Tribe alleged that the

21

State, *inter alia*, did not have jurisdiction to impose sales and use taxes on sales by the Tribe of personal property to non-members when the sales occur on lands held in trust for the Tribe.

92.     The Tribe's action in Civil No. 94-4086 was subsequently consolidated with another pending case raising similar issues, captioned *Sisseton-Wahpeton Sioux Tribe v. State of South Dakota, et al.*, Civil No. 93-1033 (D.S.D.).

93.     In connection with the *Flandreau* action, Civil No. 94-4086, consolidated with the *Sisseton-Wahpeton* action, Civil No. 93-1033, the Flandreau Tribe entered into a Deposit Agreement with the State of South Dakota, a copy of which is attached as Exhibit A. In the Deposit Agreement, the Tribe agreed, *inter alia*, that:

> [T]he Tribe shall begin filing sales tax returns on a monthly basis, beginning with December 1, 1993, with the South Dakota Department of Revenue reporting the total gross receipts resulting from the sales to non-members of food, beverages and other tangible personal property, as defined in SDCL 10-46, at the Tribe's casino.
> . . .
>
> Contemporaneously with the filing of the return, the Tribe shall deposit a sum equal to four percent (4%) of the Tribe's total gross receipts (disputed tax liability) shown on such returns with the escrow agent.

Ex. A at pp. 3-4.

94.     In return for entering into the Deposit Agreement, the State agreed, *inter alia*, "not [to] make a final determination regarding the Tribe's application for renewal of its existing liquor license [for the Royal River Casino] until final resolution of CIV93-1033." Ex. A at p. 3.

95.     The Deposit Agreement provides that disbursement of the escrowed funds shall occur as follows:

> A. The State and the Tribe agree that the final resolution of the pending matter CIV93-1033 will be the basis for any disbursement of the monies deposited with the escrow agent pursuant to this agreement.
>
> B. The Tribe, the State, and the escrow agent agree that the escrow agent shall disburse the monies deposited with it under this agreement together with any

interest earned thereon, in the following manner and consistent with the final resolution of CIV93-1033:

(1) If the final determination in CIV93-1033 declares that the State does have jurisdiction to assess sales and use tax on transactions between the Tribe and non-members taking place in a Tribally owned and operated gambling casino, the escrow agent shall disburse the funds to the State.

(2) If the final determination in CIV93-1033 declares that the State does not have jurisdiction to assess sales and use tax on transactions between the Tribe and non-members taking place in a Tribally owned gambling casino, the escrow agent shall disburse the funds to the Tribe.

Ex. A at pp. 5-6.

96.     The Tribe and the State further agreed:

[I]n the event a final determination is not reached in CIV93-1033, the amount of disputed tax liability, deposited pursuant to this agreement, together with any accrued interest thereon, shall remain with the escrow agent pending a disbursement agreement between the State and the Tribe or a final determination by a court of proper jurisdiction, whichever comes first.

Ex. A at p. 2.

97.     On April 24, 1998, the Flandreau Tribe, the Sisseton-Wahpeton Sioux Tribe and the State of South Dakota, *et al.*, filed a Stipulation of Dismissal without prejudice (Doc. No. 89) in the consolidated actions, Civil Nos. 93-1033 and 94-4086, and the Flandreau Tribe filed a motion to dismiss without prejudice, based on the stipulation (Doc. No. 90).

98.     On April 30, 1998, the District Court entered an order (Doc. No. 91) dismissing without prejudice both of the consolidated actions, Civil Nos. 93-1033 and 94-4086.

99.     There was no final determination in Civil No. 93-1033 (or Civil No. 94-4086) of the State's jurisdiction to assess sales and use tax on transactions between the Tribe and non-members taking place in a Tribally owned casino.

100.    The value of the escrow account now totals over $400,000.

101.    Defendants' actions imposing and collecting the taxes described above has caused and will continue to cause the Tribe to suffer immediate and irreparable injury, loss and damage for which there is no adequate remedy at law.

102.    Any action by the Defendants to interfere with or prevent the Tribe's purchase or sale of liquor or alcoholic beverages, including any action to deny the reissuance of the Tribe's alcoholic beverage licenses, to the extent such licenses are required, will cause the Tribe to suffer immediate and irreparable injury, loss and damage for which there is no adequate remedy at law.

### FIRST CLAIM FOR RELIEF

### INDIAN GAMING REGULATORY ACT

### STATE USE TAX AT CASINO

**The State's Attempt to Impose Use Tax on Gaming Activities Violates the Indian Gaming Regulatory Act**

103.    The allegations in the foregoing paragraphs are re-alleged and incorporated herein by reference.

104.    The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, preempts the field in the governance of gaming activities on Indian land, including all matters that are directly related to the operation of gaming activities.

