**FILED**

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

**DEC 1 8 2015**

CLERK

*******************************************************************************

|  |  |  |
|---|---|---|

FLANDREAU SANTEE SIOUX TRIBE,
a federally recognized Indian Tribe

          Plaintiff,

vs.

ANDY GERLACH, Secretary of the State of
South Dakota Department of Revenue; and
DENNIS DAUGAARD, Governor of the State
of South Dakota,

          Defendants.

\*      CIV 14-4171

MEMORANDUM OPINION AND
ORDER ON DEFENDANTS' MOTION
FOR JUDGMENT ON THE PLEADINGS

*******************************************************************************

Secretary of the State of South Dakota Department of Revenue, Andy Gerlach, and Governor of South Dakota, Dennis Daugaard (collectively, Defendants or the State) move the Court to dismiss the Flandreau Santee Sioux Tribe's (Plaintiff or the Tribe) complaint. Defendants assert three principal arguments why the action should be dismissed. First, Defendants maintain that the Tribe's action is barred by the claim preclusive, or res judicata, effect of a South Dakota administrative hearing. Second, Defendants ask that this Court abstain from hearing the case pursuant to the doctrine of *Younger* abstention. Third, Defendants argue they should be granted judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

## BACKGROUND

The Tribe is federally recognized. It operates Royal River Casino on the Flandreau Indian Reservation in Moody County in eastern South Dakota. Operating as a single business enterprise under the Royal River name, the Tribe owns and operates the Royal River Casino, the Royal

1

River Bowling Center, and the First American Mart (collectively, the "Casino"). Within these three businesses, the Casino is divided further into various departments: gaming, hotel/hospitality, gift shops, restaurants, entertainment venues, bowling alley, and a convenience store. As a unitary business, the entire enterprise is overseen by the Tribe's elected governing body, the Flandreau Santee Sioux Executive Committee. Revenue, including that from casino gaming activities, is calculated in the aggregate as "net revenues." Of that sum, 45% is disbursed to tribal members.

Pursuant to the Indian Gaming Regulatory Act (IGRA), the Tribe and the State have in place a Tribal-State gaming compact (the "Compact"), which controls the Tribe's gaming operations. The Compact contemplates neither explicitly nor impliedly the State's authority to apply its alcohol regulatory laws to the Tribe's "gaming facility," nor does it contemplate a State's authority to impose its use taxes on nonmember activity made at the Casino, nor does it contemplate the State's requirement that the Tribe collect and remit the use taxes from nonmember activities or purchases.

The Casino's patron base is approximately 60% South Dakota residents. Irrespective of residential or tribal status, the Tribe offers its patrons "goods and services," which include "bowling, shows and other live entertainment, lodging, food, beverages, package cigarettes, and other sundry items." Consequently, it is undisputed that the Tribe sold these various goods and services to nonmembers at the Casino. It is also undisputed that the Tribe has not remitted the relevant use taxes on nonmember sales to the State.

The State has issued the Tribe three alcohol licenses, one for each of the three Casino-encompassed businesses. These licenses are, however, conditioned on the Tribe's remittance of the State use tax pursuant to S.D.C.L. § 35-2-24. *See, infra*, Part.C.1. The South Dakota statute does not differentiate between alcohol tax and use tax on other goods and services. *Id.* In 2009 and 2010, the Tribe sought from the State a renewal of its three alcohol licenses. Based on S.D.C.L. § 35-2-24, both requests were denied by the State as the statute directs that licenses are not to be reissued until use taxes incurred by nonmembers have been remitted.

2

As a result, the Tribe, pursuant to S.D.C.L. § 1-26-16, requested a hearing before the South Dakota Office of Hearing Examiners to review the State's alcohol license denial.[1] At the hearing, the Hearing Examiner concluded that all nonmember purchases at the Casino are subject to the use tax scheme, that the Tribe failed to remit the use taxes, and, therefore, the Tribe was not entitled to alcohol license renewal. Prior to the Hearing Examiner's decision becoming final, the Tribe filed this action in federal court on November 18, 2014. The Tribe simultaneously moved the Court for preliminary injunction enjoining state action pursuant to the Hearing Examiner's decision. The Tribe and State made the motion for preliminary injunction moot by entering into a stipulation whereby the State recognized the three alcohol licenses' continuing validity pending a decision on the merits in this case. The Tribe did not appeal the Hearing Examiner's decision to South Dakota state court.

Specific to this federal action, the Tribe alleges that the State lacks authority to impose its use tax scheme on reservation land against nonmember Casino patrons. In its Complaint, the Tribe alleges that IGRA preempts the field of taxation thereby barring the State's imposition. To that end, the Tribe argues that all activity engaged in under the Royal River Casino name is "gaming activity" untaxable by the State by virtue of IGRA (Claims for Relief One, Two and Six). Outside of IGRA, the Tribe maintains that the use tax and remittance requirements are preempted by the Indian Commerce Clause of the Federal Constitution, federal common law, and infringe on inherent tribal sovereignty (Claims for Relief Three and Five); that the State's tax imposition is unlawfully discriminatory as applied to the Tribe (Claim for Relief Four); that, as a predicate to funds contained in an escrow account pursuant to a 1994 Deposit Agreement between the Tribe and State being disbursed to the Tribe, the State is without power to impose its taxation scheme on the Tribe's Casino (Claim for Relief Seven)[2]; and that the alcohol licenses

---

[1] It should be noted that the Tribe applied for a license renewal each year since the initial denial. Each request has been denied by the State. The Tribe, however, is enabled to continue operations under the original licenses until a final administrative decision pursuant to S.D.C.L. § 1-26-28.

[2] On April 14, 1994, the Tribe initiated an action seeking declaratory and injunctive relief against then South Dakota Governor Walter D. Miller and then Secretary of Revenue of South Dakota Ronald J. Schreiner. There, the Tribe alleged that the State lacked jurisdiction to impose its sales and use taxes on tribal sales of personal property to nonmembers when the sales occur on Indian trust lands. The case was consolidated with a pending case that raised similar issues. *Sisseton-Wahpeton Sioux Tribe v. State of South Dakota, et. al.*, No. CIV 93-1033 (D.S.D.). Related to that litigation, the Tribe entered into the Deposit Agreement wherein the Tribe agreed to deposit the aggregate amount of disputed tax liability into an escrow account pending final resolution of the case. The total amount contained in the escrow account is currently $400,000.

3

are conditioned on the S.D.C.L. § 35-2-24 tax remittance requirement is violative of 18 U.S.C. § 1161 (Claim for Relief Eight).

The State has moved the Court to dismiss the action in its entirety based on the separate doctrines of res judicata and *Younger* abstention. Alternatively, the State argues that Claims for Relief One, Two, Four, Five, Six and Eight should be dismissed. For reasons explained herein, the motion is denied.

## DISCUSSION

### A. Res Judicata

"District Courts are required to consider preclusion matters before reaching the merits of a claim." *Krull v. Jones*, 46 F. Supp. 2d 997, 1000 (D.S.D. 1999) (citing *Peery v. Brakke*, 826 F.2d 740, 744 n.4 (8th Cir. 1987)). "Claim preclusion, or res judicata, 'bars relitigation of the same claim between parties or their privies where a final judgment has been rendered upon the merits by a court of competent jurisdiction.'" *Plough By and Through Plough v. West Des Moines Community School Dist.(Plough)*, 70 F.3d 512, 517 (8th Cir. 1995) (quoting *Smith v. Updegraff*, 744 F.2d 1354, 1362 (8th Cir. 1984)). *See Allen v. McCurry*, 449 U.S. 90, 94 (1980) ("Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.").[3] In order for the previous adjudicatory decision to have preclusive effect, however, the party defending against res judicata "must have had a full and fair opportunity to investigate and litigate the matter concluded." *Id.*

It should be noted that the previously cited cases have all been in the context of 42 U.S.C § 1983 actions, and as is explained *infra*, the Supreme Court abrogated the necessity of § 1983 plaintiffs exhausting state administrative procedure. Instead, Defendants move to apply res judicata doctrine in the context of an *Ex parte Young* action against South Dakota officials. "*Ex parte Young* established the power of the federal courts to enforce the Constitution against state

---

[3] It should be emphasized that res judicata, while sometimes discussed as encompassing both claim and issue preclusion, is distinct from the latter. *Krull v. Jones*, 46 F. Supp. 2d 997, 1000 (D.S.D 1999). Issue preclusion, often referred to as collateral estoppel, forecloses a party from relitigating discrete issues previously decided by a tribunal as opposed to a claim in its entirety. *See id.* (quoting *Plough*, 70 F.3d at 515). *See McCurry*, 449 U.S. at 94 ("Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude litigation of the issue in a suit on a different cause of action involving a party to the first case.").

4

legislative and executive action." 17A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 4231 (3d ed. 2015). More to the point, *Ex parte Young* removes the Eleventh Amendment immunity hurdle a plaintiff would normally encounter when suing a State. *Id. Ex Parte Young*, therefore, permits a federal court to enjoin a state official from contravening the Constitution or federal statute. *Id.* There does exist, however, a limitation on when a litigant may pursue an *Ex parte Young* action in federal court:

> The rule can be fairly simply stated. A litigant must normally exhaust state "legislative" or "administrative" remedies before challenging the state action in federal court. He need not normally exhaust state "judicial" remedies. The rationale for this distinction is that until the administrative process is complete, it cannot be certain that the party will need judicial relief, but when the case becomes appropriate for judicial determination, *he may choose* whether he wishes to resort to a state or federal court for such relief.

