UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

**FILED**
FEB 11 2016


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| FLANDREAU SANTEE SIOUX TRIBE, a federally recognized Indian Tribe | \* \* \* \* | CIV 14-4171 |
| Plaintiff, | \* \* | |
| vs. | \* \* \* | MEMORANDUM OPINION AND ORDER ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS |
| ANDY GERLACH, Secretary of the State of South Dakota Department of Revenue; and DENNIS DAUGAARD, Governor of the State of South Dakota, | \* \* \* \* \* | |
| Defendants. | \* \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Before the Court is the Flandreau Santee Sioux Tribe's (the Tribe) motion for judgment on the pleadings. In its motion, the Tribe asks the Court to declare that the Indian Gaming Regulatory Act (the IGRA) is broad enough in scope to cover sales of goods and services beyond that of just pure gameplay on a casino floor. In addition, the Tribe moves to dismiss the State's counterclaim related to a 1994 deposit agreement (the "Deposit Agreement") that the Tribe and State are parties to. The Deposit Agreement established an escrow account into which the Tribe was to pay a disputed tax amount pending the final resolution of a federal action pending in South Dakota District Court at the time. For the following reasons, the Tribe's motion is granted. The facts laid out below are primarily taken from a previous Memorandum Opinion and Order this Court issued on the State's own motion for judgment on the pleadings, Doc. 59.

## BACKGROUND

The Tribe is federally recognized. It operates Royal River Casino on the Flandreau Indian Reservation in Moody County in eastern South Dakota. Operating as a single business enterprise

1

under the Royal River name, the Tribe owns and operates the Royal River Casino, the Royal River Bowling Center, and the First American Mart (collectively, the "Casino"). Within these three businesses, the Casino is divided further into various departments: gaming, hotel/hospitality, gift shops, restaurants, entertainment venues, bowling alley, and a convenience store. As a unitary business, the entire enterprise is overseen by the Tribe's elected governing body, the Flandreau Santee Sioux Executive Committee. Revenue, including that from casino gaming activities, is calculated in the aggregate as "net revenues." Of that sum, 45% is disbursed to tribal members.

Pursuant to the IGRA, the Tribe and the State have in place a Tribal-State gaming compact (the "Compact"), which controls the Tribe's gaming operations. The Compact contemplates neither explicitly nor impliedly the State's authority to apply its alcohol regulatory laws to the Tribe's "gaming facility," nor does it contemplate a State's authority to impose its use taxes on nonmember activity made at the Casino, nor does it contemplate the State's requirement that the Tribe collect and remit the use taxes from nonmember activities or purchases.

The Casino's patron base is approximately 60% South Dakota residents. Irrespective of residential or tribal status, the Tribe offers its patrons "goods and services," which include "bowling, shows and other live entertainment, lodging, food, beverages, package cigarettes, and other sundry items." Consequently, it is undisputed that the Tribe sold these various goods and services to nonmembers at the Casino. It is also undisputed that the Tribe has not remitted the relevant use taxes on nonmember sales to the State.

The State has issued the Tribe three alcohol licenses, one for each of the three Casino-encompassed businesses. These licenses are, however, conditioned on the Tribe's remittance of the State use tax pursuant to S.D.C.L. § 35-2-24. The South Dakota statute does not differentiate between alcohol tax and use tax on other goods and services. In 2009 and 2010, the Tribe sought from the State a renewal of its three alcohol licenses. Based on S.D.C.L. § 35-2-24, both requests were denied by the State as the statute directs that licenses are not to be reissued until use taxes incurred by nonmembers have been remitted. S.D.C.L. § 35-2-24 was enacted in 2007.

