

FILED

SEP 15 2017

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| FLANDREAU SANTEE SIOUX TRIBE, a federally-recognized Indian Tribe, | \* \* \* | CIV 14-4171 |
| Plaintiff, | \* \* \* \* | |
| vs. | \* \* \* \* \* \* | MEMORANDUM OPINION AND ORDER ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT, DOCS. 78 & 115 |
| ANDY GERLACH, Secretary of the State of South Dakota Department of Revenue; and DENNIS DAUGAARD, Governor of the State of South Dakota, | \* \* \* \* \* | |
| Defendants. | \* \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending before the Court is the Flandreau Santee Sioux Tribe's ("the Tribe") Motion for Summary Judgment on Claims for Relief One, Three, and Four of the First Amended Complaint. Doc. 115. In its motion, the Tribe asserts that the State of South Dakota's ("the State") imposition of a state use tax on nonmember purchases of goods and services throughout the Royal River enterprise is unlawful under the Indian Gaming Regulation Act ("IGRA") and interferes with and frustrates federal and tribal interests.

Also before the Court is Defendants' Motion for Summary Judgment on all claims in the First Amended Complaint. Doc. 78. In their motion, the Defendants argue that the imposition of a state use tax on nonmember consumers' purchases of goods and services throughout the Royal River enterprise is not expressly or impliedly preempted by IGRA nor does it interfere with or frustrate federal and tribal interests. Further, Defendants assert that the State may permissibly condition reissuance of a liquor license to the Tribe on the collection and remittance by the Tribe of the nonmember consumers' use tax liability.

1

The Court has considered all filings and for the following reasons, the Tribe's motion is granted in part and denied in part. The Defendants' motion is similarly granted in part and denied in part.

## FACTUAL BACKGROUND

The Tribe is a federally-recognized Indian tribe located in Flandreau, South Dakota. The Tribe owns and operates the Royal River Casino & Hotel ("the Casino") and the First American Mart ("the Store") (collectively, the "Licensed Premises") on the Flandreau Indian Reservation.[1] These two businesses operate as a single business enterprise under the Royal River name and, irrespective of patrons' tribal or residential status, provide a wide variety of goods and services, including: overnight hotel stays, recreational vehicle accommodation, food and beverage services (alcoholic and non-alcoholic), gifts and sundries, tobacco products, fuel, services for catering, meetings, conferences, and special events, live entertainment, snacks, video arcade games, transportation services, health and fitness services, and gambling.[2] As a unitary business, the entire enterprise is overseen by the Tribe's elected governing body, the Flandreau Santee Sioux Executive Committee. The Licensed Premises' patron base is approximately 60% South Dakota residents. Revenue, including that from gambling, hotel stays, food, the bar, the gift shop, the RV park, and the Store, is calculated in the aggregate as "net revenues." Of that sum, 35% is distributed toward tribal economic development, 40% via individual per capita payments to tribal members, 5% into a minors' trust fund, 15% toward tribal government operations, 4% into a community assistance fund, and 1% into a local government revenue sharing fund. The Tribe also imposes a 6% sales tax. Over 90% of the Tribe's sales tax revenue is generated by transactions at the Licensed Premises.

Pursuant to IGRA, the Tribe and the State have in place a Tribal-State gaming compact ("the Compact"), which controls the Tribe's gaming operations at the Casino. The Compact allows the Casino to participate in Class III gaming.[3] The Compact is silent in regard to the

---

[1] The Casino and the Store are located in separate buildings.

[2] The specific departments and sub-departments within the Royal River business enterprise include: Slots, Table Games, Food and Beverage (Group Sales and Events), Hotel, Controller (Gift Shop), Human Resources, Porter, Security, Surveillance, Maintenance, Marketing, Players Club, First American Mart, and the Compliance Office.

[3] Class III gaming is defined by IGRA as "all forms of gaming that are not class I gaming and class II gaming." 25 U.S.C. § 2703(8). The definition includes games such as: "slot machines, roulette, craps, pari-mutuel wagering, lotteries, and banked card games (which are games played against the 'house' rather than other players) such as blackjack and baccarat." STEPHEN L. PEVAR, *The Rights of Indians and Tribes* 277 (Oxford University Press, 4th ed. 2012). As an incentive to partake in gaming, the Casino offers a Royal Rewards Club program. Royal Rewards Club members earn points when they play Slots and other live card games, which can then be redeemed for a wide variety

2

State's authority to apply its alcohol regulatory laws, the State's imposition of its use tax on nonmember[4] activity at the Casino, and the State's requirement that the Tribe collect and remit the use taxes from nonmember activities or purchases. It is undisputed that the Tribe sold the above-listed goods and services to nonmembers at the Casino. It is also undisputed that the Tribe has not remitted to the State the relevant use taxes on nonmember sales.

The State has issued three alcoholic beverage licenses to the Tribe—one for the casino, one for the store, and one for the Royal River Family Entertainment Center ("Bowling Center").[5] These licenses, however, are conditioned on the Tribe's remittance of the State use tax pursuant to S.D.C.L. § 35-2-24. The South Dakota statute does not differentiate between alcohol tax and use tax on other goods and services. *Id.* In 2009 and 2010, the Tribe sought from the State a renewal of its three alcohol licenses. Based on S.D.C.L. § 35-2-24, both requests were denied by the State as the statute directs that licenses are not to be reissued until the Tribe remits use taxes incurred by nonmembers.[6]

As a result, the Tribe, pursuant to S.D.C.L. § 1-26-16, requested a hearing before the South Dakota Office of Hearing Examiners to review the State's alcohol license denial. At the hearing, the Hearing Examiner concluded that all nonmember purchases at the Casino are subject to the use tax scheme, that the Tribe failed to remit the use taxes, and, therefore, the Tribe was not entitled to alcohol license renewal. Prior to the Hearing Examiner's decision becoming final, the Tribe filed this action in federal court on November 18, 2014. The Tribe simultaneously moved the Court for preliminary injunction enjoining state action pursuant to the Hearing Examiner's decision. The Tribe and State ultimately made the motion for preliminary injunction moot by entering into a stipulation whereby the State recognized the three alcohol licenses' continuing validity pending a decision on the merits in this case. The Tribe did not appeal the Hearing Examiner's decision to South Dakota state court.

Specific to this federal action, the Tribe alleges that the State lacks authority to impose its use tax scheme on reservation land against nonmember patrons of the Licensed Premises. In its

---

[4] of services or for cash. The only way to earn Royal Rewards Club points is through game play. Purchases of items at the hotel, RV park, the Store, bar, restaurant, or gift shop, do not earn members points.

[4] Individuals who are not members of the Tribe.

[5] The Royal River Family Entertainment Center ("Bowling Center") is no longer in operation, having closed in July of 2015.

[6] The Tribe applied for a license renewal each year since the initial denial. Each request has been denied by the State, but the Tribe is enabled to continue operations under the original licenses until a final administrative decision is issued pursuant to S.D.C.L. § 1-26-28.

Complaint, the Tribe alleges that IGRA preempts the field of taxation thereby barring the State's imposition. To that end, the Tribe argues that all activity engaged in under the Royal River Casino name is "gaming activity" untaxable by the State by virtue of IGRA (Claims for Relief One, Two, and Six). Outside of IGRA, the tribe maintains that the use tax and remittance requirements are preempted by the Indian Commerce Clause of the Federal Constitution and federal common law and that they infringe on inherent tribal sovereignty (Claims for Relief Three and Five); that the State's tax imposition is unlawfully discriminatory as applied to the Tribe (Claim for Relief Four); that, as a predicate to funds contained in an escrow account pursuant to a 1994 Deposit Agreement between the Tribe and the State being disbursed to the Tribe, the State is without power to impose its taxation scheme on the Tribe's Casino (Claim for Relief Seven);[7] and that conditioning the alcohol licenses on the S.D.C.L. § 35-2-24 tax remittance requirement violates 18 U.S.C. § 1161 (Claim for Relief Eight).