105.    Under the Indian Gaming Regulatory Act, 25 U.S.C. § 2710(d)(3)(C) and (d)(4), states do not have the jurisdiction to impose any tax, fee, charge or other assessment in connection with a tribal gaming activity other than those that have been agreed to, in a compact with an Indian tribe, as necessary to defray the state's costs of regulating such activity.

106.    The Indian Gaming Regulatory Act preempts and prohibits the State's attempt to impose State use taxes on the use or consumption on the reservation of goods and services purchased from the Tribe at the Casino Complex.

107.    By attempting to impose State use taxes on the use or consumption on the reservation of goods and services purchased from the Tribe at the Casino Complex, the Defendants violate the Indian Gaming Regulatory Act.

## SECOND CLAIM FOR RELIEF

## INDIAN GAMING REGULATORY ACT

## STATE TAX COLLECTION REQUIREMENT AT CASINO

### The State's Attempt to Impose the Obligation to Collect and Remit Use Tax on Gaming Activities Violates the Indian Gaming Regulatory Act

108.    The allegations in the foregoing paragraphs are re-alleged and incorporated herein by reference.

109.    The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, preempts the field in the governance of gaming activities on Indian land, including all matters that are directly related to the operation of gaming activities.

110.    The Indian Gaming Regulatory Act preempts and prohibits the State's attempt to impose any obligation upon the Tribe in connection with the Tribe's gaming activities, including all matters that are directly related to the operation of class III gaming activities, except as agreed to in a Tribal-State Gaming Compact.

111.    By attempting to compel the Tribe to collect use tax from its customers at the Casino Complex and remit such taxes to the State, the Defendants violate the Indian Gaming Regulatory Act.

## THIRD CLAIM

## INDIAN COMMERCE CLAUSE AND FEDERAL COMMON LAW

## STATE USE TAX ON ON-RESERVATION USE AND CONSUMPTION

**The State's Attempt to Impose Use Tax on the Use or Consumption of Goods and Services Purchased from the Tribe on the Tribe's Reservation Is Preempted by Federal Law and Infringes upon Tribal Sovereignty**

112.    The allegations in the foregoing paragraphs are re-alleged and incorporated herein by reference.

113.    Under applicable federal law, including the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3; and federal common law, the State does not have jurisdiction within Indian country to assess, or is preempted from assessing, use taxes attributable to the purchase, by non-members, of tangible personal property and services from an Indian tribe or tribal member, when the Tribal interests and Federal interests, including the interests in promoting Tribal sovereignty and economic development, outweigh the State interest in collecting the tax.    Such state tax assessments infringe on the rights of tribes to self-government and place an undue burden on Indian commerce.

114.    With respect to State use tax on nonmembers' use or consumption of goods and services on the Tribe's reservation, the Tribal interests and Federal interests in promoting Tribal sovereignty and Tribal economic development outweigh the State's interest in collecting the tax. The value of the goods and services marketed to, and purchased by, non-members is generated by the Tribe through activities conducted by the Tribe on its reservation.  The nonmember users of the tangible personal property and services sought to be taxed benefit from Tribal governmental services, and receive no State governmental services connected with the taxed activity.

115.    By imposing State use taxes upon nonmembers' use and consumption of goods and services purchased from the Tribe at the Casino Complex, the Defendants violate applicable

26

federal law including the Indian Commerce Clause, U.S. Const., Art. I, § 8, cl. 3; and federal common law.

## FOURTH CLAIM FOR RELIEF

## INDIAN COMMERCE CLAUSE AND FEDERAL COMMON LAW

## FAILURE TO CREDIT TRIBAL SALES TAX AGAINST STATE USE TAX

**The State's Attempt to Impose Use Tax on the Use or Consumption of Goods and Services Purchased from the Tribe on the Tribe's Reservation, Constitutes Unlawful Discrimination Against the Tribe as a Similarly Situated Sovereign**

116.    The allegations in the foregoing paragraphs are re-alleged and incorporated herein by reference.

117.    The State provides a credit against any use tax imposed upon a consumer, which reduces the amount of tax imposed by the amount of sales or use tax the consumer previously paid on the taxed item to "another state or its political subdivisions," if the other state grants a reciprocal credit for taxes paid to South Dakota. SDCL § 10-46-6.1.

118.    The Tribe imposes and collects a 6% sales tax on "sales of tangible personal property ... sold at retail to consumers or users within the Flandreau Santee Sioux Reservation and within Indian Country subject to the jurisdiction of the Tribe," and an equivalent tax on services. 23 FSST Law and Order Code §§ 3.1, 3.2.

119.    The Tribe imposes and collect use tax on "the use, storage, and consumption within the Reservation of tangible personal property and services purchased for use within the Reservation," or otherwise "used, stored or consumed within the Reservation," applicable to property and services not subject to the Tribe's sales tax. 23 FSST Law and Order Code §§ 3.32, 3.33.