*Id.* at § 4233 (emphasis added). *See Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210 (1908); *Bacon v. Rutland Railroad Co.*, 232 U.S. 134 (1914). The Supreme Court stated the rule narrowly in *Monroe v. Pape*, 365 U.S. 167 (1961). There, the Court stated that, in the context of a 42 U.S.C. § 1983 action, it is unnecessary for a plaintiff to pursue state judicial remedies. In addition, two years after the *Pape* decision, the Court extended the exhaustion exception to state administrative remedies in *McNeese v. Board of Education*, 373 U.S. 668 (1963).

Assuming *arguendo* that this Court accepted that the state administrative decision qualifies for res judicata effect, the Supreme Court decisions and an abundance of case law relied upon by the State have all been in the contexts of either collateral estoppel in state courts or § 1983 actions. *See McCurry*, 449 U.S. at 96 ("It is against this background that we examine the relationship of § 1983 and collateral estoppel, . . ."); 28 U.S.C. § 1738 (federal courts shall give full faith and credit to other state court decisions); *Peery v. Brakke*, 826 F.2d 740, 746 (8th Cir. 1987) (applying collateral estoppel doctrine to a § 1983 claim); *General Drivers and Helpers Union v. Wilson Trailer Co.*, 827 F. Supp. 2d 1048, 1053 (D.S.D. 2011) (collateral estoppel case wherein it was held that S.D.C.L. § 61-7-24's "unambiguous language" barred admittance of an administrative judge's "finding of facts, conclusions of law, decision or final order . . . for any purpose . . ."). In March 2015, the Supreme Court revisited the issue of collateral estoppel doctrine's application to state administrative proceedings. It held that "[b]oth this Court's cases and the Restatement make clear that issue preclusion is not limited to those situations in which

5

the same issue is before two courts. Rather, where a single issue is before a court and an administrative agency, preclusion often applies." *B & B Hardware, Inc v. Hargis Industries, Inc.*, 135 S.Ct. 1293, 1303, 191 L.Ed.2d 222 (2015). It has never been held by the Supreme Court, however, that claim preclusion emanates from a state administrative proceeding.

The State, however, does cite to a single case that suggests that res judicata may apply when a state administrative hearing results in a final order. In *Krull v. Jones*, relying on *Plough* from the Eighth Circuit, it was held that a plaintiff's resort to South Dakota administrative procedure effectively foreclosed his federal action as barred by the res judicata effect of the state decision. Distinguishing both *Krull* and *Plough* from the instant case, however, is that each exists in the context of 42 U.S.C. § 1983 claims. As has been previously discussed, a plaintiff to a § 1983 action is "not required to exhaust his state administrative remedies before instituting [the action] in federal court." *Krull*, 46 F.Supp.2d at 1004 (citing *Patsy v. Board of Regents of State of Fla.*, 457 U.S. 496, 500 (1982)). The *Krull* court was persuaded that because the plaintiff was not required to exhaust his state administrative remedies he was bound by its conclusion if he chose to pursue state administrative remedies. If it were otherwise, then the plaintiff would have the ability to choose to litigate anew in each forum.

Here, however, the Tribe, by virtue of Ch. 1-26 of the South Dakota Code and the *Ex parte Young* doctrine, was required to exhaust state administrative procedure prior to instituting this federal action. The Court agrees with the Tribe that to find claim preclusion stemming from a compelled administrative action would provide inequitable outcomes in this and future cases. The Court is unaware of and has not been directed to any case law, Supreme Court or otherwise, that establishes that state administrative decisions, outside of 42 U.S.C. § 1983, are entitled to claim preclusion foreclosing a claim in its entirety. "Whatever else can be said, it cannot be argued that determination of such [administrative] adjudicators as these, even when reviewed by the review standards ordinarily applied in state courts, are equal to the independent determinations of the federal courts." Wright, *supra*, at § 4471.3.

The State maintains, however, that it is South Dakota law (the law of the original forum) that controls the res judicata effect of the administrative proceeding and not federal law (the law of the second forum). To be sure, "it is fundamental that the res judicata effect of the first forum's judgment is governed by the first forum's law, not by the law of the second forum."

6

*Canady v. Allstate Ins. Co.*, 282 F.3d 1005, 1014 (8th Cir. 2002) (brackets omitted), *overruled on other grounds by Syngenta Crop Protection Inc. v. Henson*, 537 U.S. 28 (2002). To reiterate, however, the Court has not been directed to any authority showing what effect an administrative "judgment" has on a subsequent federal action that is not a § 1983 action under South Dakota law. Furthermore, a threshold question that must be determined before applying state res judicata doctrine is "'not whether administrative estoppel is wise but whether it is intended by the legislature.'" *Iowa Network Services, Inc. v. Qwest Corp.*, 363 F.3d 683, 690 (8th Cir. 2004) (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991)). "Courts do not, of course, have free rein to impose rules of preclusion, as a matter of policy, when the interpretation of a statute is at hand." *See Solimino*, 501 U.S. at 108. *See also Hargis Industries*, 135 S.Ct. at 1305 ("[A]bsent a contrary indication, Congress presumptively intends that an agency's determination (there, a state agency) has preclusive effect."). "Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds." *New Orleans Public Service, Inc., v. Council of City of New Orleans (NOPSI)*, 491 U.S. 350, 359 (1989) (citing *Kline v. Burke Construction Co.*, 260 U.S. 226, 234 (1922)).

The statute the Tribe alleges the State to be contravening, and the one necessarily interpreted by the Court and, previously, the South Dakota Hearing Examiner, is the IGRA. The Court must, therefore, search for congressional intent when it enacted the IGRA as it pertains to res judicata. "[A]lthough states have no constitutional authority over Indian reservations, Congress [has] consistently authorized states to regulate or prohibit certain activities on the reservations." *Texas v. U.S.*, 497 F.3d 491, 500 (5th Cir. 2007). One such grant is embodied in Congress' enactment of the IGRA in 1988. Among the many provisions contained therein is a "'carefully crafted and intricate remedial scheme whereby, if a tribe and state do not voluntarily enter a compact for Class III gaming, the principal alternative is for the tribe to sue the state in federal court and secure a determination that the state had not negotiated in good faith.'" *Id.* (quoting *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 71-73 (1996)). The IGRA travelled through several iterations before "[t]he legislature [] settled on IGRA's judicial remedy and the tribal-state compact requirement as the best mechanism to assure that the interests of both sovereign entities are met with respect to the regulation of complex gaming enterprises." *Id.* at 507 (internal quotations and citations omitted). Today, IGRA is understood as, "passed by Congress under the Indian Commerce Clause, impos[ing] upon the States a duty to negotiate in

good faith with an Indian tribe toward the formation of a compact, . . ." *Seminole Tribe*, 517 U.S. at 47 (internal citations omitted). Pursuant to the IGRA, a Tribal-State compact may, *inter alia*, provide provisions of taxation. *See* 25 U.S.C. § 2710(d)(3)(C)(iii) and (iv).

While in *Seminole Tribe* the Supreme Court held 25 U.S.C. § 2710(d)(7)'s remedial scheme allowing states to be sued to be an unconstitutional abridgment of the Eleventh Amendment, the congressional intent emanating from that scheme should not be ignored. In enforcing the provisions agreed upon in a tribal-state compact, Congress intended for the federal courts to be the principal forum for tribal-state disputes related to gaming compacts. Even after § 2710(d)(7)'s abrogation, a multitude of authority over IGRA procedure still exists with the United States Department of the Interior, National Indian Gaming Commission (NIGC), *see* 25 U.S.C. §§ 2704, 2706, and the Chairman of the NIGC, *see* 25 U.S.C. § 2705. IGRA was passed as a congressional response to the Supreme Court decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). *See Texas v. U.S.*, 497 F.3d at 500. Specifically, it "was 'intended to expressly preempt the field in governance of gaming activities on Indian lands.'" *Mashantucket Pequot Tribe v. Town of Ledyard (Pequot)*, 722 F.3d 457, 469-70 (2nd Cir. 2013) (quoting *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 544 (8th Cir. 1996)). While the Court does not yet express an opinion on whether South Dakota's excise tax violates the IGRA or the Tribal-State Compact in issue, the IGRA is still a focal point of this dispute. Given the statutory history and current composition of the IGRA, the Court finds that to give the South Dakota Hearing Examiner's opinion claim preclusive effect would contravene congressional intent when the IGRA was enacted.

Notwithstanding federal congressional intent, S.D.C.L. § 1-26-30, the statute the State contends mandates that the Tribe appeal to South Dakota Circuit Court, states that it does not limit other means of judicial review. The statute reads, in pertinent part, "This section does not limit utilization of or the scope of judicial review available under other means of review, redress, or relief, when provided by law." S.D.C.L. § 1-26-30. Thus, by its very terms, South Dakota law allows for an aggrieved plaintiff to pursue other courses of judicial action not explicitly provided for in chapter 1-26. Confronted with a similar situation, the Fourth Circuit, in *Moore v. Bonner*, 695 F.2d 799 (4th Cir. 1982), stated that:

8

[t]he choice of whether to proceed in a state or federal forum [] necessarily belongs to the plaintiffs and they cannot be deprived of it by a state rule which gives preclusive effect to unappealed state administrative decisions. A contrary rule would frequently force plaintiffs to choose between foregoing the opportunity to resolve their problems before state administrative bodies and relinquishing their congressionally mandated access to federal courts.