As a result, the Tribe, pursuant to S.D.C.L. § 1-26-16, requested a hearing before the South Dakota Office of Hearing Examiners to review the State's alcohol license denial.[1] At the hearing, the Hearing Examiner concluded that all nonmember purchases at the Casino are subject to the use tax scheme, that the Tribe failed to remit the use taxes, and, therefore, the Tribe was not entitled to alcohol license renewal. Prior to the Hearing Examiner's decision becoming final, the Tribe filed this action in federal court on November 18, 2014. The Tribe simultaneously moved the Court for preliminary injunction enjoining state action pursuant to the Hearing Examiner's decision. The Tribe and State made the motion for preliminary injunction moot by entering into a stipulation whereby the State recognized the three alcohol licenses' continuing validity pending a decision on the merits in this case. The Tribe did not appeal the Hearing Examiner's decision to South Dakota state court.

Specific to this federal action, the Tribe alleges that the State lacks authority to impose its use tax scheme on reservation land against nonmember Casino patrons. In its Complaint, the Tribe alleges that the IGRA preempts the field of taxation thereby barring the State's imposition. To that end, the Tribe argues that all activity engaged in under the Royal River Casino name is "gaming activity" untaxable by the State by virtue of the IGRA (Claims for Relief One, Two and Six). In addition, the Tribe asserts that, as a predicate to the funds contained in the escrow account being disbursed to the Tribe, the State is without power to impose its taxation scheme on the Tribe's Casino (Claim for Relief Seven).[2] Specifically, the Tribe seeks a declaratory judgment from this Court holding that the State does not have the authority to tax purchases of goods and services made by nonmembers at the Casino.

---

[1] It should be noted that the Tribe applied for a license renewal each year since the initial denial. Each request has been denied by the State. Amended Complaint at 15. The Tribe, however, is enabled to continue operations under the original licenses until a final administrative decision pursuant to a stipulation between the Tribe and the State. *Id.* at 16.

[2] On April 14, 1994, the Tribe initiated an action seeking declaratory and injunctive relief against then South Dakota Governor Walter D. Miller and then Secretary of Revenue of South Dakota Ronald J. Schreiner. There, the Tribe alleged that the State lacked jurisdiction to impose its sales and use taxes on tribal sales of personal property to nonmembers when the sales occur on Indian trust lands, i.e., the Casino. The case was consolidated with a pending case that raised similar issues. *Sisseton-Wahpeton Dakota Nation v. State of South Dakota, et. al.*, No. CIV 93-1033 (D.S.D.). Related to that litigation, the Tribe entered into the Deposit Agreement wherein the Tribe agreed to deposit the aggregate amount of disputed tax liability into an escrow account pending final resolution of the case. The primary distinction between the 1994 litigation and the current federal action is that the State no longer seeks to impose its sales tax on the Casino, only the use tax is sought to be imposed by the State. CIV 93-1033 by stipulation of the parties was dismissed without prejudice in 1998. After the dismissal, the Tribe stopped depositing funds pursuant to the Deposit Agreement.

## STANDARD OF REVIEW

A motion for judgment on the pleadings is appropriately granted "where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009). In considering a motion under Federal Rule of Civil Procedure 12(c), it is analyzed under the same rubric as that of a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. *See id. See also E.E.O.C. v. Northwest Airlines, Inc.*, 216 F. Supp. 2d 935, 937 (D. Minn. 2002). Under Rule 12(b)(6), the factual allegations of a complaint are assumed true and construed in favor of the plaintiff, "even if it strikes a savvy judge that actual proof of those facts is improbable." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), cited in *Data Mfg., Inc. v. United Parcel Serv., Inc.*, 557 F.3d 849, 851 (8th Cir. 2009). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). The complaint must allege facts, which, when taken as true, raise more than a speculative right to relief. *Id.* (internal citations omitted); *Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008). Although a plaintiff in defending a motion under Rule 12(b)(6) need not provide specific facts in support of its allegations, *see Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam), it must include sufficient factual information to provide the grounds on which her claim rests, and to raise a right to relief above a speculative level. *Twombly*, 550 U.S. at 555–556 & n. 3. Although Federal Rule of Civil Procedure 8 may not require "detailed factual allegations," it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim must have facial plausibility to survive a motion to dismiss. *Id.* Determining whether a claim has facial plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft*, 556 U.S. at 679.