The Tribe has moved the Court for summary judgment pursuant to Fed. R. Civ. P. 56(a) as to Claims for Relief One, Three, and Four. The Defendants have moved the Court for summary judgment on all Claims for Relief. For reasons explained herein, both motions are granted in part and denied in part.

## LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A party asserting that a fact cannot be . . . disputed must support the assertion" either by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the . . . presence of a genuine dispute[.]" FED. R. CIV. P. 56(c)(1)(A)–(B). "The movant can also establish the

---

[7] On April 14, 1994, the Tribe initiated an action seeking declaratory and injunctive relief against then South Dakota Governor Walter D. Miller and then Secretary of Revenue of South Dakota Ronald J. Schreiner. *Flandreau Santee Sioux Tribe v. South Dakota*, Civ. No. 94-4086 (D.S.D.). There, the Tribe alleged that the State lacked jurisdiction to impose its sales and use taxes on tribal sales of personal property to nonmembers when the sales occur on Indian trust lands. The case was consolidated with a similar case that raised taxation issues. *Sisseton-Wahpeton Sioux Tribe v. South Dakota*, No. CIV 93-1033 (D.S.D.) ("The State contends that the Tribe is subject to the sales and use tax laws and liquor licensing laws of the State of South Dakota as they pertain to the Tribe's transactions with non-Indians and non-members at the Tribe's casino, which contention the Tribe disputes . . . . The State further contends that the Tribe has incurred and will continue to incur sales tax liability through its sales to non-Indians and non-members[.]"). Related to that litigation, the Tribe entered into the Deposit Agreement wherein the Tribe agreed to deposit the aggregate amount of disputed tax liability into an escrow account pending final resolution of the case. The 1994 action was dismissed without prejudice on April 30, 1998. Around that time, the Tribe ceased making payments into the escrow account. The total amount contained in the escrow account is currently $400,000.

4

absence of a disputed material fact by showing 'that an adverse party cannot produce admissible evidence to support the fact.'" *Jensen v. Hy-Vee Corp.*, 2011 WL 1832997, at *1 (D.S.D. May 13, 2011) (quoting FED. R. CIV. P. 56(c)(1)(B)).

In a motion for summary judgment, the moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (internal quotations omitted). Once this burden is met, the burden then shifts to the non-moving party to demonstrate "that a fact . . . is genuinely disputed" either by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." FED. R. CIV. P. 56(c)(1)(A)–(B). "For purposes of summary judgment, the facts, and inferences drawn from those facts, are 'viewed in the light most favorable to the party opposing the motion.'" *Jensen*, 2011 WL 1832997, at *2 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## DISCUSSION

### I.      Preemption of the Tax Itself

The Tribe asserts that the imposition of the State use tax on nonmember consumers of the Licensed Premises is preempted under IGRA. Further, to the extent it is not otherwise preempted by IGRA itself, the Tribe argues that the tax is incompatible with Federal and Tribal interests in protecting tribal self-government and is therefore preempted by Federal Indian law in general as it infringes on tribal sovereignty. "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." *Casino Res. Corp. v. Harrah's Entm't, Inc.*, 243 F.3d 435, 437 (8th Cir. 2001) (citing *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334 (1983)). "The traditional notions of tribal sovereignty and the recognition and encouragement of this sovereignty in Congressional Acts promoting tribal independence and economic development inform the pre-emption analysis." *Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue*, 458 U.S. 832, 846 (1982).

A state's regulatory power is at its lowest and generally inapplicable when applied to on-reservation conduct of tribal members. *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144 (1980) (citing *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 480–81 (1976) and *McClanahan v. Ariz. Tax Comm'n*, 411 U.S. 164 (1973)). The question of the lawfulness of state

5

regulatory authority becomes more difficult where, as here, a state asserts authority over the conduct of non-Indians on the reservation. *Id.*

> In such cases we have examined the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence. This inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.

*Id.* at 144–45.

### A. IGRA

For over forty years, Indian gaming has served as a source for commercial revenue for tribes. *See* KENNETH BOBROFF, ET AL., COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 875 (Nell Jessup Newton, Lexis Nexis 2015) (1941). The Supreme Court's 1987 decision in *California v. Cabazon Band of Mission Indians*, in holding that the state of California could not impose its gaming regulations on a tribal gaming operation because they were preempted by tribal and federal interests, opened the door to numerous public policy questions regarding what is today a multi-billion dollar industry. 480 U.S. 202 (1987). *See* BOBROFF, at 875–76. Thus, in 1988, Congress enacted IGRA.

> IGRA was Congress' compromise solution to the difficult questions involving Indian gaming. The Act was passed in order to prove 'a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments' and 'to shield [tribal gaming] from organized crime and other corrupting influences to ensure that the Indian tribe is the primary beneficiary of the gaming operation.' 25 U.S.C. § 2702(1) and (2). IGRA is an example of 'cooperative federalism' in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian Tribes, by giving each a role in the regulatory scheme.

*Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 715 (9th Cir. 2003) (internal quotes and citations omitted).

Under IGRA, three conditions must be satisfied before a tribe operates a class III gaming facility: (1) authorization of such gaming by the governing body of the Indian Tribe and the Chair of the National Indian Gaming Commission ("NIGC"); (2) authorization of such gaming by the state in which the reservation is located; and (3) the existence of a gaming compact

between the tribe and the state approved by the Secretary of the Interior. *See* 25 U.S.C.
§ 2710(d)(1)). The Act further delineates proper subject matter of a compact. 25 U.S.C.
§ 2710(d)(3)(C)(i)–(vii).[8] The principal subject matter provision here is subsection (vii), which
allows for a compact to contain provisions for "any other subjects that are directly related to the
operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C)(vii). IGRA does not mention the sale
of goods and services to nonmember casino patrons, alcohol sales, or a correlating taxation. As
stated before by this Court in its Memorandum Opinion and Order on Defendants' Motion for
Judgment on the Pleadings, that fact alone weighs in the Tribe's favor. Doc. 59 at 16. The basic
Indian law canons of construction require that statutes be liberally construed in favor of the
Tribes and that all ambiguities are to be resolved in their favor. *See Montana v. Blackfeet Tribe*,
4701 U.S. 759, 767–68 (1985). Further, tribal property rights and sovereignty are preserved
unless Congress's intent to the contrary is clear and unambiguous. *See Minnesota v. Mille Lacs
Band of Chippewa Indians*, 526 U.S. 172, 202 (1999).

The Compact that exists between the Tribe and the State is also silent as to the sale of
goods and services to nonmember consumers on the Licensed Premises. The Tribe asserts,
however, that the goods and services offered on the Licensed Premises are within the
contemplation of subsection (vii) as "subjects that are directly related to the operation of gaming
activities" because they "are tailored to accomplish one primary goal: to attract and retain
gaming guests and ultimately generate gaming revenue." *See* Plaintiff's Memorandum is Support
of its Motion for Summary Judgment, Doc. 117 at 5. At the same time, the Tribe argues that the
use tax is further preempted under § 2710(d)(4), which provides that "nothing in this section
shall be interpreted as conferring upon a State . . . authority to impose any tax . . . upon an Indian
tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III

---

[8] 25 U.S.C. § 2710(d)(3)(C)(i)–(vii) reads, in whole,

(C) Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to—
   (i) the application of the criminal and civil laws and regulations of the Indian tribe or the state
   that are directly related to, and necessary for, the licensing and regulation of such activity;
   (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe
   necessary for the enforcement of such laws and regulations;
   (iii) the assessment by the State of such activities in such amounts as are necessary to defray the
   costs of regulating such activity;
   (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by
   the State for comparable activities;
   (v) remedies for breach of contract;
   (vi) standards for the operation of such activity and maintenance of the gaming facility, including
   licensing; and
   (vii) any other subjects that are directly related to the operation of gaming activities.

7

activity." On the other hand, the Defendants assert that § 2710(d)(4) only prohibits the taxation of actual game play, which the State is not doing. Further, the Defendants argue that anything other than the actual game play does not fall within subsection (vii) because it is not "directly related to the operation of gaming activities."