120.    The Tribe provides a credit against any use tax imposed upon a consumer, which reduces the amount of tax imposed by the amount of sales or use tax the consumer previously paid

on the taxed item to "another tribe or state or their political subdivisions," if the other tribe or state grants a reciprocal credit for taxes paid to the Tribe.  23 FSST Law and Order Code § 3.36.

121.    The State, by recognizing the taxes paid to other jurisdictions as a basis for granting a use tax credit, but refusing to recognize sales and use taxes paid to the Tribe, unlawfully discriminates against the Tribe as a similarly situated sovereign. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973); *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 827 (10th Cir. 2007); *Cabazon Band of Mission Indians v. Smith*, 388 F.3d 691, 698-701 (9th Cir. 2004).

### FIFTH CLAIM FOR RELIEF

### INDIAN COMMERCE CLAUSE AND FEDERAL COMMON LAW

### STATE TAX COLLECTION REQUIREMENT ON TRIBE

**The State's Attempt to Compel the Tribe to Collect and Remit Use Tax Is Preempted by Federal Law and Infringes upon Tribal Sovereignty**

122.    The allegations in the foregoing paragraphs are re-alleged and incorporated herein by reference.

123.    Requiring the Tribe to determine which of its sales transactions at the Casino Complex will result in the purchaser's in-State, off-reservation use or consumption of goods, if any, imposes a heavy burden on the Tribe that is not reasonably necessary as a means of aiding the State in collecting and enforcing the State use tax on, if any, the small proportion of transactions that may give rise to activity within the State's taxing authority.

124.    By attempting to compel the Tribe to collect and remit to the State use taxes on the in-State, off-reservation use or consumption, if any, of goods purchased from the Tribe at the Tribal Businesses, the Defendants violate applicable federal law, including the Indian Commerce Clause, U.S. Const. Article I, § 8, cl. 3; and the federal common law.

### SIXTH CLAIM FOR RELIEF

### INDIAN GAMING REGULATORY ACT

### ALCOHOLIC BEVERAGE LICENSES AT CASINO

**The Imposition of the State's Alcoholic Beverage Laws on the Tribe's Gaming Activities Violates the Indian Gaming Regulatory Act**

125.    The allegations in the foregoing paragraphs are re-alleged and incorporated herein by reference.

126.    The Indian Gaming Regulatory Act preempts the field in the governance of gaming activities on Indian land, including all subjects that are directly related to the operation of gaming activities.

127.    The Indian Gaming Regulatory Act effected a partial implicit repeal of the federal statute, 18 U.S.C. § 1161, which generally gives States authority, concurrent with Indian tribes, to regulate alcoholic beverage sales on Tribal reservations where the Tribe has elected to authorize and regulate alcoholic beverages. The Indian Gaming Regulatory Act repealed this delegation of authority to the States as to alcoholic beverage sales occurring as part of or directly related to the operation of tribal gaming activities.

128.    The Indian Gaming Regulatory Act allows a State authority to enforce specified regulations on Tribal gaming activities only through an approved Tribal-State gaming compact.

129.    In the absence of agreement to allocate to the State jurisdiction over a particular subject matter subject to negotiation in a tribal-state gaming compact but not contained in an approved Tribal-State gaming compact, the State has no authority to regulate that subject.

130.    The Tribe's purchase and sale of alcoholic beverages at the Casino Complex is a Tribal gaming activity on Indian land, or is a subject directly related to the operation of such gaming activities.

131.   The Tribal-State Gaming Compact between the State and the Tribe does not give the State authority to regulate the Tribe's purchase and sale of alcoholic beverages at the Casino Complex, and does not authorize the State to apply any part of its alcoholic beverages law to the Tribe in connection with alcoholic beverages sold by the Tribe at the Casino Complex.

132.   By imposing on the Tribe the requirements of the State's alcoholic beverages law with respect to the Tribe's gaming activities, including the requirement that the Tribe hold a State alcoholic beverage license to purchase and sell alcoholic beverages at the Casino Complex and to engage in related activities that would require an alcoholic beverage license under State law, the Defendants violate federal law and the Tribe's rights under the Indian Gaming Regulatory Act to engage in gaming activities, including activities directly related to the operation of gaming activities free from State regulation except as expressly authorized in such Act.

## SEVENTH CLAIM FOR RELIEF

## DECLARATORY RELIEF

## TAX DEPOSIT AGREEMENT – LACK OF STATE JURISDICTION TO TAX NONMEMBERS AT CASINO

**Declaration of Lack of State Jurisdiction to Assess Sales and Use Taxes at Tribe's Casino as Predicate to Disbursement to Tribe of Funds Held In Escrow Pursuant to the Deposit Agreement between Tribe and State**

133.   The allegations in the foregoing paragraphs are re-alleged herein and incorporated by reference.

134.   Pursuant to the Deposit Agreement attached hereto as Exhibit A, the Tribe has deposited funds in an escrow account at Farmer's State Bank in Flandreau, South Dakota.