*Id.* at 801.

Even if the Court were to accept that res judicata application is warranted, the State has failed to meet the rule adhered to by South Dakota courts. In order for res judicata to apply South Dakota courts require

(1) a final judgment on the merits in an earlier action; (2) the question decided in the former action is the same as the one decided in the present action; (3) the parties are the same; (4) there was a full and fair opportunity to litigate the issues in the prior proceeding.

*Farmer v. South Dakota Dept. of Revenue and Regulation*, 781 N.W.2d 655, 659 (S.D. 2010); *Wilson Trailer*, 827 F. Supp. at 1051. The first prong of the test is met since, as the State points out in its brief, "[t]he administrative decision became a final and binding decision when the Tribe failed to seek further appellate review as provided by statute." Defendants' Brief in Support of Motion for Judgment on the Pleadings at 8 (citing *Beals v. Wagner*, 668 N.W.2d 415, 417-18 (S.D. 2004)). The third prong is also met as it is uncontested that the current dispute is between the same parties as were before the Hearing Examiner.

Fatal to the State's claim, however, are the second and fourth prongs of the res judicata test. By the Hearing Examiner's own admission, the only issue presented was "the limited [one] of whether the Department [of Revenue] correctly applied SDCL 35-2-24 . . ." Findings of Fact Conclusions of Law & Final Order, DOR 13-24 (2014) (South Dakota Hearing Examiner's final order as to alcohol license reissuance). The focal point of the Hearing Examiner's decision was whether the South Dakota statute was properly applied to the Tribe. While the Final Order discussed IGRA's application, it was in a limited capacity. It was discussed by the Hearing Examiner that application of the State's use tax on the Tribe violated neither IGRA nor the Tribal-State Compact, which is a common issue between the administrative hearing and this action. The Final Order does not, however, address the Tribe's current claims that the tax is preempted by federal law and infringes on the Tribes inherent sovereignty (Third Claim for

Relief). Nor does the Final Order offer any discussion of the Tribe's discrimination (Fourth Claim for Relief) and Deposit Agreement (Seventh Claim for Relief) claims. Moreover, the Hearing Examiner concluded, in broad terms, that South Dakota's tax law applies to the Tribe's sale to nonmembers of intangible goods and services. The Supreme Court has held that when a State seeks to impose a tax on nonmember activity on a reservation, a balancing test of State, Tribal, and Federal interests must be undertaken in order to determine the tax's validity. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144-45 (1980). The Court is unaware if the Hearing examiner undertook such a balancing of interests in reaching its conclusion. Additionally, a related question of the source of the value created (i.e., on or off the reservation) is also relevant to the validity of the state tax. *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 156-57 (1980). Based on the Final Order issued, it is unclear to the Court if the Hearing Examiner considered the distinction between tangible goods purchased off-reservation to be resold to nonmember patrons (e.g., alcohol, cigarettes, and other sundry items) and services provided on the reservation (e.g., hospitality, food services, bowling, and other entertainment).

Ultimately, the administrative process in issue was a state executive procedure meant to assess whether South Dakota's alcohol licensing procedure had been violated by the Tribe and whether the Tribe should be reissued licensure. The Court is aware of neither the exact procedure adhered to by the Hearing Examiner (e.g., rules regarding evidence, witness examination, etc.) nor the substantive scope of the hearing as the only relevant information the Court has is the Final Order. The Court is aware, however, that the hearing related to the South Dakota Department of Revenue's alcohol licensure requirements. The federal action, in contrast, calls into question fundamental principles regarding state taxation on reservation land, federal preemption law, the operation of IGRA, and 28 U.S.C. § 1362. Such questions appear to have been outside the parameters of the South Dakota Department of Revenue hearing process. Because of the limited scope of the Hearing Examiner's review, the Court finds that the Tribe's current claims are not precluded by any res judicata effect of the Hearing Examiner's Final Order.

## B. Younger Abstention

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 813 (1976). Abstention doctrine, which directs federal courts to decline jurisdictional exertion or, at least, postpone it, "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." [4] *Id. See Sprint Communications, Inc. v. Jacobs*, ___ U.S. ___, 134 S.Ct. 584, 588 (2013) ("[F]ederal courts are obliged to decide cases within the scope of federal jurisdiction."). A federal court need not decline exercising jurisdiction merely because a pending state proceeding centers on the same subject matter. *Sprint*, 134 S.Ct. at 588 (citing *NOPSI*, 491 U.S. at 373). After concluding that res judicata is inapplicable, it cannot be disputed that the instant case is properly before this Court. *See id.* at 590 (the Supreme Court "had 'no doubt that federal courts had federal question jurisdiction . . .'" to hear a suit regarding preemptive force of federal law).[5] Thus, it must be determined if the *Younger* abstention doctrine counsels against federal jurisdiction.

Prior to the *Colorado River* and *Sprint* declarations, in *Younger v. Harris*, 401 U.S. 37 (1971), the Supreme Court pronounced "that a federal court, in the absence of unusual circumstances, cannot interfere with a pending state criminal prosecution." Wright, *supra*, at § 4252. Moreover, the Supreme Court has held that application of *Younger* abstention can extend to the civil arena. *Sprint*, 134 S.Ct. at 588 ("This Court has extended *Younger* abstention to particular state civil proceedings that are akin to criminal prosecutions, . . . , or that implicate a State's interest in enforcing the orders and judgments of its courts.") (citations omitted). Recently, the *Sprint* Court revisited the Supreme Court's previous recognition that there exist "certain instances in which the prospect of undue interference with state proceedings counsels against federal relief." *Id.* Ultimately, as was emphasized in *Sprint*, cases suitable for *Younger* abstention "are 'exceptional'; they include, as catalogued in *NOPSI*, 'state criminal

---

[4] It should be noted, however, that reliance on *Colorado River* further than for general pronouncements of abstention would be misplaced. Here, the State maintains that application of *Younger* abstention (or "Our Federalism") counsels against federal court intervention. *Colorado River* abstention, however, is distinct from *Younger*-type abstention, the latter of which inheres in the notions of federalism and comity. *See Colorado River*, 424 U.S. at 817 (observing that the facts presented lent themselves to none of the then-existing abstention doctrines); *Sprint*, 134 S.Ct. at 591 (*Younger* doctrine is "reinforced" by comity – "a proper respect for state functions.").

[5] The Tribe has invoked this Court's jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1362 in that the dispute involves interpretation of IGRA and its alleged preemptive effect by virtue of the Supremacy Clause of the Constitution.

11

prosecutions,' 'civil enforcement proceedings,' and 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Id.* (quoting *NOPSI*, 491 U.S. at 367-68). It is the second category, civil enforcement proceedings, in which the State wishes to place the instant case. The Court disagrees.

At the outset, the cases relied upon by the State, while instructive, are inapposite to or contradictive of the State's argument. *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975) (Ohio officials brought a civil action in state court); *NOPSI*, 491 U.S. at 362 (quoting *Public Util. Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. 456, 468-69 (1943) (noting that it is only a "'rule of equity and not to be applied in blind disregard of fact'" that federal jurisdiction ought to abate in the face of interrupting proceedings of state administrative tribunals)). Thus, while state administrative proceedings may qualify for *Younger* abstention, the fact that a federal court's exercise of jurisdiction may result in an injunction against state action is of no consequence. *NOPSI*, 491 U.S. at 363. "'[T]here is no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy.'" *Id.* (quoting *Zablocki v. Redhail*, 434 U.S. 374, 380 n. 5 (1978)). Relying on *NOPSI* for the proposition that an administrative proceeding and correlating state judicial appeal is a "unitary process" for the purposes of *Younger*, the State asserts that the South Dakota proceeding in issue here is currently "ongoing" and "uninterruptible" by federal jurisdiction. *Id.* at 369 (assuming to be correct that litigation – "from agency through courts" – is a unitary process immune from disruption). This Court agrees insofar as the "agency through courts" process may well qualify as a "unitary process." The Court need not reach that question, however, as it disagrees that the process in issue here fits within any of the prescribed *Younger* categories, specifically, the second (civil enforcement proceeding).

Enforce is defined as "to make or gain by force; to force; to compel" or "to compel observance of; as, to enforce the laws." Webster's New Twentieth Century Dictionary 602 (2nd ed. 1979) (emphasis omitted). Enforcement, then, implies action on the part of the State. For example, the executive, by way of a locality's police force and prosecutor, enforces its criminal laws through some action. "Enforcement actions are characteristically initiated to sanction the federal plaintiff, . . ." *Sprint*, 134 S.Ct. 592 ("In cases of this genre, a state actor is routinely a party to the state proceeding and often initiates the action."). The State completely discounts this

case's procedural posture. Here, the State was, in effect, the "defendant" at the state administrative level. The Tribe initiated the administrative proceeding seeking to compel the reissuance of its alcohol license. It cannot be said, therefore, federal jurisdiction would interrupt the State's civil enforcement proceeding as it was the Tribe seeking to enforce what it perceived to be the law. Moreover, and as a threshold matter, in order to fall under the protection of *Younger*, the state proceeding must be "judicial in nature." *NOPSI*, 491 U.S. at 370. *See Huffman*, 420 U.S. at 604 (civil action brought by Ohio officials meant to curtail the showing of obscene materials in a theater). Such is not present in the case at bar. Here, the state proceeding was a licensure hearing brought, again, by the Tribe (i.e., Plaintiff) and not the State.