## DISCUSSION

### The IGRA's Scope

In a previous Memorandum Opinion and Order, Doc. 59, this Court denied the State's motion for judgment on the pleadings. In the motion, the State sought to dismiss parts of the Tribe's Complaint insofar as, it argued, the IGRA is not applicable to the Tribe's action. Finding in favor of the Tribe, the Court ruled that alcohol sales to nonmember patrons at the Casino can be directly related to class III gaming and taxes on the sales are, therefore, preempted by the IGRA. As discussed in the Memorandum Opinion, "Congress indicated that its intent upon passing IGRA was 'to provide a statutory basis for the regulation of gaming by an Indian tribe adequate . . . to ensure that the Indian tribe is the primary beneficiary of the gaming operation.'" *City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 785 F.3d 1207, 1211 (8th Cir. 2015) (quoting 25 U.S.C § 2702(2)). Allowing a Tribe to be the primary beneficiary of alcohol sales made on a casino floor is consistent with congressional intent. Having so ruled in the Memorandum Opinion and Order, the Court now grants the Tribe's motion for judgment on the pleadings and a declaration that the IGRA may encompass more than pure gameplay. As the Memorandum Opinion and Order states, at the least, there is a factual issue that remains to be resolved relative to which goods and services sold at the Casino relate to class III gaming. Alcohol is sold, entertainment is provided, meals are eaten, rooms are rented, and other activities take place. The Court will ultimately hear evidence on what activities are covered by the IGRA. In any event, the Court finds the IGRA covers activity beyond just pure gameplay at a casino.[3]

---

[3] The South Dakota Department of Revenue held an administrative hearing and determined essentially that state law preempted the IGRA. That conclusion is directly contrary to the IGRA and settled law. 25 U.S.C. § 2710(d)(3)(C)(i)-(vii); *Casino Resource Corp. v. Harrah's Entertainment, Inc.*, 243 F.3d 435, 437 (8th Cir. 2001) (citing *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983)) ("State jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority."). Further, an administrative hearing within a state regulatory department is not "a final determination by a court of proper jurisdiction . . ." as required by Recital F of the Deposit Agreement. The "court of proper jurisdiction" is clearly federal court for the determination of application of the IGRA concerning a tribal casino on tribal land. *Michigan v. Bay Mills Indian Community*, __ U.S. __, 134 S.Ct. 2024, 2028, 188 L.Ed.2d 1071 (2014) by comparison held that "Indian tribes have immunity even when a suit arises from off-reservation commercial activity." That is, unless there is a waiver of immunity under a compact or the IGRA. There is no applicable compact waiver in the present case. Also, *see generally, City of Duluth v. Fond du Loc Band of Lake Superior Chippewa*, 785 F.3d 1207 (8th Cir. 2015).

## Escrow Account

The Tribe also moves to dismiss the State's counterclaim. The counterclaim, the Tribe argues, violates tribal sovereign immunity and cannot be maintained in this Court. The State's counterclaim centers on the Deposit Agreement that it and the Tribe entered into in 1994. In 1994, the Tribe filed a Complaint in this Court seeking injunctive and declaratory relief. *Flandreau Santee Sioux Tribe v. State of South Dakota, et al.*, Civ. No. 94-4086 (D.S.D.). The action was consolidated with *Sisseton-Wahpeton Sioux Tribe v. State of South Dakota, et. al.*, No. CIV 93-1033 (D.S.D.). *See, supra*, note 2 and accompanying text. In that action, the Tribe challenged not only the State's imposition of a use tax on nonmember purchases of goods made at the Casino, but also a sales tax. Doc. 32-1 at 2 ("The State contends that the Tribe is subject to the sales and use tax laws and liquor licensing laws of the State of South Dakota as they pertain to the Tribe's transactions with non-Indians and non-members at the Tribe's casino, which contention the Tribe disputes. . . . The State further contends that the Tribe has incurred and will continue to incur sales tax liability through its sales to non-Indians and non-members[.]"). Related to that disputed tax liability, the State and Tribe entered into the Deposit Agreement. "This agreement required [the Tribe] to 'deposit a sum equal to four percent (4%) of the Tribe's total gross receipts (disputed tax liability)' with an escrow agent." Defendants' Answer to First Amended Complaint, Doc. 34, at 19 (quoting the Deposit Agreement). The 1994 action which was consolidated with CIV 93-1033 was dismissed without prejudice on April 30, 1998. Around that time, the Tribe ceased making payments into the escrow account. Thus, no final determination as to the propriety of the State's tax imposition was made. Presently, the escrow account contains over $400,000.