When assessing whether certain subject matter falls within the scope of IGRA's catchall provision, it should not be simply asked "but for the existence of the Tribe's class III gaming operation, would the particular subject regulated under a compact provision exist? Instead, we must look to whether the regulated activity has a direct connection to the Tribe's conduct of class III gaming activities." Doc. 42-1 (Letter from Donald E. Laverdure, Acting Assistant Secretary, Indian Affairs, to Greg Sarris, Chairman, Federated Indians of Graton Racheria at 10) (July 13, 2012)) (hereinafter, "Graton Letter"). *See* 25 U.S.C. § 2710(d)(3)(C)(vii). To the extent such activities are "directly related to the operation of gaming activities," however, Federal courts need not balance the competing federal, tribal, and state interests involved, as Congress already completed the balancing test with respect to those activities in enacting IGRA. *See Gaming Corp of Am.*, 88 F.3d at 544 (citing S.Rep. No. 445, 100th Cong., 2d Sess. 6 (1988)).

In opposition to the Tribe's broad definition of "directly related to the operation of gaming activities," the Defendants rely on *Michigan v. Bay Mills Indian Cmty. (Bay Mills)*, 134 S.Ct. 2024 (2014) for the proposition that the scope of 25 U.S.C. § 2710(d)(3)(C)(vii) is actually quite narrow. In *Bay Mills*, the Supreme Court held that the provision of IGRA authorizing a state to sue a tribe to enjoin a class III gaming activity located on Indian lands did not abrogate tribal sovereign immunity to enjoin a tribe from operating a casino located outside its reservation. *See Bay Mills*, 134 S.Ct. at 2039. In an attempt to fit the suit within the provision's authority, Michigan argued that, though the casino was outside the Indian reservation, Bay Mills "authorized, licensed, and operated" that casino from within its own reservation and that authorization, licensing, and operation was "Class III gaming activity." *Id.* at 2032. Therefore, Michigan claimed, the State could sue to enjoin the "gaming activity" because part of that activity took place on reservation land. *Id.* The Supreme Court, however, disagreed, saying that "numerous provisions of IGRA show that 'class III gaming activity' means just what it sounds like—the stuff involved in playing class III games…each roll of the dice and spin of the wheel." *Id.* at 2032–33. That class III gaming activity is "the gambling in the poker hall, not the proceedings of the off-site administrative authority," *see id.* at 2033, however, does not answer

the question presented to this Court. Instead, this Court must determine what is "directly related to the operation of gaming activity," or, in the words of the Supreme Court in *Bay Mills*, what is "*directly related to the operation of* 'the gambling in the poker hall.'"

IGRA was "intended to expressly preempt the field in the governance of gaming activities on Indian lands," *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 544 (8th Cir. 1996). It follows then, that "'[a]ny claim which would directly affect or interfere with a tribe's ability to conduct its own [gaming] licensing [and operation] process[es] should fall within the scope of [IGRA's] complete preemption.'" *Casino Res. Corp. v. Harrah's Entm't, Inc.*, 243 F.3d 437 (8th Cir. 2001) (quoting *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 549 (8th Cir. 1996)). Though that is the strongest proposition that the preemptive scope of IGRA applies, that is not the only proposition. *Gaming Corp.*, 88 F.3d at 550 ("The proposition that the preemptive scope of IGRA encompasses a claim is strong for claims that would intrude on the tribe's regulation of gaming . . . . *Potentially valid* claims under state law are those which would not interfere with the nation's governance of gaming." (emphasis added)). Indeed, were it the only proposition, § 2710(d)(3)(C)(vii) would be rendered superfluous, as subsection (i) already provides a means by which states and tribes may negotiate regarding the application of civil laws and regulations "that are directly related to, and necessary for, the licensing and regulation of such activity." 25 U.S.C. § 2710(d)(3)(C)(i). Similarly subsection (vi) provides that the states and tribes may negotiate regarding "standards for the operation of such activity and maintenance of the gaming facility, including licensing." *Id.* at § 2710(d)(3)(C)(vi).

"[C]ourts have been quick to dismiss challenges to generally-applicable laws with de minimis effects on a tribe's ability to regulate its gambling operations. For example, courts have held that IGRA's preemptive scope is not implicated in cases involving gaming management and service contracts with a tribe, *Casino Res. Corp. v. Harrah's Entm't, Inc. (Harrah's Entm't)*, 243 F.3d at 438–39 (8th Cir. 2001); contracts to acquire materials to build a casino, *Barona Band*, 528 F.3d at 1192; and release of detailed investigative reports on the management of gaming, *Siletz*, 143 F.3d at 487." *Mashantucket Pequot Tribe v. Ledyard*, 722 F.3d 457 (2d Cir. 2013). Similarly, in *Ledyard*, the court found IGRA did not preempt a property tax imposed by the state on a non-Indian vendors property leased to the tribe. *Id.* at 469–71. All of these cases, however, are distinguishable from the case at bar.

In *Harrah's Entm't*, a non-Indian company, Harrah's Entertainment, entered into a consulting agreement with another non-Indian company, Casino Resource Corporation (CRC) to jointly pursue gaming opportunities with the Potawatomi Indian Nation. *Harrah's Entm't*, 243 F.3d at 436. After the Nation was unable to negotiate a compact agreement with the state of Michigan, the non-Indian companies executed a termination agreement that dissolved their management relationship. *Id.* at 437. CRC then sued Harrah's Entertainment in federal court asserting state law claims, alleging that Harrah's Entertainment breached the consulting agreement and tortiously interfered with CRC's "contractual and prospective economic advantage." *Id.* The Eighth Circuit found that the state law claims could not be preempted by IGRA merely because the original contract between the two parties was "peripherally associated with tribal gaming." *Id.* at 439. Instead, the court found "the potential infringement on a tribe's governance of gaming" minimal, as "a non-tribal entity's state law claim (that does not implicate tribal interests) against another non-tribal entity is not of central concern to IGRA." *Id.* at 440.

Seven years later, in *Barona Band*, the Ninth Circuit found a state tax on construction materials was not preempted by IGRA. *See Barona Band*, 528 F.3d 1184. The Tribe entered into a contract with a non-Indian general contractor to construct the expansion of the casino floor and hotel, as well as other amenities. *Id.* at 1187. In the contract, "the Tribe touted a method it had devised to circumvent state sales tax, which would otherwise fall on the contractor, by scheduling deliveries to occur on tribal lands." *Id.* Under this contract, the contractor entered into a series of subcontracts with contractors in various trades. *Id.* An audit of the general contractor determined that over $200,000 in sales and use tax associated with purchases of construction materials from non-Indian vendors for use on the casino expansion—with deliveries taking place on Indian land. *Id.* at 1188. The court found that IGRA did not preempt taxation of third-party purchases of equipment used to construct the gaming facilities when the construction materials, purchased by a non-Indian subcontractor, "could be used for a multitude of purposes unrelated to gaming." *Id.* at 1191–92 ("That these sophisticated parties contracted to create a taxable event on Indian territory which otherwise would occur on non-Indian territory factually distinguishes the present case from the multitude of cases where courts have analyzed state taxation on non-Indians performing work on Indian land."). The court refused to invalidate the state tax by preemption "where the Tribe has invited commercial activity onto its territory for the purpose of marketing a sales tax exemption to non-Indian businesses who would otherwise be liable for the

state tax under laws of general applicability." *Id.* at 1193. *See also Washington v. Confederated Tribes of the Colville Indian Reservation (Colville)*, 447 U.S. 134 (1980) (upholding a state tax on cigarettes sold on-reservation to nonmembers when the only value added to the transaction by the tribe was the marketing of a tax exemption).

Similarly, in *Ledyard*, the Second Circuit upheld a state tax on non-Indian owners of slot machines that were leased to a tribe to be used in their on-reservation gaming facility. *See Ledyard*, 722 F.3d 457. "[U]nder IGRA, *mere ownership* of slot machines by the vendors does not qualify as gaming and taxing such ownership therefore does not interfere with the 'governance of gaming.'" *Id.* at 470. Because the tax was dependent entirely on a non-Indian's ownership of the property, and had nothing to do with a transaction with the tribe, *id.* at 469, the tax was permissible, and any effect on the tribe was "too indirect and too insubstantial" to support a preemption claim. *Id.* at 476 ("Any adverse effect on the Tribe's finances caused by the taxation of a private party contracting with the Tribe would be ground to strike the tax. Absent more explicit guidance from Congress, we decline to return to this long-discarded and thoroughly repudiated doctrine." (quoting *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 186–87 (1989))).