135.   Pursuant to the Deposit Agreement, Recital F and Section 5(B)(2), when a final determination is reached in *Sisseton-Wahpeton Sioux Nation v. State of South Dakota*, Civil No. 93-1033 or, if no final determination is reached in that case, then when a final determination is

made by a court of proper jurisdiction, declaring "that the State does not have jurisdiction to assess sales and use tax on transactions between the Tribe and non-members taking place in a Tribally owned gambling casino, the escrow agent shall disburse the funds to the Tribe."

136.    *Sisseton-Wahpeton Sioux Nation v. State of South Dakota* was disposed without the final determination contemplated in the Deposit Agreement.

137.    The State no longer contends that it has the authority to assess sales tax on transactions between the Tribe and non-members taking place in a Tribally owned casino; only its authority to assess use tax on such transactions is disputed.

138.    In accordance with the Deposit Agreement, upon a final determination of this question in the Tribe's favor, the Tribe is entitled to all sums deposited pursuant to the Deposit Agreement, including interest.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that this Court grant the following relief:

1.      Issue a judgment declaring that:

(a)    Defendants, their assigns, employees, and other agents do not possess the jurisdiction, or otherwise lack the authority, to impose the use taxes described herein;

(b)    Defendants, their assigns, employees, and other agents do not possess the jurisdiction, or otherwise lack the authority, to compel the Tribe to collect and remit to the State the use taxes described herein;

(c)    Defendants, their assigns, employees, and other agents do not possess the jurisdiction, or otherwise lack the authority, to impose on the Tribe, with respect to any Tribal gaming activity on Tribal land, any requirement arising from the State's alcoholic beverage laws,

31

including any requirement that the Tribe hold an alcoholic beverage license for activities it conducts at its gaming facility;

2.      Issue an order stating that because the State does not have authority to assess sales and use tax on transactions between the Tribe and non-members taking place in a Tribally owned gambling casino, Farmer's State Bank shall disburse to the Tribe all funds, including interest, deposited pursuant to the Deposit Agreement.

3.      Issue a preliminary and permanent injunction enjoining the Defendants, their assigns, employees, or other agents from:

(a)      Assessing the use taxes described herein, and compelling the Tribe to collect and remit such use taxes, as a condition precedent to the issuance or reissuance of a state alcoholic beverage license to the Tribe, or otherwise;

(b)      Taking any action that would deny to the Tribe any of the rights and privileges of a holder of a State alcoholic beverage license on the grounds that the Tribe does not hold such a license for the Casino Complex (including its constituent departments), or otherwise enforcing any part of the State alcoholic beverage laws against the Tribe in connection with Tribal gaming activities on Tribal land.

4.      Award the Tribe attorney's fees, costs and such other and further relief as the Court may deem just and proper.

Respectfully submitted,

FLANDREAU SANTEE SIOUX TRIBE

November 18, 2014                    By: _____

Steven M. Johnson, S.D. Bar No. 2181
Ronald A. Parsons, Jr., S.D. Bar No. 2765
JOHNSON, HEIDEPRIEM & ABDALLAH, LLP
101 South Main Avenue, Suite 100
Sioux Falls, South Dakota 57104
Telephone: (605) 610-2188
Fax: (605) 338-4162
steve@jhalawfirm.com
ron@jhalawfirm.com

Rebecca L. Kidder, S.D. Bar No. 2774
FREDERICKS PEEBLES & MORGAN LLP
910 5th Street, Suite 104
Rapid City, South Dakota 57701
Telephone: (605) 791-1515
Fax: (605) 791-1915
rkidder@ndnlaw.com

John M. Peebles, *Pro Hac Vice pending*
Steven J. Bloxham, *Pro Hac Vice pending*
John Nyhan, *Pro Hac Vice pending*
Tim Hennessy, *Pro Hac Vice pending*
FREDERICKS PEEBLES & MORGAN LLP
2020 L Street, Suite 250
Sacramento, California 95811
Telephone: (916) 441-2700
Fax: (916) 441-2067
jpeebles@ndnlaw.com
sbloxham@ndnlaw.com
jnyhan@ndnlaw.com
thennessy@ndnlaw.com

## VERIFICATION

I, Anthony Reider, President of the Flandreau Santee Sioux Tribe Executive Committee, the elected governing body of the plaintiff Flandreau Santee Sioux Tribe, hereby verify and declare under penalty of perjury under the laws of the United States that I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief and know the contents thereof, and that the matters contained in the Verified Complaint are true to my knowledge, except as to those facts that are stated on information and belief, and as to those matters I believe them to be true.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct. Executed on November __17th__, 2014, at Flandreau, South Dakota.

Anthony Reider