This Court recognizes, as others have, that state courts are competent in adjudicating federal issues, a notion that "'is essential to 'Our Federalism,' particularly in the area of state taxation.'" *Pequot*, 722 F.3d at 466 (quoting *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 103 (1981)). As was recognized by the *Pequot* court, however, "[t]here is little precedent for applying the comity doctrine in cases brought by Indian tribes." *Id.* Moreover, this Court endorses the *Pequot* court's ultimate conclusion on abstention doctrine and its interplay with Indian law:

> Two factors counsel against dismissing due to comity in this case, brought by an actual Indian tribe and not yet litigated in state court. First, there are strong federal interests in determining the contours of the [] IGRA, [a] federal regulatory regime[] that entirely occup[ies] (and preclude[s] state legislation in) [a] field of indeterminate size. Where Congress has determined that there are "strong policies . . . favoring a federal forum to vindicate deprivations of federal rights," as in the context of litigation brought by Indian tribes, federal courts should exercise their lawful jurisdiction. *McNary*, 454 U.S. at 119. Second, federal courts have regularly entertained Indian tribes' challenges to state taxes. *See e.g., Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 138 (1980); *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154 (2nd Cir. 2011). Seeing no reason to depart from this precedent, we affirm the denial of the motion to dismiss on comity grounds.

*Id.* The *Pequot* court concluded its discussion by noting that had the trial court dismissed the action premised on comity, "such a decision would have made it the first federal court to dismiss an Indian tribe's challenge of a state tax on comity grounds." *Id.* n. 7. Therefore, this Court declines the State's invitation to dismiss the Tribe's action premised on "Our Federalism" doctrine.

13

## C. Judgment on the Pleadings

Having concluded that the threshold matters of res judicata and *Younger* abstention do not warrant dismissal, the Court will now consider the State's Rule 12(c) motion for judgment on the pleadings. A motion for judgment on the pleadings is appropriately granted "where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009). In considering a motion under Federal Rule of Civil Procedure 12(c), it is analyzed under the same rubric as that of a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. *See id. See also E.E.O.C. v. Northwest Airlines, Inc.*, 216 F. Supp. 2d 935, 937 (D. Minn. 2002).

Under Rule 12(b)(6), the factual allegations of a complaint are assumed true and construed in favor of the plaintiff, "even if it strikes a savvy judge that actual proof of those facts is improbable." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), cited in *Data Mfg., Inc. v. United Parcel Serv., Inc.*, 557 F.3d 849, 851 (8th Cir. 2009). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiffs obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). The complaint must allege facts, which, when taken as true, raise more than a speculative right to relief. *Id.* (internal citations omitted); *Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008). Although a plaintiff in defending a motion under Rule 12(b)(6) need not provide specific facts in support of its allegations, *see Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam), it must include sufficient factual information to provide the grounds on which her claim rests, and to raise a right to relief above a speculative level. *Twombly*, 550 U.S. at 555–556 & n3. Although Federal Rule of Civil Procedure 8 may not require "detailed factual allegations," it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S.662, 678 (2009). A claim must have facial plausibility to survive a motion to dismiss. *Id.* Determining whether a claim has facial plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft*, 556 U.S. at 679.

14

## 1. Indian Gaming Regulatory Act

The State asserts that claims for relief one, two and six of the Tribe's Complaint should be dismissed due to the IGRA's inapplicability and its, therefore, lack of preemptive force. In opposition, the Tribe argues the IGRA's preemptive force extends beyond just actual gameplay to include other related activities that enhance and facilitate gaming. "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." *Casino Resource Corp. v. Harrah's Entertainment, Inc.*, 243 F.3d 435, 437 (8th Cir. 2001) (citing *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334 (1983)). Extrapolating from *Harrah's Entertainment*, it would stand that "'[a]ny claim which would directly affect or interfere with a tribe's ability to conduct its own [gaming] licensing [and operation] process[es] should fall within the scope of [IGRA's] complete preemption.'" *Id.* (quoting *Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 549 (8th Cir. 1996)).

> IGRA was Congress' compromise solution to the difficult questions involving Indian gaming. The Act was passed in order to provide 'a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments' and 'to shield [tribal gaming] from organized crime and other corrupting influences to ensure that the Indian tribe is the primary beneficiary of the gaming operation.' 25 U.S.C. § 2702(1) and (2). IGRA is an example of 'cooperative federalism' in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian Tribes, by giving each a role in the regulatory scheme.

*Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 715 (9th Cir. 2003) (internal quotes and citations omitted).

In its Complaint, the Tribe argues that S.D.C.L. § 35-2-24 interferes with and is, therefore, preempted by operation of the IGRA. The statute reads, in pertinent part,

> No license granted under this title may be reissued to an Indian tribe operating in Indian country controlled by the Indian tribe or to an enrolled tribal member operating in Indian country controlled by the enrolled tribal member's tribe until the Indian tribe or enrolled tribal member remits to the Department of Revenue all use tax incurred by nonmembers as a result of the operation of the licensed premises, and any other state tax has been remitted or is not delinquent.

15

S.D.C.L. § 35-2-24. The ultimate question, therefore, is whether state taxation of nonmember purchases of goods and services at an IGRA-sanctioned casino is preempted and, therefore, violative of the IGRA. The IGRA "provides that a state must negotiate in good faith with its resident Native American tribes to reach compacts concerning casino-style gaming on Native American Lands." *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger* (*Rincon*), 602 F.3d 1019, 1022 (9th Cir. 2010). The IGRA commands that states enter into compacts with Tribes insofar as the Tribe wishes to operate a "class III" gaming enterprise.[6] 25 U.S.C. § 2710(d)(3)(C). The Act further delineates proper subject matter of a compact. 25 U.S.C. § 2710(d)(3)(C)(i)-(vii). The principal subject matter provision here is subsection (vii), which allows for a compact to contain provisions for "any other subjects that are directly related to the operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C)(vii).[7] Furthermore, three conditions must be satisfied before a tribe operates a class III gaming facility:

> (1) authorization by an ordinance or resolution of the governing body of the Indian tribe and the Chair of the National Indian Gaming Commission ('NIGC'); (2) location in a state that permits such gaming for any purpose by any person, organization, or entity; and (3) the existence of a Tribal–State compact approved by the Secretary of the Interior.

*Norton*, 353 F.3d at 715-16 (citing 25 U.S.C. § 2710(d)(1)).

Notably, IGRA does not mention the sale of goods and services to nonmember casino patrons, namely, alcohol sales or a correlating taxation. That fact alone weighs in the Tribes favor. *Id.* at 729 (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 105 (1958))

---

[6] Class III gaming includes slot machines, horse racing, and certain card games. *Michigan v. Bay Mills Indian Community*, ___ U.S. ___, 134 S.Ct. 2024, 2028 (2014). Class I games are defined as traditional tribal games and class II as bingo and "non-banked" card games. *Rincon*, 602 F.3d at 1022 n. 2.

[7] 25 U.S.C. § 2710(d)(3)(C)(i)-(vii) reads, in whole,

   (C) Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to--

   (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

   (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

   (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

   (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

   (v) remedies for breach of contract;

   (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

   (vii) any other subjects that are directly related to the operation of gaming activities.

(describing "two canons of construction that apply specially in Indian law, one of which is that 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'").[8] Moreover, the compact that exists between the Tribe and the State is also silent on the issue. *See* Plaintiff's Brief in Opposition at 13-14; Doc. 32-3 at 6-19 (the Tribe and South Dakota's Tribal-State Compact). The Tribe asserts, however, that subsection (vii) operates as a "catchall" and sales of goods and services are within its contemplation. Instructive on this point are *In re Indian Gaming Related Cases (Indian Gaming)*, 331 F.3d 1094 (9th Cir. 2003) and *Rincon*. In issue in *Indian Gaming* were provisions of a tribal-state compact providing for payments by the Tribe into what were termed the Revenue Sharing Trust Fund (RSTF) and the Special Distribution Fund (SDF). *Indian Gaming*, 331 F.3d at 1114. While the payments were not decidedly held by the court to be "taxes," they were held as being "directly related to the operation of gaming." The SDF payments were directly related as those funds were designated for gaming-related purposes. *Id.* The RSTF funds were also held to be directly related as those amounts were intended to be redistributed from gaming to non-gaming tribes, which the court found to be consistent with the IGRA's purpose of furthering tribal economic development. *Id.* at 1111.