In its counterclaim, the State requests (1) that this Court order the Tribe to "deposit the required sum, pursuant to the Deposit Agreement, from the date the Tribe stopped depositing such sum in the escrow account to the date the funds in the escrow account are disbursed[,]" *Id.*, and (2) the escrow agent be ordered to disburse the contents of the escrow account to the State. *Id.* at 20.

"It is well established that Indian tribes possess the common law immunity from suit traditionally enjoyed by sovereign powers." *Rosebud Sioux Tribe v. Val-U Const. Co. of South Dakota, Inc. (Val-U Const.)*, 50 F.3d 560, 562 (8th Cir. 1995) (citing *Santa Clara Pueblo v.*

6

*Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978)). Tribal immunity may be waived in one of two ways: First, "Congress must 'unequivocally' express that purpose." *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411, 418, 121 S.Ct. 1589, 1594, 149 L.Ed.2d 623 (2001) (citing *Martinez*, 436 U.S. at 58). Second, a Tribe may itself waive its immunity to suit, but "a Tribe's waiver must be 'clear.'" *Id.* (citing *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991)). See *Val-U Const.*, 50 F.3d at 562 ("A tribe may waive its immunity, but such waiver cannot be implied but must be unequivocally expressed.") (internal quotations and citation omitted); *Squaxin Island Tribe v. State of Washington*, 781 F.2d 715, 723 (9th Cir. 1986) ("Consent to suit must be unequivocally indicated.") (internal citation omitted).

Specific to counterclaims, "[a]n Indian Tribe does not consent to suit on a counterclaim merely by filing an action as a plaintiff." *Chemehuevi Indian Tribe v. California State Bd. of Equalization*, 492 F. Supp. 55, 58 (N.D.C.A. 1979) (citing *U.S. v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940)), *rev'd in part on other grounds*, 757 F.2d 1047 (9th Cir. 1985). See *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah (Ute Indian Tribe)*, 790 F.3d 1000, 1009 (10th Cir. 2015) (citing *Oklahoma Tax Comm'n*, 498 U.S. at 509-10) (holding that the principle of sovereign immunity "extends to counterclaims lodged against a plaintiff tribe–even compulsory counterclaims."). "'[T]he sovereign does not waive immunity as to claims which do not meet the same transaction or occurrence test nor to claims of a different form or nature than that sought by it as plaintiff nor to claims exceeding in amount that sought by it as plaintiff.'" *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1344 (10th Cir. 1982) (quoting *Frederick v. U.S.*, 386 F.2d 481, 488 (5th Cir. 1967)). Instead, when a Tribe files an action, it is immune from the defendant's counterclaims "except for [counterclaims grounded] in recoupment[.]" *Val-U Const.*, 50 F.3d at 562 (citing *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 874 F.2d 550, 552 (8th Cir. 1989)). "Recoupment is a defensive action that operates to diminish the plaintiff's recovery rather than to assert affirmative relief." *Id.* (citing *Andrus*, 687 F.2d at 1344). "Claims in recoupment arise out of the same transaction or occurrence, seek the same kind of relief as the plaintiff, and do not seek an amount in excess of that sought by the plaintiff." *Berrey v. Asarco, Inc.*, 439 F.3d 636, 643 (10th Cir. 2006) (citing *FDIC v. Husley*, 22 F.3d 1472, 1487 (10th Cir. 1994)). "Traditionally, [] court[s] [have] treated recoupment as 'an