Finally, in *Confederated Tribes of Siletz Indians v. Oregon (Siletz)*, the tribe and the state of Oregon negotiated a compact that authorized Oregon to monitor and investigate the casino to ensure compliance with the compact. 143 F.3d 481, 482–84 (9th Cir. 1998). Included in the compact was a provision providing that the tribe must comply with the state's public records laws. *Id.* The Ninth Circuit found, without any analysis of 25 U.S.C. § 2710(d)(3)(C)(iii), which appears to answer the question, that the state reporting statute applied to the tribe's operations by virtue of the Tribal—State compact itself. *Id.* at 484–85. Further, the court iterated that the records laws did not seek to usurp tribal control over gaming and the fact that the release of a report that contained damaging information on the operation of the casino could have a detrimental effect on the business was fully consistent with IGRA's goal of fair and honest gaming. *Id.* at 487.

Essentially, the taxes and regulations in the cases above were only tangentially related to tribal gaming and each could have taken place regardless of the tribe's operation of a casino. Ownership of slot machines by non-Indians, the purchase of construction materials by non-Indian subcontractors, and the state law claims of a non-Indian company against another non-

Indian company arising out of a management contract between the two companies are all events that could arise in spite of the tribe's ownership and operation of a casino. In this case, most of the transactions the State seeks to tax are not merely tangentially related to tribal gaming, but would not exist but for the Tribe's operation of a casino. Further, by finding the state's public records laws consistent with IGRA and a permissible provision of the compact between the state and the tribe in *Siletz*, because the state had properly included the provision in its compact, preemption analysis was rendered irrelevant. *Id.* at 484 ("We are not persuaded that a preemption analysis is necessary here. Rather, we look to the Compact itself."). The Tribe in this case similarly argues that preemption analysis is not necessary here, at least with respect to their first claim for relief, as the imposition of the use tax should have been included in the Compact.

*In re Gaming Related Cases (Coyote Valley II)*, 331 F.3d 1094 (9th Cir. 2003), *Rincon Band of Luiseno Mission Indians of the Rincon Reservation v. Schwarzenegger (Rincon)*, 602 F.3d 1019 (9th Cir. 2010), and *Big Lagoon Rancheria v. California (Big Lagoon)*, 759 F.Supp.2d 1149 (N.D. Cal. 2010) offer more instruction. In *Coyote Valley II*, the tribe asserted that the state had acted in bad faith in negotiating the tribal-state compact. The State had insisted on provisions providing for a revenue-sharing trust fund (RSTF) and a special distribution trust fund (SDF), as well as a provision requiring the tribe to adopt a labor relations ordinance. The Tribe argued these provisions fell outside the list of appropriate topics for tribal-state compacts in 25 U.S.C. § 2710(d)(3)(C) and that the insistence on the RSTF and SDF provisions constitute a "demand by the State for direct taxation of the Indian tribe," 25 U.S.C. § 2710(d)(7)(B)(iii)(II). The Ninth Circuit disagreed. The RSTF funds were held to be directly related to the operation of gaming as those amounts were intended to be redistributed from gaming to non-gaming tribes, which the court found to be consistent with IGRA's purpose of furthering tribal economic development. *Id.* at 1111. The SDF payments were also considered directly related as those funds were designated to compensate for negative externalities associated with gaming, i.e., for gaming-related purposes. *Id.* at 1114. Further, both the RSTF and SDF provisions were permissible because the state had "offered meaningful concessions in return" and therefore "[did] not exercise 'authority to impose' anything." *Id.* at 1112. Finally, the labor relations provision was also found to be directly related to the operation of gaming. The provision "demanded that tribes meet with labor unions to negotiate independently a labor ordinance addressing only organization and

representational rights and applicable only to employees *at tribal casinos and related facilities.*"
*Id.* at 1116. The compact provided:

> Notwithstanding any other provision of this Compact, this Compact shall be null and void if on or before October 13, 1999, the Tribe has not provided an agreement or other procedure acceptable to the State for addressing organizational and representational rights of Class III Gaming Employees and other employees associated with the Tribe's Class III gaming enterprise, such as food and beverage, housekeeping, cleaning, bell and door services, and laundry employees at the Gaming Facility or any related facility, *the only significant purpose of which is to facilitate patronage at the Gaming Facility.*

*Id.* (emphasis added). The court found that this provision was "directly related to the operation of gaming activities" and thus permissible to include in the compact pursuant to 25 U.S.C. § 2710(d)(3)(C)(vii). *Id.* at 1115–16. "Without the 'operation of gaming activities,' the jobs this provision covers would not exist; nor, conversely, could Indian gaming activities operate without someone performing these jobs." *Id.* at 1116. Because all of the provisions were found to be "directly related to the operation of gaming activities," the Court found the state did not negotiate in bad faith in requiring that the Tribe consent to those provisions. *Id.* at 1115–16.

Similarly, and in relying on *Coyote Valley II*, the Northern District of California found in *Big Lagoon* that the state's requests for environmental mitigation measures in the compacting process "was permissible so long as such measures directly relate to gaming operations or can be considered standards for the operation and maintenance of the Tribe's gaming facility" and the state offered meaningful concessions in return. *Big Lagoon*, 759 F.Supp.2d at 1161. The tribe did not dispute that the gaming activities would take place in an environmentally-sensitive area or that the operations would take place without any negative environmental effects. *Id.* Further, "Big Lagoon [did] not establish that the State's proposed environmental mitigation measures [were] so discordant with IGRA's purposes that they amount to prohibited topics of negotiation." *Id.* at 1162.

In *Rincon*, the Ninth Circuit was presented with another revenue sharing provision in a tribal-state compact. The court referred back to its earlier decision in *Coyote Valley II*, recognizing that the court construed the meaning of subjects "directly related to the operation of gaming" broadly to include "fair distribution of gaming opportunities" and "compensation for the negative externalities caused by gaming." *Rincon*, 602 F.3d 1019, 1033–34. However, the court found that the general fund revenue sharing, unlike funds paid into the RSTF and SDF, had

13

undefined potential uses and therefore could not be found to be directly related to gaming. "Whether revenue sharing is an authorized negotiation topic under § 2710(d)(3)(C)(vii) thus depends on the use to which the revenue will be put, not on the mere fact that the revenue derives from gaming activities." *Id.* ("No amount of semantic sophistry can undermine the obvious: a non-negotiable, mandatory payment of 10% net profits into the State treasury for unrestricted use yields public revenue, and is a 'tax.'").

In the case presented before the Court, the State seeks to impose a use tax on the transactions of nonmembers with the Indian tribe at the Casino and its amenities, as well as the Store. The funds from this use tax are placed in the State's general fund, to be used for any number of purposes. As mentioned *supra*, most of the transactions the State seeks to tax are not merely tangentially related to tribal gaming, but would not exist but for the Tribe's operation of a casino, thus they are not of the kind in *Harrah's Entm't* that would occur between non-Indians regardless of the existence of the Casino.

This Court finds that whether the only significant purpose of these amenities is to facilitate gaming is supported by evidence of complementarity of these amenities with gaming. Complementary goods are "[p]airs of goods for which consumption is interdependent." Declaration of Jonathan B. Taylor in Support of [the Tribe's] Motion for Summary Judgment, Doc. 118-1, at 10 (citing G. BANNOCK ET AL., DICTIONARY OF ECONOMICS 66 (4th ed. 2003) [hereinafter BANNOCK ET AL.]). If a good is complementary, the proportionate change in the quantity demanded of one good divided by the proportionate change in the price of another good will be negative. *Id.* at 11 (citing BANNOCK ET AL., at 83). For example, if the price of coffee rises, the demand for coffee creamer falls. "Complementarity often motivates an enterprise to develop one product as a "loss-leader" to increase sales of its complement." *Id.* at 13. A "loss-leader" is a "product deliberately sold below cost and therefore at a loss to in an attempt to encourage sales of other products." *Id.* (citing A. ASHWIN, M. TAYLOR, & N.G. MANKIW, BUSINESS ECONOMICS 324 (2016)). At the Licensed Premises, the food and beverage department, live entertainment, and the Store all operate at a loss. While the Court finds the fact that these amenities operate at a loss to be evidence of their complementarity, it does not find it dispositive. The Court finds more convincing evidence that increases in patronage at one amenity is directly tied to increases in gaming activity itself.