In *Rincon*, California, during its compact negotiations with the Rincon Band of Luiseno Mission Indians (Rincon Tribe), offered a compact to the Rincon Tribe that allowed for the operation of 900 devices[9] above the 1600 then in operation. In return, California demanded the Rincon Tribe pay to California 15% of net winnings on the new devices. Additionally, California offered the Rincon Tribe "exclusivity" in its operations if it paid an additional 15% revenue share. The Rincon Tribe rejected California's proposal and offered its own, which was, likewise, rejected by California. After further negotiations, California made its final offer, which included much of the previous terms, but extended the compact's life for an additional five years and lessened the net win fee from 15% to 10%. The *Rincon* court found this type of payment demanded by California to be a tax, *Rincon*, 602 F.3d at 1029-30 ("No amount of semantic

---

[8] This liberal construction canon grew originally out of land disputes but has since been applied in the context of state jurisdiction to tax. *See Norton*, 353 F.3d at 729 (citing *Bryan v. Itasca County*, 426 U.S. 373 (1976)). Using the canon, the *Norton* court interpreted an ambiguity in the IGRA in a tribe's favor in order to uphold a tribal-state compact that granted Indian tribes monopolies on class III gaming enterprises in California. *Id.* at 728-31.

[9] What was contemplated by "devices" is not clear from the *Rincon* opinion, but, presumably, it is a reference to slot machines and other electronic gambling consoles. Notwithstanding, the definition of "devices" is not pertinent to this discussion.

sophistry can undermine the obvious: a non-negotiable, mandatory payment of 10% of net profits into the State treasury for unrestricted use yields public revenue, and is a 'tax.'"), and in contravention of 25 U.S.C. § 2710(d)(4). *Id.* at 1031 ("[T]he state is using its power over negotiations to force Rincon to pay the State a portion of its income into the State's general fund . . . in order to engage in class III gaming. If § 2710(d)(4) means anything, it means that California cannot do that."). Contrasting the facts confronting it, the Ninth Circuit in *Rincon* noted that the revenue sharing demand made by California was distinct from the payments made by the tribe in *Indian Gaming.* In *Indian Gaming,* the *Rincon* court observed, the funds being paid were clearly "directly related" to gaming. *Id.* at 1033. By contrast, "[g]eneral fund revenue sharing, unlike funds paid into RSTF and SDF, has undefined potential uses." *Id.* In that sense, the court held, what is dispositive on the issue of direct relation is the use to which the funds will be put. *Id.* The *Rincon* court also noted that a state is authorized to "request revenue sharing if the revenue sharing provision is (a) for uses 'directly related to the operation of gaming activities' in § 2710(d)(3)(C)(vii), (b) consistent with the purposes of IGRA, and (c) not 'imposed' because it is bargained for in exchange for a 'meaningful concession.'" *Id.* (emphasis omitted).

Here, the Tribe points to *Rincon's* "use analysis" under prong (a) as being needed to be undertaken and, as a result, a dismissal is unwarranted. *See id.* The Court agrees that that analysis would be aptly applied here. While the instant case is distinct from *Rincon* on the basis that the funds in *Rincon* were general, the two sets of facts are similar insofar as the payments in *Rincon* were payments (i.e., taxes) being made from revenues accumulated from patrons' activities at a tribally-owned casino. As will be discussed further *infra,* this Court is of the opinion that, at a minimum, alcohol purchased and consumed on a casino floor is directly related to class III gaming activity. Thus, like in *Rincon,* the taxes here befall as a result of casino activity. Because the case at bar is in its early stages of litigation, what use the funds will be put to is not clear. Thus, the Court is not yet positioned to fully address the "use analysis." As noted above, however, the Court finds that the Tribe has adequately plead to withstand the State's motion for judgment on the pleadings as to the IGRA's interplay with use taxes on alcohol and corresponding regulation. The IGRA was enacted with the intent of "provid[ing] a legal framework within which tribes could engage in gaming . . . while setting boundaries to restrain aggression by powerful states . . .. Under IGRA, a tribe may conduct class III gaming only once

a compact with its home state is in effect." *Rincon*, 602 F.3d at 1027. Here, a compact exists between the Tribe and the State. As noted above, however, the compact is in no way directed at the State's authority to tax alcohol sales at the Tribe's casino. As the holdings of *Indian Gaming* and *Rincon* make clear, however, state fees may be negotiated for and included in a tribal-state compact so long as the taxes result from class III gaming and comport with 25 U.S.C. § 2710(d)(3)(C)(iii). Pursuant to the IGRA, "the State may attempt to rebut bad faith by demonstrating that the revenue demanded was to be used for 'the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities.'" *Id.* at 1032 (quoting 25 U.S.C. § 2710(d)(3)(B)(iii)(II)). Taking the Complaint's factual allegations as true, the Court finds that the State could have negotiated for taxes on alcohol sales on the Casino floor depending on the use to which those funds were to be put. Failing that, a question remains to be answered whether the State waived its right to such a tax imposition. At the very least, a factual issue remains that is not properly resolved on a motion for judgment on the pleadings.

The Tribe fails to cite to case law, and the Court is not aware of any, that explicitly holds that goods and services sold at a casino directly relates to gaming. The Tribe's brief points out that "[n]o court has ever held that alcohol at a casino is not subject to IGRA, . . ." Plaintiff's Brief in Opposition at 19. What the Tribe fails to address, however, is that no court has ever held that alcohol is subject to the IGRA. When assessing whether certain subject matter falls within the scope of the IGRA's catchall provision, it should not be simply asked "but for the existence of the Tribe's class III gaming operation, would the particular subject regulated under a compact provision exist? Instead, we must look to whether the regulated activity has a direct connection to the Tribe's conduct of class III gaming activities." Doc. 41-2 (Letter from Donald E. Laverdure, Acting Assistant Secretary, Indian Affairs, to Greg Sarris, Chairman, Federated Indians of Graton Rancheria at 10) (July 13, 2012)) (hereinafter, "Graton Letter"). *See* 25 U.S.C. § 2710(d)(3)(C)(vii). Construing the facts, as true, most favorably to the Tribe, the latter question can be answered in the affirmative. *See Indian Gaming*, 331 F.3d at 1111 ("[I]t is clear from the legislative history that by limiting the proper topics for compact negotiations to those that bear a direct relationship to the operation of gaming activities, Congress intended to prevent compacts from being used as subterfuge for imposing State jurisdiction on tribes concerning issues unrelated to gaming."). The Graton Letter, while not dispositive on the issues, supports the

Tribe's argument that, at least, alcohol sales bear a "direct relationship" to class III gaming activities. The Graton Letter does cut against the Tribe, however, on the issues of food and other services provided to nonmembers on Indian land.

In the Graton Letter, Acting Assistant Secretary of Indian Affairs Donald E. Laverdure noted that "[w]hile the [Federated Indians'] provision of food, beverages, and drinking water to its patrons may occur on the same parcel on which it conducts class III gaming, it does not necessarily follow that such activities are 'directly related to the operation of gaming activities' under IGRA." Graton Letter at 11 (citing 25 U.S.C. § 2710(d)(3)(C)(vii)). The Secretary of Indian Affairs, therefore, understood food, beverages, and water services to have no "direct relationship" to class III gaming. Additionally, the Graton Letter "permit[s] the Compact to take effect by operation of law, but only to the extent it is consistent with IGRA[.]" *Id.* at 12. Thus, and as the State points out in its Reply Brief, it is not unheard of that the Secretary of Indian Affairs allows Compacts to survive scrutiny, but only insofar as they comport with the IGRA. *See Rincon*, 602 F.3d at 1041-42 ("Often, the Secretary simply permits compacts with revenue sharing provisions to go into effect 'only to the extent they are consistent with IGRA,' thus leaving open the precise question at issue."). Thus, the Court notes that the fact that the Tribe points to various Compacts between states and tribes that provide for food, alcohol, and service regulation does not imply that such provisions are consistent with IGRA. In fact, the *Rincon* court noted for itself that "[t]he state [] could not reasonably have relied on the Department of the Interior's approval of certain other compacts as proof that its demands to Rincon were lawful." *Id.* at 1042.