7

equitable defense that applies only to suits for money damages.'" *Ute Indian Tribe*, 790 F.3d at 1011 (quoting *Citizen Band Potawatomi Indian Tribe v. Oklahoma Tax Comm'n*, 888 F.2d 1303, 1305 (10th Cir. 1989), *rev'd in part on other grounds*, 498 U.S. 505, 111 S.Ct. 905). In a counterclaim for recoupment, the finding of a waiver is based "on the rationale that 'recoupment is in the nature of a defense arising out of some feature of the transaction upon which the [sovereign's] action is grounded.'" *Asarco*, 439 F.3d at 643 (quoting *Bull v. U.S.*, 295 U.S. 247, 262, 55 S.Ct. 695, 79 L.Ed. 1421 (1935)). "[T]hus, when a tribe files suit it waives its immunity as to counterclaims of the defendant that sound in recoupment." *Id.* (citing *Andrus*, 687 F.2d at 1344).

The State does not argue that Congress has waived the Tribe's immunity in these circumstances. *See Oklahoma Tax Comm'n*, 498 U.S. at 510 ("Although Congress has occasionally authorized limited classes of suits against Indian tribes, it has never authorized suits to enforce tax assessments."). Instead, it is argued that the counterclaim may be brought in recoupment by virtue of the Tribe bringing the present action or, alternatively, that the Tribe waived its immunity from suit when it entered into the Deposit Agreement with the State. The Court disagrees as to both arguments. The Supreme Court has held, "Tribe[s] [do] not waive [] sovereign immunity merely by filing an action for injunctive relief." *Id.* at 509-10. Generally speaking, the Tribe's Complaint seeks injunctive relief and a declaration from this Court that the State is without power to impose its taxation and related alcohol regulatory schemes on the Tribe's Casino revenues. Most pertinent to this Rule 12(c) motion, the Tribe's Seventh Claim for Relief seeks declaratory relief from this Court in the form of a declaration that the State lacks jurisdiction to assess sales and use taxes at the Casino. First Amended Complaint, Doc. 32, at 32. While the Tribe alleges in the Seventh Claim for Relief that such a declaration is a necessary "predicate to disbursement" of the funds in the escrow account, the claim does not affirmatively seek this Court to order the funds disbursed to the Tribe. *Id.* By contrast, the State's First Claim for Relief seeks monetary relief from the Tribe that in no way is meant to offset a claim for relief contained in the Tribe's Complaint. Thus, insofar as the Tribe's present action is one for injunctive and declaratory relief, the State's counterclaim seeking monetary relief in the form of further payments into the escrow account from the Tribe is not an action in recoupment and the First Claim for Relief is, therefore, barred by tribal sovereign immunity.

Regarding the State's alternative argument that the Tribe has waived sovereign immunity, Section 4(B) of the Deposit Agreement states, "The parties agree that this escrow agreement does not constitute a waiver of any defenses or causes of action in any pending or future action not specifically waived in this agreement." Doc. 32-1 at 6. *See Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 759, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998) ("Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation."). Notwithstanding, the State asserts that by entering into the Deposit Agreement, it, in effect, provides a basis for the State to sue the Tribe as a means to collect taxes. "There is no doubt[, however,] that sovereign immunity bars the State from pursuing the most efficient remedy," i.e., federal court action. *Oklahoma Tax Comm'n*, 498 U.S. at 514. *See Chemehuevi Indian Tribe*, 492 F. Supp. at 60-61 ("[E]ven if the court were to decide in favor of the Board in the Declaratory judgment action brought by the Tribe, it would still not have jurisdiction to adjudicate a counterclaim against the Tribe, nor to award money damages or injunctive relief against the Tribe. The Tribe's sovereign immunity might create practical difficulties for the Board in attempting to enforce its cigarette tax laws against the Tribe, but these potential enforcement problems cannot override the Tribe's claim of sovereign immunity."). As the *Oklahoma Tax Commission* Court held, there are other means through which a state may collect taxes from a tribe without violating sovereign immunity doctrine. The Supreme Court has "never held that individual agents or officers of a tribe are not liable for damages in actions brought by the State. . . . States may also enter into agreements with the tribes to adopt a mutually satisfactory regime for the collection of this sort of tax." *Id.* (citations omitted). Other language in the Deposit Agreement also cuts against the State. Recital F. of the Deposit Agreement establishes the rights of the Tribe and State under the agreement. It states that

> the aggregate amount of any disputed tax liability prior to a final resolution of the matter now pending in the United States District Court for the Northern Division of South Dakota, Sisseton-Wahpeton Sioux Nation v. State of South Dakota, Civil Suit Number 93-1033 [] be deposited with Farmer's State Bank as the escrow agent.