14

The Tribe has shown the complementarity of food, alcohol, and hospitality with casino activity. For example, "a one-dollar increase in the variable representing overall restaurant sales produced a $91 increase in slot wagers." V. Kalargyrou, A.K. Singh & A.F. Lucas, *Estimating the Effect of Racino Restaurant Sales on Slot Wagering Volume*, 24 INT'L. J. OF CONTEMPORARY HOSP. MGMT. 1088, 1088 (2012). Further, "[a] 10% increase in the price of food reduces consumption of entertain on average by 7.2%." R.H. FRANK, MICROECONOMICS & BEHAVIOR 126 (2015). This Court has found from the start that alcohol consumption and gaming on a casino floor are commonly associated and certainly reinforce one another. *See e.g., Hakimoglu v. Trump Taj Mahal Assocs.*, 70 F.3d 291, 294 (3rd Cir. 1995) (quoting *Tose v. Greate Bay Hotel and Casino Inc.*, 819 F.Supp. 1312, 1317 n. 8 (D.N.J. 1993), *aff'd*, 34 F.3d 1227 (3rd Cir. 1995)) ("'The State has regulated the minutiae of gaming rules and alcohol service and expressly permitted the serving of free drinks to patrons at the gaming tables. Surely it could not have been unaware that the cognitive functioning of many gamblers would be impaired by drinking or of the consequences of permitting persons so impaired to gamble.'"); *Tose*, 819 F.Supp. at 1320 ("At the very least the State condones casino patrons drinking while they place bets, and the policing of providing free drinks on request could arguably be said to actively encourage this conduct."). This Court now finds that related amenities, the only significant purpose of which is to facilitate gaming activities at the Casino, also fall within the purview of 25 U.S.C. § 2710(d)(3)(C)(vii). The Court is convinced that but for the existence of the Casino, the gift shop, hotel, RV park, food and beverage services, and live entertainment events would not exist in the sleepy but pleasant little town of Flandreau, population 2,332. Nor could the Casino operate without the existence of these amenities. Unlike other casinos, Royal River is far from a substantial population center and, in fact, provides the only hotel service in town. Without a hotel or RV park, the Casino simply could not operate in order to further the self-sufficiency of the Tribe. Similarly, the gift shop would be of little worth without the Casino's apparel. When purchases take place at these amenities, the state is not "losing tax revenues it would otherwise obtain from sales made outside of tribal boundaries," nor is the Casino and its related facilities undermining the state economy or tax base. *See Indian Country, U.S.A., Inc. v. Oklahoma*, 829 F.2d 967, 986 (10th Cir. 1987). The product of value is not a tax exemption, but a "form of entertainment that is wholly created, sold, and consumed within the boundaries" of the Flandreau

Indian Reservation. *Id.* The product of value is a form of entertainment the only significant purpose of which is to facilitate gaming activities at the Casino.

Beyond what is authorized by 25 U.S.C. § 2710(d)(3)(C), 25 U.S.C. § 2710(d)(4) prohibits a state from taxing "an Indian Tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity." 25 U.S.C. § 2710(d)(4). The Court finds logical that that proscription applies to nonmembers on the Casino floor authorized to gamble, which includes the costs of associated activities, i.e., gamblers and what they spend on gambling, alcohol, food, rooms, and other merchandise from the Casino. However, the mere fact that the convenience store falls within the same business enterprise operated by the Tribe is not sufficient to equate such services as directly related to the operation of gaming. *See Barona Band of Mission Indians v. Yee*, 528 F.3d 1184, 1193 (2008) ("Extending IGRA to preempt any commercial activity remotely related to Indian gaming-employment contracts, food service contracts, innkeeper codes-stretches the statute beyond its stated purpose."). Were the various food, beverages, and other services offered at the convenience store to be within the scope of 25 U.S.C. § 2710(d)(3)(C)(vii), there would be no end to what other activities would fall under the IGRA's protection when, by virtue of a business decision, they are somehow operated under the same umbrella as an IGRA-sanctioned casino. The Tribe has not presented sufficient evidence to the Court to show that the Store is sufficiently complementary to gaming, thus the Court finds that the Store, though it may benefit from its proximity to the Casino, is not in existence but for the tribe's operation of a Casino and it cannot be said that the only substantial purpose of a convenience store is to facilitate gaming.[9]

Section 2710(d)(4) provides that IGRA should not be interpreted to provide the state with authority to impose a tax on (1) the tribe or (2) "any other person or entity authorized by an Indian tribe to engage in a class III activity," except to the extent such a tax is agreed to in the compact under § 2710(d)(3)(C)(iii) as an "assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity." In other words, § 2710(d)(4) reinforces the permissible compact negotiation topics provided in § 2710(d)(3)(C) by requiring a state to engage in compact negotiations despite the fact that IGRA does not grant the state any additional taxing authority. *See Rincon* 602 F.3d at 1031. "[I]t is clear from the

---

[9] Prior to oral argument, the Court specified some of the issues to be addressed. Plaintiff submitted additional affidavits on the day of argument. The Court did not request nor authorize supplementation to the record which was long before closed, so that submission has not been considered.

legislative history that by limiting the proper topics for compact negotiations to those that bear a direct relationship to the operation of gaming activities, Congress intended to prevent compacts from being used as subterfuge for imposing State jurisdiction on tribes concerning issues unrelated to gaming." *Coyote Valley II*, 331 F.3d at 1111. Instead, the state may only negotiate for "such amounts as are necessary to defray the costs of regulating such activity." Any other request for "revenue sharing" is only a permissible topic for compact negotiation, under *Rincon*, "if the revenue sharing provision is (a) for uses 'directly related to the operation of gaming activities' in § 2710(d)(3)(C)(vii), (b) consistent with the purposes of IGRA, and (c) not 'imposed' because it is bargained for in exchange for a 'meaningful concession.'" *Rincon*, 602 F.3d at 1033 (emphasis omitted).

The Defendants contend that the Tribe's motion may not be granted without finding that the IGRA provision describing compactable topics is a mandatory provision rather than a permissive one. Indeed, IGRA provides that compacts "may include provisions" as set forth in 25 U.S.C. § 2710(d)(3)(C), and not that the compacts "shall" contain such provisions. However, the list of subjects is merely permissive in that a compact is not required to contain any of the subjects listed. It is mandatory, however, that if a tribe requests negotiation on any of those subjects, a state "shall" negotiate in good faith on the requested subjects. 25 U.S.C. § 2710(d)(3)(A). Further, if the state wishes to have authority over any of the listed subjects, it is mandatory that such authority be found in a valid gaming compact. *See Gaming Corp of Am. v. Dorsey & Whitney*, 88 F.3d 536, 546–47 ("[U]nder [IGRA], the only method by which a state can apply its general civil laws to gaming is through a tribal-state compact.") Ultimately, since the Court holds that the slots, table games, food and beverage services, hotel, RV park, live entertainment events, and gift shop are directly related to class III gaming pursuant to 25 U.S.C. § 2710(d)(3)(C)(vii), regulation and taxation is, therefore, compactable between a tribe and a state. As the State and the Tribe did not include a provision providing for such taxation in the gaming compact, the application of the use tax to such amenities is preempted by IGRA and the Tribe's motion for summary judgment is granted to that extent. Even had the State negotiated for such a provision, though, the State would have to earmark those funds for services that are also directly related to the operation of gaming activities as well as offer meaningful concessions in return to satisfy the rationale of *Rincon*. The remittance of those taxes into a general fund with unlimited potential uses, such as the State's general fund here, would not satisfy *Rincon* and

would be preempted by IGRA as an impermissible negotiation topic. Finally, with respect to the Store, the Tribe's motion for summary judgment is denied, as the convenience store's connection to the gaming activities is too indirect and insubstantial.