The Tribe maintains that alcohol is provided "to facilitate and enhance gaming patronage at the enterprise." Plaintiff's Brief in Opposition at 21. Therefore, it argues, alcohol sales are "directly related to gaming." The Court agrees that alcohol can "facilitate and enhance gaming." Alcohol consumption and gaming on a casino floor are commonly associated and certainly reinforce one another. *See e.g., Hakimoglu v. Trump Taj Mahal Associates*, 70 F.3d 291, 294 (3rd Cir. 1995) (quoting *Tose v. Greate Bay Hotel and Casino Inc.*, 819 F. Supp. 1312, 1317 n. 8 (D.N.J. 1993), *affd*, 34 F.3d 1227 (3rd Cir. 1995))("'The State has regulated the minutiae of gaming rules and alcohol service and expressly permitted the serving of free drinks to patrons at the gambling tables. Surely it could not have been unaware that the cognitive functioning of

many gamblers would be impaired by drinking or of the consequences of permitting persons so impaired to gamble.'"); *Tose*, 819 F. Supp. at 1320 ("At the very least the State condones casino patrons drinking while they place bets, and the policy of providing free drinks on request could arguably be said to actively encourage this conduct."). On the other hand, it can be reasonably argued that water services do not. Were the various food, beverages, and other services to be within the scope of 25 U.S.C. § 2710(d)(3)(C)(vii), there would be no end to what other activities undertaken at an IGRA-sanctioned casino would fall under the IGRA's protection. The Tribe highlights that the Graton Letter states that alcohol regulation is directly related to class III gaming, Graton Letter at 11 n. 13, and should, therefore, be conclusive on the point. When compared to the Graton Letter's position on food and water services, however, the Graton Letter is notably inconsistent and undermines itself. In any event, the Court agrees with the Tribe that alcohol sales can be directly related to gaming. In *Michigan v. Bay Mills Indian Community*, the Supreme Court explicitly defined "class III gaming activity" as "just what it sounds like – the stuff involved in playing class III games. . . . [The] phrases [contained in 25 U.S.C. § 2710(d)(3)(C)] make perfect sense if 'class III gaming activity' is what goes on in a casino – each roll of the dice and spin of the wheel." ___ U.S. ___, 134 S.Ct. 2024, 2032, 188 L.Ed.2d 1071 (2014). At issue there was tribal sovereign immunity as it related to a tribally owned casino on off-reservation land. Michigan argued that because the off-reservation casino was controlled by tribal executives on reservation land IGRA applied and, effectively, abrogated tribal immunity from suit.[10]

While the facts facing the *Bay Mills* Court are distinguishable from the instant case, the Court nonetheless finds that alcohol sales fall within what the Supreme Court defined 25 U.S.C. § 2710(d)(3)(C) as encompassing. Alcohol sales and consumption is commonly associated with gambling, which was recognized in the Graton Letter, and, as the Tribe correctly argues, surely then alcohol availability within a casino advances the casino's, and therefore the Tribe's, interests. Such advancement of tribal interests by way of casino operations and revenue falls squarely within the IGRA's purpose of furthering tribal progress. Moreover, the *Bay Mills* Court

---

[10] The Tribe correctly points out that the facts in *Bay Mills* are distinguishable. Factual distinction notwithstanding, the Supreme Court still defined what 25 U.S.C. § 2710(d)(3)(C) contemplates: A "roll of the dice and spin of the wheel," i.e., gaming, *Bay Mills*, 134 S.Ct. at 2032, and activity directly related to gaming. 25 U.S.C. § 2710(d)(3)(C)(vii). Changing facts does not necessarily change definitions. If what 25 U.S.C. § 2710(d)(3)(C) encompassed morphed with each factual wrinkle, uncontemplated and unpredictable results would be imparted into the statutory scheme.

focused on 25 U.S.C. § 2710(d)(3)(C) as a whole but does not elaborate on what is directly related to "a roll of the dice and spin of the wheel" pursuant to 25 U.S.C. § 2710(d)(3)(C)(vii). In sum, the Court finds neither the Graton Letter nor other Tribal-State compacts dispositive, and being unaware of any case law directly on point, the Court finds, as noted above, that a factual issue exists whether sales of alcohol and other services is directly related to gaming.

Ultimately, since the Court holds that alcohol sales at a casino enterprise can be directly related to class III gaming pursuant to 25 U.S.C. § 2710(d)(3)(C)(vii), regulation and taxation is, therefore, compactable between a tribe and a state. As discussed above, the Ninth Circuit, in *Indian Gaming*, 331 F.3d 1094 (9th Cir. 2003), approved a compact premised on a "tribe's agreement to certain revenue-sharing and employment provisions." *Norton*, 353 F.3d at 723-24 (discussing *Indian Gaming*). The Eighth Circuit recently interpreted IGRA, stating, "Congress indicated that its intent upon passing IGRA was 'to provide a statutory basis for the regulation of gaming by an Indian tribe adequate . . . to ensure that the Indian tribe is the primary beneficiary of the gaming operation.'" *City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 785 F.3d 1207, 1211 (8th Cir. 2015) (quoting 25 U.S.C § 2702(2)). "Congress has noted that for tribes, gaming income 'often means the difference between an adequate governmental program and a skeletal program that is totally dependent on Federal funding.'" *Id.* (quoting S.Rep. No. 100–446, at 3 (1988)). In *Fond du Lac Band*, the Eighth Circuit noted that the Gaming Commission had "determined that rent payments to the City violated the IGRA requirements that a tribe be the sole proprietor of a casino and also the primary beneficiary of gaming." *Id.* Nowhere in the IGRA are rent payments expressly mentioned, but the Gaming Commission did not find that such a fact prevented it from declaring that the IGRA prohibited a city from demanding rent from a tribally owned casino. Surely, rent payments are beyond the specific actions of "a spin of the wheel" or "roll of the dice" and yet the IGRA still has application in that context. So to, here, the Court finds that IGRA can have application on alcohol and other services "directly related to the operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C)(vii).

Alternatively, and, in effect, reinforcing the argument regarding IGRA's applicability, the Tribe argues that 25 U.S.C. § 2710(d)(4) bars the state tax.[11] For this proposition, the Tribe relies

---

[11] That provision reads

> Except for any assessments that may be agreed to under paragraph (3)(C)(iii) of this subsection, nothing in this section shall be interpreted as conferring upon a State or any of its political

heavily on *Rincon*. Unlike *Rincon*, here, the Tribal-State Compact is silent as to the contested issues. Neither the Tribe nor the State asserts any issues stemming from the negotiation of the Compact. Additionally, the tax California sought to impose on the Rincon Tribe was directed at actual gameplay – the net revenue obtained from use of the casino devices. According to 25 U.S.C. § 2702, the IGRA is meant to exalt tribal development, abate criminality resulting from gaming, and ensure a fair operation of gaming. *See Rincon*, 602 F.3d at 1034. The facts presented clearly do not fall into the second and third categories. The Court finds, however, that the first category, furthering tribal development, has application here. As mentioned above, the tax at issue here falls onto the shoulders of nonmember patrons of the casino. That fact does distinguish the case at bar from *Indian Gaming* and *Rincon*. Notwithstanding, it can reasonably be argued that such a tax interferes with the IGRA's purpose of amplifying tribal development as it relates to gaming. Beyond what is authorized by 25 U.S.C. § 2710(d)(3)(C), 25 U.S.C. § 2710(d)(4) prohibits a state from taxing "an Indian Tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity." 25 U.S.C. § 2710(d)(4). The Court finds logical that that proscription applies to nonmembers on the Casino floor authorized to gamble, which includes the costs of associated activities, i.e., gamblers and what they spend on gambling, alcohol, and food in the casino. While the Court does not conclusively rule on this point, as noted previously, the logic does become tenuous as to such things as the Casino's bowling center, gift shop, and motel. Ultimately, and for much of the same reasons expressed above, the Court finds that a factual issue remains as to whether alcohol, food, beverages, and services come within the reach of 25 U.S.C. § 2710(d)(4) that is not properly resolved on the State's motion for judgment on the pleadings. The Court finds that the Tribe's first, second, and sixth claims for relief withstand the State's Rule 12(c) motion for judgment on the pleadings.

## 2. Mescalero

Next, the State argues that the Tribe's fourth claim for relief should be dismissed as it erroneously relies on *Mescalero Apache Tribe v. Jones*, 411 U.S. 145 (1973). At issue in

---

subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity. No State may refuse to enter into the negotiations described in paragraph (3)(A) based upon the lack of authority in such State, or its political subdivisions, to impose such a tax, fee, charge, or other assessment.

25 U.S.C. § 2710(d)(4).

*Mescalero* was a ski resort, located in New Mexico, operated by the Mescalero Apache Tribe. The ski resort itself was located outside of Indian land. Because of the land's location, New Mexico imposed taxes on the resort's gross receipts from the sale of services and tangible property. The Supreme Court rejected, as did the state court, "the broad assertion that the Federal Government has exclusive jurisdiction over the Tribe for all purposes and that the State is therefore prohibited from enforcing its revenue laws against any tribal enterprise whether the enterprise is located on or off tribal land." *Jones*, 411 U.S. at 148-49 (internal quotations and citations omitted). In sum, the Court understood Indian activities carried on outside the reservation, as the ski resort was, to be subject to nondiscriminatory state taxation law, *Id.*, and Indian tribes are not afforded broad immunity irrespective of an activity's location. *Id.* at 155. With the foregoing in mind, the *Mescalero* Court refused to "imply an expansive immunity from ordinary income taxes that businesses throughout the State are subject to." *Id.* at 158. The Court therefore held that an exemption contained in 25 U.S.C. § 465 did not bar New Mexico's generally applied taxation laws from operating on the ski resort's gross receipts. The Supreme Court reached a different conclusion as "to the compensating use tax imposed on the personalty installed in the construction of the ski lifts." *Id.* The ski lifts, which were apparently constructed on reservation land,[12] were exempt from state taxation. The Court held that "[i]n view of s 465, these permanent improvements on the Tribe's tax-exempt land would certainly be immune from the State's ad valorem property tax." *Id.*

Interpreting the contours of the *Mescalero* holding, the Supreme Court in *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 99 (2005), held that any preemption analysis is unnecessary to evaluate a state fuel tax as it applied to an Indian gas station because the tax was, in effect, imposed off-reservation, prior to the Indian-merchant's receipt. What was most significant to the *Wagnon* Court was who bore the "legal incidence" of the state tax. *Id.* at 101 (quoting *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458 (1995) ("We have determined that 'the initial and frequently dispositive question in Indian tax cases . . . is *who* bears the legal incidence of the tax[.]'") (brackets omitted) (emphasis in original)). The *Wagnon* Court went on to rule conclusively that, as the State points out, any interest balancing undertaken by a federal court should be limited to circumstances when a state imposes a tax on a

---

[12] While the ski resort and other buildings themselves bordered the reservation land, some cross-country ski trails were in fact located on Indian land. *See Jones*, 411 U.S. at 146.