Doc. 32-1 at 3. Recital F. further delineates two means through which the escrow account's contents may be disbursed.

9

> The parties further agree that in the event a final determination is not reached in CIV93-1033, the amount of disputed tax liability, deposited pursuant to this agreement, together with any accrued interest thereon, shall remain with the escrow agent pending a disbursement agreement between the State and the Tribe or a final determination by a court of proper jurisdiction, whichever occurs first.

*Id.* The Deposit Agreement, therefore, was contingent on the completion of CIV 93-1033. As the agreement makes clear, were that action to not end in a final resolution, as the parties concede occurred, one of the proper courses of disbursement of the escrow account's funds was not through the courts but a disbursement agreement between the parties.

The alternative means of disbursement, however, opposes a separate provision in the Deposit Agreement. On one hand, Section 4(B) makes clear that the Deposit Agreement does not waive any defenses or other causes of action that either side may raise in future actions. *See id.* On the other hand, Recital F., in defining the two means through which the funds may be disbursed, states that deposited funds will remain in the escrow account "pending . . . final determination by a court of proper jurisdiction[.]" *Id.* It is arguable that based on Recital F., therefore, the Tribe waived its sovereign immunity as to disbursement of the escrow account pursuant to the Deposit Agreement. Faced with similar circumstances, however, the Tenth Circuit in *Ute Indian Tribe* held,

> [T]rying to make sense of the whole document before us without rendering any portion of it a nullity–always our aspiration when interpreting contracts–we cannot say it clearly and unequivocally waives sovereign immunity. Instead, the language the defendants cite seems to us best understood as a forum selection clause. *Cf. Santana v. Muscogee (Creek) Nation, ex rel. River Spirit Casino*, 508 Fed. Appx. 821, 823 (10th Cir. 2013) (holding that a compact provision "waiv[ing] tribal immunity . . . in a 'court of competent jurisdiction'" did not "alone confer jurisdiction on state courts because states are generally presumed to lack jurisdiction in Indian Country."). So the agreement both refuses to waive sovereign immunity and proceeds to designate the District of Utah as the venue for any disputes should immunity ever be overcome. This arrangement may not seem the most intuitive but it's hardly incongruous: after all, the Tribe is always free to consent to a particular suit arising under the Mutual Assistance Agreement and allow it to proceed in the designated forum even as the Tribe chooses to stand on its claim of immunity in most cases. *See Jicarilla Apache Tribe v. Hodel*, 821 F.2d 537, 539-40 (10th Cir. 1987) (holding that a tribe's potential waiver of immunity in one suit did not waive its immunity in a subsequent suit); *cf. Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) ("[A] State's sovereign immunity is 'a

personal privilege which it may waive at pleasure.'" (quoting *Clark v. Barnard*, 108 U.S. 436, 447, 2 S.Ct 878, 27 L.Ed. 780 (1883))).

*Ute Indian Tribe*, 790 F.3d at 1010 (first alteration added). The Court finds *Ute Indian Tribe* persuasive. Nothing in the inexactly drawn Deposit Agreement unequivocally waives tribal sovereign immunity and the First Claim for Relief in the State's counterclaim is barred.