## B. Under Federal Law

"The federal policy favoring tribal self-government operates even in areas where state control has not been affirmatively preempted by federal statute." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987). Thus, it is still necessary to determine if the use tax, where not preempted by plain implication of IGRA—in other words, the sale of goods and services at the Store—is not otherwise preempted under the *Bracker* balancing test.

Undertaking on-reservation preemption analysis begins with determining where the "legal incidence" of the tax falls. *See Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458–59 (1995). "State taxes on nontribal members in Indian country are not categorically barred. Instead, courts apply a 'flexible preemption analysis sensitive to the particular facts and legislation involved,' *Cotton Petroleum,* 490 U.S. at 176, to determine whether a state can impose the taxes." BOBROFF, *supra*, at 702. From there, federal and tribal interests, in conjunction, are weighed against state interests. If the former outweighs the latter, the tax is invalid. If, however, state interests predominate, the state tax on the nonmember is permissible. *See Chickasaw Nation*, 515 U.S. at 459. Other factors that have been considered in the context of on-reservation state tax preemption include: the degree of federal regulation, the respective governmental interests of the tribe and state; provision of tribal or state services to the part the state seeks to tax, *see Machinery Co. v. Arizona State Tax Comm'n*, 448 U.S. 160 (1980); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143–51 (1980); *Colville*, 447 U.S. at 152–59; the economic burden of the tax, *see Bracker*, 448 U.S. at 149–50; whether the value being taxed is generated on the reservation or is attracted to the reservation solely by the claimed exemption from state taxes, *see Colville*, 447 U.S. at 154–57; and whether the state tax discriminates against Indian commerce or unduly burdens it, *see id.* at 156–57 (dictum).

There is no dispute that the incidence of the use tax imposed on Store purchases falls upon the nonmember consumer. Therefore, the Court must apply the *Bracker* balancing test to determine if the use tax is permissible. "The traditional notions of Indian sovereignty provide a crucial 'backdrop' against which any assertion of State authority must be assessed." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334 (1983) (internal citations omitted). Both the Tribe

18

and the Federal Government have an interest in promoting tribal self-government, including "Congress' overriding goal of encouraging 'tribal self-sufficiency and economic development.'" *Id.* (citing *Bracker*, 448 U.S. at 143 (footnote omitted)). However, "[the State] does not infringe the right of reservation Indians to "make their own laws and be ruled by them" merely because the result of imposing its taxes will be to deprive the Tribes of revenues which they currently are receiving." *Colville*, 447 U.S. at 156 (citing *Williams v. Lee*, 358 U.S. 217, 220 (1959). "While the Tribes do have an interest in raising revenues for essential governmental programs, that interest is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services." *Id.* at 156–57. "The State also has a legitimate governmental interest in raising revenues, and that interest is likewise strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services." *Id.* at 157. *See also Barona Band*, 528 F.3d at 1193 (citing *Ramah*, 458 U.S. at 843) ("We recognize that the state interest strengthens where there is a nexus between the taxed activity and the government function provided.").

Where the Federal government has undertaken comprehensive regulation, a number of policies underlying the federal regulatory scheme are threatened by the taxes, and the state is unable to justify the taxes except in terms of a generalized interest in raising revenue, the taxes are impermissible. *See Bracker*, at 448 U.S. at 151. Where, however, the Tribe benefits from generalized government functions, the legitimacy of generalized taxes on third parties with whom the Tribe does business is strengthened. *See Ledyard*, 722 F.3d at 475.

IGRA created a federal National Indian Gaming Commission (NIGC) to oversee regulation, licensing, and background checks of key employees. The Store's connection to the NIGC, however, is tangential, and none of the functions overseen by the NIGC take place at the Store. The Tribe asserts that the Store, like its other facilities, is subject to Indian Health Services health and safety regulations and Bank Secrecy Act regulations regarding the handling of cash with which the Tribe must comply. This Court is not convinced that this is the same extensive regulation seen in other cases where the courts have found no room for state regulation, nor is it regulation that applies only to the Store by virtue of its indirect connection to the casino. Further, the cost of compliance with the tax, though it may decrease revenue in general, is not enough to shake up the regulatory structure currently in place.

While the value of the Tribe's goods and services need not come from on-reservation activity, the Tribe must serve as more than "a conduit for the products of others." *Cabazon Band of Mission Indians v. Wilson*, 37 F.3d 430, 435 (9th Cir. 1994) ("It is not necessary...that the entire value of the on-reservation activity come from within the reservation's borders. It is sufficient that the Bands have made a substantial investment in the gaming operations and are not merely serving as a conduit for the products of others."). The Tribe argues that the value of the Store is substantially produced on the reservation. The Tribe built the Store, purchases and stocks the items in the Store, as well as prices and monitors the items for spoilage. The Tribe also asserts that value added on the reservation includes additional costs of overhead, such as marketing, human resources, maintenance costs, accounting, security, surveillance, etc. Certainly the same overhead costs can be said to exist in any business. However, *Colville* requires that the value marketed be generated on the reservation "by activities in which the Tribes have a significant interest." *Colville*, 447 U.S. at 155. Though tribal sovereignty and economic development are activities in which the tribe has an interest, it is insufficient by itself to bar the State's generally applicable tax imposed on nonmember purchases from a convenience store. *See Ledyard*, 722 F.3d at 477 ("Tribal sovereignty is an important consideration for a court weighing interests in the *Bracker* test, but it is insufficient in itself to bar the State's generally applicable tax imposed on non-Indians' ownership of on-reservation personal property.").

Finally, the use tax imposed on goods and services provided at the Store will be placed into the State's general fund, which is distributed for any number of services including funding for schools, health and medical services, emergency management services, Medicaid, economic assistance programs, and long-term care services, parks and recreation services, court services, and correctional services. While the parties disagree as to the extent the nonmember consumers of the Store benefit from these services, it stands to reason that South Dakota residents generally benefit from the services provided by the general fund, regardless of the extent to which those services are provided on the reservation.

"[T]he State does not interfere with the Tribes' power to regulate tribal enterprises when it simply imposes its tax on [use by] nonmembers." *Colville*, 447 U.S. at 159. "Nor would the imposition of [the] tax on these purchasers contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing tribe." *Id.* at 161. Further, "[t]he State has an interest in the uniform application of its tax code." *Town of Ledyard*,

722 F.3d at 475. The Court finds the State's interests outweigh the general interests of the Federal Government and the Tribe with respect to a tax imposed on nonmember purchases made at the Store. Thus, the Tribe's motion for summary judgment with respect to preemption of the tax on nonmember purchases at the Store is denied.

## II.     Discriminatory Nature of State Tax

In addition to the preemption arguments asserted above, the Tribe also argues in their fourth Claim for Relief of their First Amended Complaint and the final component of their Motion for Summary Judgment that the State use tax is invalid because it is discriminatory. The Tribe asserts that the State discriminates against the Tribe by failing to grant a tax credit to consumers who have paid sales or use tax to the Tribe on the same transaction sought to be taxed by the State, while granting a credit to consumers who have paid a tax to other taxing jurisdictions.

S.D.C.L. 10-46-6.1 provides:

> The amount of any use tax imposed with respect to tangible personal property, any product transferred electronically, or services shall be reduced by the amount of any sales or use tax previously paid by the taxpayer with respect to the property on account of liability to another state or its political subdivisions.

This credit is only available if the other state "reciprocally" grants a credit. *Id.* In accordance with the statute, the State grants such a credit to forty-three states and the District of Columbia.

The Tribe imposes a tax on all on-reservation purchases of goods and services at a rate of six percent. Further, the Tribe's tax code provides:

> The amount of any tax imposed by this Subchapter with respect to tangible personal property or services shall be reduced by the amount of any sales or use tax previously paid by the taxpayer with respect to the property or services on account of liability to another tribe or state or their political subdivisions.