24

nonmember doing business on a reservation. *Id.* at 112-13. Therefore, when off-reservation taxes are in issue, instead of balancing the interests of the particular tribe, the federal government, and the state government, a court should look only to whether federal law expressly preempts the off-reservation tax imposition and whether the state law is nondiscriminatory. *See id.* at 113 ("In these cases, we have concluded that absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State.") (internal quotations and citations omitted)).

Thus, the Tribe's reliance on *Mescalero* and *Wagnon* is misplaced insofar it is undisputed that the state tax in issue here is taking place on reservation land. By the plain language of S.D.C.L. § 35-24-2, the use tax imposed is upon nonmember patrons. That does not dispense, however, with the alleged discriminatory nature of the South Dakota tax. Controlling case law on this issue is *Confederated Tribes of the Colville Indian Reservation v. United States (Coleville)*, 447 U.S. 134 (1980), and its progeny. In *Coleville*, the principal issue was "whether an Indian tribe ousts a state from any power to tax on-reservation purchases by nonmembers of the tribe by imposing its own tax on the transaction . . ." *Id.* at 138. Washington State imposed a cigarette excise tax on, *inter alia*, the sale of cigarettes. As a result, the law was to be applied on Indian land insofar as Indian merchants were directed to collect and remit the tax from sales to nonmembers. The tribes in issue all purchased cigarettes from out-of-state dealers. The tribes then distributed the cigarettes to the Indian store owners and collected their own taxes. Thus, by refusing to comply with the state taxation scheme, the tribes were able to sell their cigarettes at a lower price than their nonmember cohorts elsewhere in the state. "In short, the Indian retailer's business [was] to a substantial degree dependent upon [this] tax-exempt status, and if he los[t] that status his sales [would] fall off sharply." *Id.* at 145.

Bolstering the Tribe's claim that taxes on reservation land still must be nondiscriminatory, the *Coleville* Court indicated that "[s]tate[s] may sometimes impose a nondiscriminatory tax on non-Indian customers of Indian retailers doing business on the reservation." *Id.* at 151. *See id.* at 157 ("The [Indian Commerce] Clause may have a more limited role to play in preventing undue discrimination against, or burdens on, Indian Commerce."). The Court continued that these nondiscriminatory taxes may be imposed "even if it seriously disadvantages or eliminates the Indian retailer's business with non-Indians." *Id.* Concurrently,

25

however, "federal law [] has not worked a divestiture of Indian taxing power. Executive branch officials have consistently recognized that Indian tribes possess a broad measure of civil jurisdiction over the activities of non-Indians on Indian reservation lands in which the tribes have a significant interest." *Id.* at 152. In sum, the tribes in *Coleville* argued that because each imposed its own taxation scheme on cigarette sales, any state tax would render their businesses disadvantaged by virtue of being "double taxed." The tribes argued the state taxes were "(1) preempted by federal statutes regulating Indian affairs; (2) inconsistent with the principle of tribal self-government; and (3) invalid under "negative implications" of the Indian Commerce Clause." *Id.* at 154. The *Coleville* Court ultimately found for Washington State, holding that "Washington's taxes are applied in a nondiscriminatory manner to all transactions within the State. And although the result of these taxes will be to lessen or eliminate tribal commerce with nonmembers, that market existed in the first place only because of a claim exemption from these very taxes." *Id.* at 157.

On the issue of tax credits, an issue which the Tribe herein raises, the Supreme Court did note the tribes' argument that not receiving a tax credit from the state placed the Indian retailers at a competitive disadvantage, as compared to other, non-Indian, retailers. *Id.* The Court found that the argument "was not without force," but the tribes had not shown that business "would be significantly reduced by a state tax without a credit as compared to a state tax with a credit." *Id.* Ultimately, the Supreme Court held Washington's tax on nonmember purchases of cigarettes on Indian land validly ran concurrent with the tribes' taxation schemes.

Since the *Coleville* holding, a per se rule has developed that states cannot tax Indians in Indian country unless Congress makes "unmistakably clear" its intention to grant the states authority to tax. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 215 n. 17 (1987). *See* Erik M. Jensen, *Taxation and Doing Business in Indian Country*, 60 Me. L. Rev. 1, 64 (2008) ("State taxes are generally inapplicable to tribes, . . . and tribal members as long as the activity or property that would otherwise be taxed is within Indian country.") Contrarily, when a state imposes a tax on nonmember activity on Indian land, the question of preemption is much more involved compared to activity off Indian land. "State taxes on nontribal members in Indian country are not categorically barred. Instead, courts apply a 'flexible preemption analysis sensitive to the particular facts and legislation involved,' *Cotton Petroleum Corp. v. New*

26

*Mexico*, 490 U.S. 163, 176 (1989), to determine whether a state can impose the taxes." KENNETH BOBROFF, ET AL., COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 702 (Nell Jessup Newton, Lexis Nexis 2005) (1941). Undertaking on-reservation preemption analysis begins with determining where the "legal incidence" of the tax falls. *See Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458-59 (1995) ("The initial and frequently dispositive question in Indian tax cases . . . is who bears the legal incidence of a tax. [I]f the legal incidence of the tax rests on non-Indians, no categorical bar prevents enforcement of the tax."). From there, federal and tribal interests, in conjunction, are weighed against state interests. If the former outweighs the latter, the tax is invalid. Jensen, *supra*, at 73. If, however, state interests predominate, the state tax on the nonmember is permissible. *See Chickasaw Nation*, 515 U.S. at 459. Other factors that have been considered in the context of on-reservation state tax preemption include: the degree of federal regulation, the respective governmental interests of the tribe and state; provision of tribal or state services to the party the state seeks to tax, *see Central Machinery Co v. Arizona State Tax Comm'n*, 448 U.S. 160 (1980); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143-51 (1980); *Coleville*, 447 U.S. at 152-59; the economic burden of the tax, *see Bracker*, 448 U.S. at 149-50; whether the value being taxed is generated on the reservation or is attracted to the reservation solely by the claimed exemption from state taxes, *see Coleville*, 447 U.S. at 154-157; and whether the state tax discriminates against Indian commerce or unduly burdens it, *see id.* at 156-57 (dictum).

Based on the above, the Court disagrees with the State that merely citing to *Mescalero* forecloses the Tribe's fourth claim for relief. The Court finds that the Tribe has pled adequate facts and law to survive a motion for judgment on the pleadings. Emphasis should be placed on the fact that the facts at bar are distinguishable from *Coleville*. Here, the State seeks to tax not only goods presumably purchased by the tribe off the reservation for resale to casino patrons but also services provided to patrons on the reservation. Because this is a tax being imposed on Indian land, the interests of the Tribe, the State, and the federal government all must be weighed in order to determine if the State's taxes are permissible. The Tribe's Complaint, alone, is not enough to make that determination. The Tribe, therefore, has met the threshold requirement of plausibility.

## 3. Ripeness

The State next argues that the Tribe's fifth claim for relief should be dismissed as it is unripe for judicial determination. "'The ripeness inquiry requires examination of both fitness of the issues for judicial decision and the hardships to the parties of withholding court consideration.'" *Parrish v. Dayton*, 761 F.3d 873, 875 (8th Cir. 2014) (quoting *Nebraska Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038 (8th Cir. 2000)) (internal quotations and internal citations omitted). "The fitness prong 'safeguards against judicial review of hypothetical or speculative disagreements.'" *Id.* (quoting *MidAmerican Energy*, 234 F.3d at 1038). The hardship inquiry focuses on "whether delayed review 'inflicts significant practical harm' on the plaintiffs." *Id.* (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)). A claim is unripe "'if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Id* at 875-76 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)) (internal quotations and citations omitted). It is sufficient for ripeness purposes, however, that injury is "certainly impending." *Id.* at 876 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)) (internal quotations and citations omitted).

Here, the disagreement is neither hypothetical nor speculative. Under S.D.C.L. § 35-24-2, in order to retain its alcohol license, the Tribe was obligated to remit any applicable use tax or risk losing its alcohol licensure. The Tribe failed to remit the tax. The State declined to renew the Tribe's license. This action followed. The notion that the exact contours of the remittance mechanism are vaguely defined is irrelevant. The Tribe is alleging that the tax scheme in its entirety is invalid as applied to its on-reservation patrons. As a corollary, therefore, the Tribe argues that any remittance scheme is, likewise, invalid. Thus, the disagreement is not hypothetical, it occurred when the Tribe and State failed to adhere to their respective "obligations."