For similar reasons, the Second Claim for Relief contained in the counterclaim is also barred by the Tribe's sovereign immunity. First, as discussed above, the Tribe is not seeking monetary relief from this Court, only injunctive and declaratory relief. By contrast, the State's Second Claim for Relief seeks affirmative relief from this Court in the form of ordering the escrow account to be disbursed to the State. The Court finds that this requested relief does not sound in recoupment. *See id.* at 1011 (quoting *Bull*, 295 U.S. at 262) ("[E]ven assuming the [recoupment] doctrine might operate in cases like this, 'recoupment is in the nature of a defense' to defeat a plaintiff's claims, not a vehicle for pursuing an affirmative judgment."). Second, as discussed above, the Deposit Agreement is not an unequivocal waiver of tribal sovereign immunity. Therefore, the State's Second Claim for Relief is barred by the Tribe's sovereign immunity.

The State points to *Rupp v. Omaha Indian Tribe*, 45 F.3d 1241 (8th Cir. 1995), for its argument that the Tribe, by filing the present action, unequivocally waived its sovereign immunity. The Court does not agree. In *Rupp*, the Omaha Indian Tribe filed suit in federal court to quiet title to land in its favor. "The Tribe affirmatively requested the district court to order the defendants to assert any claims in the disputed lands they possessed against the Tribe and exercise its equitable powers to, among other things, quiet title in the Tribe's name." *Rupp*, 45 F.3d at 1244. The *Rupp* court found that "language explicitly requesting [the defendants] to assert any 'right, title, interest or estate' they may have in the disputed land [was] an unequivocal consent to any counterclaims asserted by [the defendants] to quiet title and award damages in [the defendants'] respective names." *Id.* at 1244-45. The Eighth Circuit distinguished the facts confronting it in *Rupp* from those facing the Supreme Court in *Oklahoma Tax Commission*. "The Tribe in *Oklahoma Tax Commission* only requested the district court to enjoin the state from collecting taxes from the tribe; it did not request the court to determine whether or not any taxes were in fact due and owing." *Id.* at 1245 (citing *Oklahoma Tax Comm'n*, 498 U.S. at 506-08)

(emphasis in original). Here, however, the facts more closely resemble *Oklahoma Tax Commission* than *Rupp*. Similar to *Oklahoma Tax Commission*, the Tribe here seeks only a declaration that the State is without power to tax certain goods and services on tribal land. That the land here is a Casino compacted for under the IGRA is irrelevant. The Tribe is not affirmatively seeking monetary relief from the State or requesting the Court determine "whether or not any taxes [are] in fact due and owing." *Id.* Instead, it merely seeks a declaration as to the parties' respective rights. As a result, *Oklahoma Tax Commission* controls and the State's argument that the Tribe has waived its sovereign immunity is rejected. Even though the counterclaims are dismissed, it appears to the Court that at the conclusion of this litigation, the proper disposition of the approximately $400,000 in escrow will be evident. It may be that even though the State's counterclaims are dismissed, the State might, depending upon the outcome of this case, receive some portion of the approximately $400,000 now held in escrow as those funds were paid into escrow by the Tribe pursuant to the Deposit Agreement. Having the Escrow Agent pay out some portion of that $400,000 is analytically different from the counterclaim demanding that the Tribe be ordered to pay additional sums despite tribal immunity. Because the foregoing resolves the contested issues raised by Plaintiff's Motion for what amounts to partial judgment on the pleadings, the Court does not reach the parties' remaining arguments.

## CONCLUSION

As the Court held in its previous Memorandum Order and Opinion, the IGRA contemplates more than solely pure gameplay. Instead, the IGRA protects those activities directly related to class III gaming. Additionally, because the Tribe has not waived its sovereign immunity, the State's counterclaim seeking monetary and other affirmative relief is barred. What activities beyond pure gameplay are contemplated by the Indian Gaming Regulatory Act remains to be determined as this case proceeds. Accordingly,

IT IS ORDERED:

(1) that the Tribe's motion for judgment on the pleadings declaring that the Indian Gaming Regulatory Act contemplates activity beyond pure gameplay is granted and

(2) that the Tribe's motion for judgment on the pleadings on the State's counterclaim is granted.

Dated this 11th day of February, 2016.

BY THE COURT:

/s/ Lawrence L. Piersol
Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: /s/ _____
         DEPUTY