23 FSST Tribal Law and Order Code § 3.36.

In *Colville*, the Court indicated that "[s]tate[s] may sometimes impose a *nondiscriminatory* tax on non-Indian customers of Indian retailers doing business on the reservation." *Colville*, 447 U.S. at 151 ("The [Indian Commerce] Clause may have a more limited role to play in preventing undue discrimination against, or burden on, Indian Commerce."). "A tax is discriminatory if it is not imposed equally upon similarly situated groups." *Salt River Pima-Maricopa Indian Cmty. v. Yavapai County*, 50 F.3d 739, 740 (9th Cir.

1995) (citing *First Federal S & L v. Mass. Tax Comm'n*, 437 U.S. 255, 260–62 (1978); *United States v. Fresno,* 429 U.S. 452, 462 (1977)).

The Defendants argue that the nonmember consumers are subject to a nondiscriminatory tax because the Tribe is not similarly situated to other states or their political subdivisions. By contrast, the Tribe, relying on *Prairie Band Potawatomi Nation v. Wagnon (Prairie Band)*, 475 F.3d 818 (10th Cir. 2007) and *Cabazon Band of Indians v. Smith*, 388 F.3d 691 (9th Cir. 2004), asserts that it is a similarly-situated sovereign government entitled to the credit. However, the Tribe's reliance on these cases is misplaced. Unlike the tribe and state's similar public safety interests in the use of emergency light bars on patrol vehicles at issue in *Cabazon*, and unlike the complete ouster of tribal jurisdiction caused by the registration and titling laws of the state in *Prairie Band*, this is a tax case, where, "[w]hen two sovereigns have legitimate authority to tax the same transaction, exercise of that authority by one sovereign does not oust the jurisdiction of the other." *Prairie Band*, 475 F.3d 818, 827 (citing *Colville*, 447 U.S. at 184 n. 9 (Rehnquist, J., concurring in part, concurring in result in part, and dissenting in part) ("When two sovereigns have legitimate authority to tax the same transaction, exercise of that authority by one sovereign does not oust the jurisdiction of the other. If it were otherwise, we would not be obligated to pay federal as well as state taxes on our income or gasoline purchases. Economic burdens on the competing sovereign...do not alter the concurrent nature of the taxing authority.")).

The Tribe also argues that instead of comparing tribal retailers to other retailers in the State of South Dakota, the Court should compare tribal retailers to "similarly situated" retailers in other states because there are no "similarly situated" retailers in the State. *Id.* at 33. The Tribe argues that "the discrimination arises not from a failure to grant tax-exempt treatment to goods destined for the Tribe-as-retailer (as in *Wagnon*), but from the failure to afford equal treatment to the Tribe-as-government." *Id.* at 33. In *Cabazon*, the regulation was found discriminatory because it treated law enforcement agencies of other States differently from the law enforcement agency of the tribe. The case at hand is not a matter of treating a tribal agency differently than an agency of another State, this is a matter of granting a tax credit to a State versus a tribe within the boundaries of the same State imposing the tax.

All of the transactions the State seeks to tax are located entirely within the borders of the Flandreau Indian Reservation and also within the borders of the State of South Dakota. Both entities have taxing jurisdiction of nonmembers within their borders to the extent state taxation

22

has not been preempted by federal law. As stated above, federal law has not preempted the state tax with respect to nonmember consumers of the Store. While these nonmember consumers will be subject to a total tax that is higher on the reservation than off the reservation, that is not because the tax is discriminatory. The State tax is imposed at a uniform rate throughout the state's jurisdiction, both on and off the reservation. "The burdensome consequence is entirely attributable to the fact that the [transactions] are located in an area where two governmental entities share jurisdiction." *Cotton Petroleum*, 490 U.S. at 189.

In *Wagnon v. Prairie Band Potawatomi Nation (Wagnon)*, 546 U.S. 95 (2005), the Supreme Court found that the tribe was not similarly situated to other states or the Federal Government, which were exempt from the fuel tax, because the Tribe benefited from the proceeds of the fuel tax imposed on Kansas fuel retailers. *See Wagnon*, 546. U.S. at 115. The fuel tax proceeds were used to pay for a significant portion of the costs of maintaining the roads and bridges on the tribe's reservation, including the main highway used by casino patrons. "Kansas offers no similar services to the several States or the Federal Government." *Id.* The Tribe and the State disagree as to how similar the facts of *Wagnon* are to the case presented here, as the Tribe argues that "South Dakota does not expend significant sums from the proceeds of its use tax to provide government services within the Flandreau Indian Reservation or within the exterior boundaries of other states, let alone services specifically and uniquely funded through the challenged tax itself." Doc. 117 at 33. However, "the relevant services provided by the State include those that are available to the [consumers] and the members of the Tribe off the reservation as well as on it." *Cotton Petroleum*, 490 U.S. at 190. Although the proceeds of the use tax enter the State's general fund, which is not earmarked for any expenditures in particular, the Tribe does indeed benefit from off-reservation road maintenance and public safety services leading to the Store, the licensure of some food vendors, as well as other services. Further, nonmember consumer residents of South Dakota benefit from a wide range of general services offered by the State when off the reservation. Therefore, the State tax is not discriminatory, as the Tribe is not similarly situated to other states which have been granted a tax credit. Accordingly, the Tribe's Motion for Summary Judgment on Claim for Relief Four is denied and the Defendants' Motion for Summary Judgment on the same is granted.

### III.    Preemption of Collection and Remittance of the Tax

The Tribe's second and fifth Claims for Relief of the First Amended Complaint allege that the State's attempt to impose the obligation to collect and remit the use tax 1) violates IGRA and 2) is preempted by federal law and infringes upon Tribal sovereignty. The Defendants moved for summary judgment on the issues, arguing that IGRA's scope does not include the collection and remittance of the use tax as it is not imposed on gaming activities. The Tribe asserted that the issues were not ripe for summary judgment, as the collection and remittance requirements would not be at issue unless some or all of the disputed taxes were found to be valid.

As the Court discussed *supra*, to the extent the tax is imposed on transactions that are "directly related to the operation of gaming activities" the tax is impermissible, as it should have been imposed via the gaming contract. To the extent the tax is invalid, the challenge to collection and remittance requirements is therefore moot. However, to the extent the tax is imposed on transactions that are not "directly related to the operation of gaming activities" (i.e., nonmember consumer purchases at the Store), the Court must consider whether the collection and remittance requirements are preempted by federal law or improperly infringe on tribal sovereignty.

*Moe v. Salish & Kootenai Tribes*, 425 U.S. 463 (1976), established that a State may impose at least "minimal" burdens on an Indian retailer to aid in enforcing and collecting a valid tax. *See also Dep't. of Taxation & Fin. v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 73 (1994) ("States may impose on reservation retailers minimal burdens reasonably tailored to the collection of valid taxes from non-Indians."). The State imposes the tax on the transaction at the Store and where the goods or services purchased are ultimately consumed is irrelevant. The Tribe's burden in enforcing and collecting the tax is limited to determining if the purchase is made by a member of the Tribe or a nonmember. This collection burden is not unlike those upheld in *Moe* and *Colville*, and is therefore valid. The Court thus grants the Defendants' motion for summary judgment on the second and fifth Claims for Relief to the extent the collection and remittance requirements are imposed on nonmember consumer purchases at the Store.

### IV.    Validity of S.D.C.L. § 35-2-24

In its sixth Claim for Relief, the Tribe also argues that S.D.C.L. § 35-2-24 interferes with and is, therefore, preempted by IGRA. In the alternative, in its eighth Claim for Relief, the Tribe argues that the statute is impermissible as it exceeds the scope of the State's regulatory authority

under 18 U.S.C. § 1161. The Defendants have moved for summary judgment while the Tribe asserts that the issues, like the collection and remittance requirements, are not ready for summary judgment review.

S.D.C.L. § 35-2-24 reads, in pertinent part,

> No license granted under this title may be reissued to an Indian tribe operating in Indian country controlled by the Indian tribe or to an enrolled tribal member operating in Indian country controlled by the enrolled tribal member's tribe until the Indian tribe or enrolled tribal member remits to the Department of Revenue all use tax incurred by nonmembers as a result of the operation of the licensed premises, and any other state tax has been remitted or is not delinquent.