In *Dayton*, a Minnesota law was passed making child-care providers "executive branch state employees employed by the commissioner of management and budget for collective bargaining purposes." *Dayton*, 761 F.3d at 875 (internal quotations and citations omitted). The law allowed for the providers to elect an "exclusive representative" to represent the providers in negotiations with the state. The representative could then assess a "fair share fee" on other

employees. To commence an election, a petition had to be filed by a candidate. At the point in which the case was in front of the Eighth Circuit, no employee organization had filed a petition. Plaintiffs to the action "argue[d] that exclusive representation and the fair share fee violate[d] their First Amendment rights." *Id.* In opposition, the state and an employee organization asserted that the plaintiff's claims were unripe as no petition had been filed. The Eighth Circuit agreed, noting that no election was scheduled, a petition for an election had not been filed, and the election of a representative was not "certainly impending, and may have not [have] occur[ed] at all." *Id.* at 876.

By contrast, the Tribe allegedly violated the remittance requirement by failing to collect and remit the pertinent use taxes. In response, the State allegedly injured the Tribe by declining to renew the alcohol licenses. Now, however, the State maintains that the action pertaining to the remittance scheme should be dismissed as unripe as the boundaries of the remittance scheme are undeveloped. The State cannot have it both ways. It cannot withhold a licensee's renewal due to the licensee's failure to comply with the law (i.e., the remittance requirement) and simultaneously assert that the claim is unripe due to the law not having yet been developed (i.e., undefined remittance mechanism). Such a circuitous argument cannot form the basis of a ripeness defense.

### 4. Consent

Finally, the State contends that the Tribe's eighth claim for relief is fit for dismissal due to the Tribe's alleged consent to South Dakota's alcohol licensing laws. The State argues that by applying for an alcohol license, the Tribe consented to application of South Dakota's alcohol licensing scheme. Thereby, the State maintains, the Tribe consented to remit the pertinent use tax pursuant to S.D.C.L. § 35-2-24 as a condition of alcohol licensure. The Tribe's opposition is twofold: First, states have no authority to convert invalid on-reservation taxes into valid taxes by merely conditioning alcohol licensure on paying the taxes. Second, the Tribe asserts that a state's power to regulate alcohol within its borders does not empower the state to attach tax conditions to licensures that have no nexus to alcohol regulation.

29

While the parties do not agree as to the extent of its application, it is agreed that 18 U.S.C. § 1161[13] is the relevant statute. It "provides that liquor transactions in Indian country are not subject to prohibition under federal law provided those transactions are 'in conformity both with the laws of State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country.'" *Rice v. Rehner*, 463 U.S. 713, 716 (1983) (quoting 18 U.S.C. § 1161). Federal control of alcohol in Indian country is "'one of the most comprehensive [federal] activities in Indian affairs ....'" *Id.* at 722 (quoting Cohen's Handbook of Federal Indian Law 273 (1982)). Traditional notions of Indian sovereign immunity and inherent authority have not been recognized to militate in favor Indian regulation of alcohol. *Id.* Consequently, that inherent authority, independently, established an Indian tribe's regulatory authority over alcohol was rejected by the *Rehner* Court. *Id.* at 725.

When confronted with the issue of whether 18 U.S.C. § 1161 preempted state regulation of alcohol in Indian country or authorized it, the *Rehner* Court held the latter. The *Rehner* Court engaged in a discussion of 18 U.S.C. § 1161's legislative history and viewed it "as federal prohibition, and as legalizing Indian liquor transactions as long as those transactions conformed both with tribal ordinance and state law." *Id.* at 728. In effect, the statute operated to delegate Congressional authority over liquor regulation in Indian country to both Indian tribes and states, concurrently. *See id.* at 728-29, 733-34. Accordingly, it was held by the *Rehner* Court that 18 U.S.C. § 1161 required a tribe to adhere to both tribal ordinances and state law when seeking to regulate the sale of liquor. Such adherence, additionally, required tribes to obtain applicable state liquor licenses.

This Court agrees that, contrary to what the State asserts, the Tribe's eighth claim for relief is not an assertion that the State's liquor license requirement is inapplicable to the Tribe generally. Based on *Rehner*, such an assertion would plainly be incorrect. Instead, the eighth

---

[13] The statute reads

> The provisions of sections 1154, 1156, 3113, 3488, and 3669, of this title, shall not apply within any area that is not Indian country, nor to any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register.

28 U.S.C. § 1161.

claim for relief states that conditioning issuance of a liquor license on taxes unrelated to alcohol regulation is invalid. More specifically, the Tribe is not asserting that the State's alcohol licensure requirement is invalid as to the Tribe, but that the State, pursuant to S.D.C.L. § 35-2-24, conditioning reissuance of the liquor licenses on the remittance of alleged invalid, unrelated taxes is an improper exercise of state regulatory authority. It is on this issue that the *Rehner* decision departs from relevance. *Rehner* was concerned with whether California may impose its liquor licensing requirement on an Indian merchant selling alcohol on reservation land. It did not, however, contend with the more discrete issue of what conditions may be attached to licensure.

The Court discussed *supra* the various limitations on a state's taxation authority on reservation land. If a tax on Indian land is invalid, as a corollary, it seems axiomatic that a state cannot condition certain powers on the payment of those very same invalid taxes. The State defends by asserting that 18 U.S.C. § 1161 instructs tribes wishing to sell alcohol on reservation land to comply with both state law and tribal ordinances. This much is true. The State also seems to suggest, however, that the state laws the tribes must comply with may be of indeterminate scope and contemplate a vast array of subject matter unrelated to alcohol regulation. All a state need do is establish a statutory scheme superficially connecting the subject matter (here, a tax) with alcohol regulation. For this proposition, the State cites to various cases, all of which, however, are unrelated to the issue the Tribe challenges. *See Fort Belknap Indian Community of Fort Belknap Indian Reservation v. Mazurek (Mazurek)*, 43 F.3d 428 (9th Cir. 1994) (Montana sought to prosecute Indians for state liquor law violations on reservation land); *City of Timber Lake v. Cheyenne River Sioux Tribe*, 10 F.3d 554 (8th Cir. 1993) (whether a tribe has alcohol regulatory authority over non-Indians in non-Indian communities within reservation land); *Citizen Band of Potawatomi Indian Tribe of Oklahoma v. Oklahoma Tax Comm'n*, 975 F.2d 1459 (10th Cir. 1992) (challenge to state alcohol license requirement to sell 3.2% beer); *Squaxin Island Tribe v. State of Washington*, 781 F.2d 715 (9th Cir. 1986) (challenge to state tax on liquor sales to non-Indians). The foregoing cases all deal with regulations sharing a nexus with alcohol. As it pertains to liquor licenses, case law instructs that states may require Indian merchants to obtain such a license. The cited cases, however, are silent as to states' various requirements for receiving that license. Specifically, case law is bereft of instruction as to what states may permissibly tax before issuing a liquor license.

31

While *Squaxin* may appear useful, the regulation in issue there dealt with a tax directly on alcohol sales. The *Squaxin* court explicitly noted that the challenge was to "the state's authority to regulate or tax tribal liquor sales to non-tribal members." *Squaxin*, 781 F.2d at 719 (emphasis omitted). This Court agrees with the Tribe that S.D.C.L. § 35-2-24 is broader. The *Squaxin* court itself noted that "the value marketed [there] by the tribes to non-tribal members '[was] not generated on the reservation by activities in which the Tribes have a significant interest' but [was] instead 'solely an exemption from state taxation.'" *Id.* at 720 (quoting *Coleville*, 447 U.S. at 155). Consequently, the *Squaxin* court, at least impliedly, indicated that the state tax was valid as it was confined strictly to alcohol sales marketed toward non-members who were being empowered to avoid state tax impositions.

As was held in *Rehner*, tradition does not weigh in favor of tribal regulation of liquor. "[T]radtion simply has not recognized a sovereign immunity or inherent authority in favor of liquor regulation by Indians." *Rehner*, 463 U.S. at 722. Instead, "[f]ederal law provides a comprehensive scheme of liquor regulation within Indian country." Cohen, *supra*, at 889. Within that scheme, 18 U.S.C. § 1161 delegates concurrent regulatory authority to the states and tribes. Contrarily, a state's authority to tax in Indian country is operationally curtailed by a tribe's sovereign immunity.

> State power, including the power to tax, may be limited within Indian country if either the exercise of state power would "infringe on the right of the Indians to govern themselves," *Williams v. Lee*, 358 U.S. 217, 223 (1959), or the exercise would be preempted by federal law, *See McClanchan v. Arizona State Tax Comm'n*, 411 U.S. 164 (1973), [which is] now generally a matter of weighing federal and tribal interests against state interests.

Jensen, *supra*, at 56. Therefore, the Court finds that the Tribe has adequately plead to withstand a Rule 12(c) motion for judgment on the pleading as to its eighth claim for relief. Accordingly,

IT IS ORDERED

> (1) that the State's motion to dismiss the Complaint based on res judicata is denied;
> (2) that the State's motion to dismiss the Complaint pursuant to *Younger* abstention is denied;
> (3) that the State's motion for judgment on the pleadings as to Claims for Relief One, Two and Six is denied;

32

(4) that the State's motion for judgment on the pleadings as to the Fourth Claim for Relief is denied;

(5) that the State's motion for judgment on the pleadings as to the Fifth Claim for Relief is denied; and

(6) that the State's motion for judgment on the pleadings as to the Eighth Claim for Relief is denied.

Dated this 18th day of December, 2015.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
                  DEPUTY

33