As was established *supra*, to the extent the taxes are imposed on transactions that are "directly related to the operation of gaming activities," those taxes are impermissible as they should have been imposed through the compact negotiation process provided by IGRA. To the extent those taxes are imposed on transactions at the Store, however, they are not preempted by IGRA, and the Court grants the Defendants' motion for summary judgment on the Tribe's sixth claim for relief to that extent. However, as to the taxes imposed on transactions at the Store, the Court must determine whether the conditioning of the renewal of a beverage license on the collection and remittance of a use tax on nonmember consumer purchases is permissible.

18 U.S.C. § 1161[10] provides that "liquor transactions in Indian country are not subject to prohibition under federal law provided those transactions are 'in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country.'" *Rice v. Rehner*, 463 U.S. 713, 716 (1983) (quoting 18 U.S.C. § 1161). In finding that "tradition simply has not recognized a sovereign immunity or inherent authority in favor of liquor regulation by Indians, *id.* at 722, and that, because of the potential for substantial impact beyond the reservation, the state has important interests in controlling liquor traffic within its borders, *id.* at 725–56, the statute, in effect, operated to delegate Congressional authority over liquor regulation in Indian country to both Indian tribes and states, concurrently. *See id.* at 723–79, 733–34.

---

[10] The statute reads:

> The provisions of sections 1154, 1156, 3113, 3488, and 3669, of this title, shall not apply within any area that is not Indian country, nor to any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register.

28 U.S.C. § 1161.

Prosecutions of Indians for state liquor law violations on reservation land, *Fort Belknap Indian Cmty. of Fort Belknap Indian Reservation v. Mazurek*, 43 F.3d 428 (9th Cir. 1994), tribal regulations over non-Indians within reservation land, *City of Timber Lake v. Cheyenne River Sioux Tribe*, 10 F.3d 554 (8th Cir. 1993), a state alcohol license requirement to sell 3.2% beer, *Citizen Band of Potawatomi Indian Tribe v. Okla. Tax Comm'n*, 975 F.2d 1459 (10th Cir. 1992), and a state tax on liquor sales to non-Indians, *Squaxin Island Tribe v. Washington*, 781 F.2d 715 (9th Cir. 1986) have all been upheld under 18 U.S.C. § 1161. However, there is little by way of instruction as to what states may permissibly tax before issuing a liquor license. This Court has expressed skepticism about the State's view of 18 U.S.C. § 1161 before. "The State seems to suggest that the state laws the tribes must comply with may be of indeterminate scope and contemplate a vast array of subject matter unrelated to alcohol regulation. All a state need do is establish a statutory scheme superficially connecting the subject matter (here, a tax) with alcohol regulation." Doc. 59 at 31.

A state's authority to tax in Indian country is operationally curtailed by a tribe's sovereign immunity in a way in which liquor regulation is not. Recognizing the limited tax enforcement power of States on reservations, the Supreme Court suggested five alternative remedies for the collection of a cigarette tax in *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505 (1991), including: imposing liability on individual agents of tribes for failing to collect the taxes; seizing untaxed goods in shipment to reservations; collecting taxes from wholesalers off reservations; entering into collection agreements with tribes; and seeking congressional legislation. *Id.* at 513–14. Though certainly not dispositive of the issue, the Supreme Court did not recommend imposing conditions on licensing requirements, liquor or otherwise.

"Indian traders are not wholly immune from state regulation that is reasonably necessary to the assessment or collection of lawful state taxes." *Milhelm Attea*, 512 U.S. at 75. However, the Court does not find the imposition of a condition that the tribe remit all outstanding taxes on the renewal of an alcohol license as reasonably necessary. If it were, there would be no limit to the authority the State would try to impose on a tribe by virtue of the State's regulation of alcohol sales. The State has a valid interest in the regulation of alcohol within its borders due to the potential for substantial impact beyond the reservation. *Rice*, 463 U.S. at 725–26. However, conditioning an alcohol license on taxes entirely unrelated to alcohol and its potential for

substantial impact does not further the State's recognized interest. Therefore, the Defendants' Motion for Summary Judgment on claim eight is denied.

## V.    Declaration of Jurisdiction

The Tribe's seventh Claim for Relief seeks a declaration upon resolution of the use tax claims that the escrow agent should disburse to the Tribe the funds held in escrow pursuant to the deposit agreement between the Tribe and the State. The State agrees that the Court's determination regarding the applicability of the state's use tax to nonmember consumer purchases at the Licensed Premises will determine the appropriate recipient of the proceeds of the escrow account. As the Court has determined the use tax on nonmember consumer purchases at the Store are properly subject to state tax, the State has jurisdiction to assess a use tax on those purchases. The State does not have jurisdiction, however, to assess a use tax on nonmember consumer purchases at the Casino's slots, table games, food and beverage services, hotel, RV park, live entertainment events, and gift shop. Consistent with this Court's earlier ruling in this case, notwithstanding this declaration, the Court does not have jurisdiction to award money damages or injunctive relief against the Tribe. *See* Doc. 60 (citing *Chemehuevi Indian Tribe v. California State Bd. of Equalization*, 492 F. Supp. 55, 58 (N.D.C.A. 1979) ("[E]ven if the court were to decide in favor of the Board in the Declaratory judgment action brought by the Tribe, it would still not have jurisdiction to adjudicate a counterclaim against the Tribe, nor to award money damages or injunctive relief against the Tribe."). Accordingly,

IT IS ORDERED:

1. The Tribe's Motion for Summary Judgment, Doc. 115, is GRANTED to the extent that:

   a. The State cannot impose a use tax on nonmember purchases of goods and services as to the Casino's slots, table games, food and beverage services, hotel, RV park, live entertainment events, and gift shop (claim one).

2. The Tribe's Motion for Summary Judgment, Doc. 115, is DENIED as to the following:

   a. The State can impose a use tax on nonmember purchases of goods and services at the Store (claims one and three).

27

      b.  The State's use tax on nonmember purchases of goods and services at the Store is not discriminatory (claim four)

3. The Defendants' Motion for Summary Judgment, Doc. 78, is GRANTED to the extent that:

      a.  The State's use tax on nonmember purchases of goods and services at the Store is not preempted by IGRA (claim one).

      b.  The State's use tax on nonmember purchases of goods and services at the Store is not discriminatory (claim four).

      c.  The collection and remittance of taxes on nonmember consumer purchases at the Store are not preempted by federal law and do not infringe on tribal sovereignty (claims two and five).

4. The Defendants' Motion for Summary Judgment, Doc. 78, is DENIED as to the following:

      a.  The State cannot impose a use tax on nonmember purchases of goods and services as to the Casino's slots, table games, food and beverage services, hotel, RV park, live entertainment events, and gift shop (claim one).

      b.  The State cannot condition renewal of the Tribe's beverage license on the collection and remittance of a use tax on nonmember consumer purchases (claims six and eight).

5. The State does not have jurisdiction to assess a use tax on nonmember purchases at the Casino's slots, table games, food and beverage services, hotel, RV park, live entertainment events, and gift shop. However, the State does have jurisdiction to assess a use tax on nonmember purchases at the Store (claim seven).

6. Each party requested declaratory relief. Tribal sovereign immunity is jurisdictional in nature. This Court has no jurisdiction due to tribal sovereign immunity to order the payment to the State from the escrow funds held pursuant to the Deposit Agreement. The Tribe, however, agreed in the Deposit Agreement that those funds would be held by the escrow agent pending the outcome of this lawsuit. Accordingly, the escrow agent may now, subject to

any stay granted pursuant to an appeal, pay the funds held in escrow to the Tribe and to the State in their respective shares under the guidance provided by this declaratory judgment.

BY THE COURT:

Lawrence L. Piersol
United States District Judge
SEPT. 15, 2017

ATTEST:
JOSEPH HAAS, Clerk of Courts

BY: Summer Wahford
Deputy

29